1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
GOWANUS INDUSTRIAL PARK,            :   06-CV-00105 (SJ)(JO)
INC.,                               :
                                    :
         Plaintiff,                 :
                                    :   United States Courthouse
                                    :   Brooklyn, New York
    -against-                       :
                                    :
                                    :   Tuesday, May 20, 2008
                                    :   9:30 a.m.
ARTHUR H. SULZER                    :
ASSOCIATES, INC.,                   :
                                    :
         Defendant.                 :


- - - - - - - - - - - - - - - X

TRANSCRIPT OF CIVIL CAUSE FOR CIVIL HEARING
BEFORE THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE

A P P E A R A N C E S:

For the Plaintiff:    PAYKIN MAHON ROONEY & KRIEG LLP
                      185 Madison Avenue
                      10th Floor
                      New York, New York 10016
                 BY:  JOSEPH N. PAYKIN, ESQ.

For the Defendant:    LAW OFFICE OF JAMES M. MALONEY
                      33 Bayview Avenue
                      Port Washington, New York 11050
                 BY:  JAMES M. MALONEY, ESQ.


Court Reporter:   Victoria A. Torres Butler, CRR
                  Official Court Reporter
                  Telephone: (718) 613-2607
                  Facsimile: (718) 613-2324
                  E-mail:    VButlerRPR@aol.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                    2

1          (In open court.)

2          COURTROOM DEPUTY:  All rise.

3          THE COURT:  All right.  Counsels, did you wish to

4    make any statements before we get to the testimony?

5          MR. MALONEY:  Since it's a nonjury proceeding,

6    Your Honor, I have no real opening statement.  I would just

7    note some facts have already been determined by the Judge's

8    summary judgment order.  I would assume they need not be

9    explored.

10         THE COURT:  Okay.  Well, just in case there's any

11   disagreement about that, just let me get a sense of what you

12   think those facts that are already established are.

13         MR. MALONEY:  The primary one being that the barge

14   was wrongfully withheld after Arthur H. Sulzer, Incorporated,

15   and Mr. Sulzer identified themselves as its owner.  That was

16   specifically found in Judge Johnson's opinion and so I thought

17   that was not an issue.

18         THE COURT:  You agree; right, Mr. Paykin?

19         MR. PAYKIN:  I agree that that's what the decision

20   says.

21         THE COURT:  Okay.  That that's what this says?  Or

22   that that's the fact?

23         MR. PAYKIN:  I dispute that as...

24         THE COURT:  How many times did you get to litigate

25   it?

R. Henry - Direct / Maloney                3

1          MR. PAYKIN:  Well, I think there's an appeals
2   process.
3          THE COURT:  I see, but for purposes of today's
4   hearing I am supposed to accept it as fact; correct?
5          MR. PAYKIN:  Correct.
6          THE COURT:  Okay.
7          Do you have a witness?
8          MR. MALONEY:  Yes, I do, Your Honor.
9          We call Captain Robert Henry.
10         (Witness enters and takes stand.)
11
12         COURTROOM DEPUTY:  Please, raise your right hand.
13   C A P T A I N    R O B E R T    H E N R Y,
14         called by the Plaintiff, having been
15         first duly sworn, was examined and testified
16         as follows:
17         COURTROOM DEPUTY:  State your name for the record,
18   please.
19         THE WITNESS:  Robert Henry.
20         THE COURT:  Have a seat, Mr. Henry.
21         COURTROOM DEPUTY:  Thank you.
22   DIRECT EXAMINATION
23   BY MR. MALONEY:
24   Q    Good morning, Captain Henry.
25         Can you briefly tell the Court the nature and extent

R. Henry - Direct / Maloney                              4

1    of your maritime background and experience?

2    A    Started working on a fishing boat as a deck hand, 1965.

3    I have a repair shop, welding since 1971.  1987, I got my

4    Captain's license.  1989, I brought my first tug up from Texas

5    in '89.  Since then, I've brought two more up that I operate.

6    So, I have three now.

7    Q    So, in your business, you operate three tug boats at this

8    time?

9    A    Yes.

10   Q    And what do you do with the tug boats in your business?

11   A    I do general towing and salvage work connected with my

12   diving and my mechanical experience.

13   Q    In the course of your business, do you work with barges

14   and other steel water craft?

15   A    Primarily, 95 percent of my business is with barges,

16   whether they're floating or sunk.

17   Q    Do you ever have occasion to charter barges?

18   A    On occasion.

19   Q    Okay.  Did there come a time when you were contacted by

20   the gentleman who is sitting to the right back there

21   (indicating), about retrieving a barge?

22   A    Yes.

23   Q    When was that?

24   A    I believe it was towards the late summer of '05, or fall

25   of '05.

R. Henry - Direct / Maloney                5

1   Q     Okay.

2         THE COURT:  Could we just have, for the record, the

3   name of the person you're indicating.

4         THE WITNESS:   Arthur Sulzer.

5   Q     And had you known Mr. Sulzer before?

6   A     No.

7   Q     Did he contact you or you contacted him?

8   A     He contacted me.

9   Q     Right.   What did he ask you to do?

10  A     He asked me to pick you up a barge in Brooklyn in the

11  Gowanus Bay and bring it to a shipyard on Staten Island.

12  Q     What was the name of the shipyard?

13  A     May Shipyard.

14  Q     Did he give you any specific instructions about the

15  operation?

16  A     He asked me to get the barge to the shipyard as soon as I

17  could, at my convenience.

18         And also, he had issues with the people that had the

19  barge, so not to go on their pier.   Just take the barge and

20  bring it to the shipyard.

21  Q     And did you do that?

22  A     That's what I did.

23  Q     And can you describe the events that, at that time when

24  you did that.

25         What exactly did you do?   How did you approach?

R. Henry - Direct / Maloney                    6

1    When did you approach?  Do you remember the date?

2    A    I think it was October.  It was third week in October,

3    towards the end.  I believe the date was October 26th or 25th.

4    I finished the job up in the Brooklyn area and from there,

5    that night I went by there.

6            I saw the barge.  I got the barge.  Towed it from

7    there, after -- I had to release all kinds of steel cables

8    that were laying all over in the water.  I released it from

9    its holdings and brought it to May Shipyard.  Tied it up and

10   from -- the morning, the shipyard needed the barge for the

11   morning.

12   Q    Now, was the barge attached to the pier there?

13   A    It was attached to another barge.

14   Q    Was it, was the other barge on the outside of it or the

15   inside of it?

16   A    The other barge was on the inside between the barge that

17   I got and the pier.

18   Q    So, it was the outermost?

19   A    Yes.

20   Q    How many barges all together?

21   A    I believe there were three.

22   Q    Okay.  And did you go on the pier, physically?

23   A    No, I did not have to.

24   Q    Did you go on the other barges?

25   A    I don't believe so, no.  In the course of putting these

R.  Henry - Direct / Maloney                    7

1    steel cables that are laying all over, getting them secured on
2    the barge, I may have stepped on it.  But no, I did not have
3    to go on it to release anything.
4    Q    Now, you mentioned the barge was moored by steel cables.
5         In your experience with barges, is that the way that
6    barges should be moored?
7    A    No, not normally.
8    Q    Why not?
9    A    Because it's extremely difficult to release a barge under
10   pressure.
11        Also, sometimes, if there's a electricity on a barge
12   for pumps or lights, you can create a galvanic action; the
13   electrolysis.  And electrical current will sometimes flow into
14   the water.  It's sea water, it conducts it.  And you wind up
15   having a corrosion problem with barges.
16   Q    The barges will corrode more?
17   A    Yeah, they'll corrode more rapidly with electricity.
18   Q    Is that the kind of that's commonly known in your
19   business?
20   A    Yes, it's a common-known thing not to use cables, you
21   know.  It's not normally done, cables, no.
22   Q    Okay.  What did you do with the barge after you picked it
23   up?
24   A    Towed it over to May Shipyard, landed it where they
25   requested it, and that was it.

R.  Henry - Direct / Maloney                    8

1          (Pause in the proceedings.)

2    Q    Are you, you mentioned earlier that you are familiar with

3    barge hire rates in the New York area?

4    A    Yes.

5    Q    Is that -- what is that based on?

6    A    Working in salvage business, like I do, on occasion we

7    need a crane barge or deck barges.   And because it's not

8    something that's constantly needed, I don't normally have them

9    myself.  I hire them as needed.

10   Q    So, you yourself and your business will hire barges on

11   occasion?

12   A    Yes.

13   Q    So, you're familiar with that business?

14   A    Yes.

15   Q    In the time frame we're talking about, around 2005, what

16   would be the daily hire rate for a short-term hire for a crane

17   barge --

18   A    For --

19   Q    -- of that size?

20          MR. PAYKIN:  Objection.

21          THE COURT:  On what grounds?

22          MR. PAYKIN:  He hasn't indicated he hired a barge in

23   that time frame.

24          THE COURT:  Do you have any information about the

25   rates?

R.  Henry - Direct / Maloney                9

1        THE WITNESS:  I have, I have, I've been in contact

2    with several different dock builders.  I've got a letter from

3    one man that, you know, where he stipulated what the going

4    rate for barges are.  I know it's, I know what the rate is

5    from calling different people.

6            The rate is pretty uniform.  It's pretty standard.

7    It's who's got a barge available is who you wind up hiring.

8        THE COURT:  All right.  The objection is overruled.

9    Q    So, the question is:  In the time frame around 2005, what

10   would be the daily hire rate for a crane barge of the size

11   that Mr. Sulzer's barge was?

12   A    For short-term hire, meaning for several days,

13   approximately a thousand dollars a day, plus costs.

14   Q    Okay.  What about longer term hire?

15           Do you have any knowledge about that?

16   A    The price normally comes down a little.  Exactly how much

17   less it comes down, depending on how active the barge will be,

18   how long the charter is for.  That's very specific related to

19   the cost of it, to what it's doing or not doing.

20   Q    If you know, does New York have higher rates or lower

21   rates that other ports on the East Cost?

22   A    They're normally higher.  Things in New York are higher.

23   Q    Okay.  And I guess my last question is, we haven't asked

24   this yet.

25           The barge that you picked up that night, that was a

R. Henry - Cross / Paykin                 10

1   crane barge, wasn't it?

2   A    Yes.

3   Q    Okay.

4          MR. MALONEY:  I have nothing further.

5          THE COURT:  Do you remember the name of the barge?

6          THE WITNESS:  I believe it was A-D-A.  "ADA", I

7   believe that's what the name of it was.

8          THE COURT:  All right.

9          Go ahead, Mr. Paykin.

10  CROSS-EXAMINATION

11  BY MR. PAYKIN:

12  Q    Good morning, Captain Henry.

13  A    Good morning.

14  Q    My name is Joe Paykin.  I represent Gowanus Industrial

15  Park.  I have a few questions to ask you.

16         When you picked up this barge, do you know the

17  condition that it was in?

18  A    If looked like it hadn't been used in a while.

19  Generally, it looked like a barge that had been lying for a

20  long time.  It was covered with pieces of rope, steel cable.

21  The phrase for it is housekeeping.  The housekeeping on it was

22  terrible.  Signs that it had been sitting.

23  Q    But did you notice any unusual rust on the barge?

24  A    Well, it had a rusty appearance because it hadn't been

25  maintained.

R. Henry - Cross / Paykin                    11

1    Q     And you indicated you work with barges generally.

2          How often should a barge be dry-docked?

3    A     Normally, they get dry-docked at least once a year.

4    Q     And how often should a barge be painted?

5    A     As often as needed.  It's steel.  It's in the, a salt

6    water environment.  If you have bare steel today, you'll have

7    rust tomorrow.

8          So, paint, painting never ends.  Especially on a

9    crane barge where you're constantly moving, working heavy

10   objects.  You're scraping the paint off all the time.

11   Q     Now, you indicated that this barge was connected to

12   another barge; is that correct?

13   A     Yes.

14   Q     And isn't it correct the barge was connected with ropes?

15   A     There were steel cables and there were pieces of rope.

16   The ropes themselves were in very poor condition.  So, it was

17   my belief at the time that they were backed up with these

18   steel cables and pieces of cable just to keep it from floating

19   away.  That's what it appeared to me to be.

20   Q     And how many pieces of steel cable were there?

21   A     Quite a few.  Four, five different sections of cable.

22   Q     And it was connected to another barge with the steel

23   cables?

24   A     Yes.

25   Q     And you're certain of that?

1    A    Oh, yes.

2    Q    Have you ever -- now, you indicated a short-term lease of

3    a barge cost a thousand dollars a day; isn't that correct?

4    A    Yes.

5    Q    Have you ever leased a barge for a thousand dollars a

6    day?

7    A    Yes.

8    Q    Have you ever done a long-term lease of a barge?

9    A    For a week.  Most of my work is in salvage business,

10   you've either got it done in a week or it's becomes a major

11   project.  It changes its whole complexity then.  But normally,

12   barges I rent for a week.

13   Q    So, you don't know what a long-term lease would be; do

14   you?

15   A    To a degree I know because I've priced out several jobs

16   where long-term lease of a barge would be required for the

17   job.  So, I've talked to different people in the industry over

18   the years to get a cost, so I could go back to a construction

19   company or someone and give them an idea.

20   Q    And do you know the price of purchasing a barge such as

21   the ADA?

22   A    Price?  It depends on the particular barge.  It could

23   start at a hundred thousand, it could go up.  You could spend

24   a million dollars to build a barge.

25   Q    But a used barge, a hundred, roughly a hundred feet by

R. Henry - Redirect / Maloney                    13

1  30 feet?

2  A    With a crane on it and the winches, the anchor winches

3  that are on it, you probably spend about 200,000, I would

4  think for a barge in good shape.

5           MR. PAYKIN:  Okay.  I have no further questions.

6           MR. MALONEY:  One question on redirect, Your Honor.

7           THE COURT:  Yes.

8  REDIRECT EXAMINATION

9  BY MR. MALONEY:

10  Q    Earlier you talked about your observation of the

11  condition of the barge.

12           In your experience, when a barge is sitting in the

13  water, does the corrosion occur mostly above the water line or

14  mostly below the water line?

15  A    It can happen in both places.  It's very difficult to

16  gauge what's happening under water without inspection, either

17  by divers or by dry-docking, but it's certainly an issue that

18  you have to be on top of.

19  Q    Were you able to observe any underwater portions of the

20  barge when you picked it up?

21  A    Not particularly.  What you do normally, see on the sides

22  of the barge that you have these metal attachments called

23  Zincs.  They're bright gray and they're there in place to help

24  prevent corrosion, this galvanic action, which causes the

25  steel to rust and rot.

1   Q    But were you able to observe any of the underwater

2   portion of the barge?

3   A    No.

4   Q    No?

5   A    Along the water line, yes.

6        MR. MALONEY:  I'm sorry, one more.

7   Q    Earlier you mentioned, and you started to talk about it

8   now, this galvanic action and corrosion.

9        Would that be --

10       MR. PAYKIN:  I'm going to object.  I didn't go into

11  this in my cross.

12       THE COURT:  Overruled.  You can re-cross.

13       MR. MALONEY:  I'll rest -- oh, if he can re-cross?

14       THE COURT:  Sure.

15  Q    Earlier you testified about this galvanic action and its

16  effect on corrosion on the barge.

17       Would that be something that you could observe on a

18  barge when it was sitting in the water or would it have to be

19  up in dry-dock before you could see that corrosion?

20  A    Normally, you'd have to dry-dock it to accurately gauge

21  the corrosion.  There are procedures where you could check on

22  it while it's in the water, there is certain instruments that

23  can measure the electrical flow around, which is what causes

24  this galvanic action.

25  Q    Okay.  But as far as just actually seeing what corrosion

R. Henry - Redirect / Maloney                    15

1   has occurred, the way to do it would be an inspection in

2   dry-dock; is that correct?

3   A     An inspection in dry-dock or trying to look at these

4   zincs, which are welded to the outside of the hull around the

5   perimeter at the water line.

6   Q     Okay.

7              MR. MALONEY:  I have nothing further.

8              THE COURT:  Any re-cross?

9              MR. PAYKIN:  No, Your Honor.

10             THE COURT:  All right.

11             Thank you, sir.  You're excused.

12             THE WITNESS:  All right.

13             (Witness excused.)

14             THE COURT:  Do you have another one?

15             MR. MALONEY:  The next witness is Arthur H.  Sulzer.

16             (Witness enters and takes stand.)

17

18             COURTROOM DEPUTY:  Please, raise your right hand.

19  A R T H U R     H.     S U L Z E R,

20             called by the Plaintiff, having been

21             first duly sworn, was examined and testified

22             as follows:

23             COURTROOM DEPUTY:  State your name for the record,

24  please.

25             THE WITNESS:  Arthur H. Sulzer.

A. Sulzer - Direct / Maloney                    16

1        COURTROOM DEPUTY:   You may be seated.

2   DIRECT EXAMINATION

3   BY MR. MALONEY:

4   Q     Good morning.

5         Could you briefly tell us the nature and extent of

6   your maritime background, education and experience.

7   A    I'm a graduate of New York Maritime College.  I'm a

8   licensed ship's captain and an engineer.  I've gone to sea

9   most of my life, on and off.  I'm a naval reserve officer.  I

10  just retired recently from the Navy Active Reserve Service as

11  a captain.

12        I'm involved in the family business since I was in

13  fourth grade, which is basically barge and crane and tug boat

14  rentals in the Port of Philadelphia.

15        And then, along with that, I do marine surveying and

16  consulting on the side.

17  Q     And tell me more about the family business.

18        What is the nature of the family business?  Is that

19  Arthur H. Sulzer Associates Incorporated?

20  A     Yes.   My father started the business in about 1964 when

21  he bought his first barge.  We've over the, I guess,

22  40-something years since then, we've had about 40, 50 barges

23  in the family.  Also, tug boats, crane barges.  We basically

24  rent equipment out to contractors and construction people to

25  use in construction and marine work.

1          And then, along with that, we've done surveying on

2    barges and equipment for various hull and classifications

3    societies.  He was a marine engineer and a graduate of

4    New York Maritime College also, as was my brother.  And that's

5    what the family firm does.

6          He passed away in 2001.  And I got reengaged in the

7    business at that time and have been managing it and operating

8    it since that time.

9    Q    Did there come a time when one of the barges that was

10   owned by the business was chartered out to CDS Marine?

11   A    Yes.  In 2000, my father chartered the barge ADA to

12   CDS Marine in Philadelphia for, it was originally for a

13   four-month period with the ability for the contractor or the

14   charter as we call it in the marine field, to be extended.

15   And they continued to extend it for several years and paid us

16   on a regular basis.

17          In 2003, the checks were not forthcoming.  I had

18   been called up for the war and was away on reserve duty.  My

19   mother was managing the business at the time.  When I got

20   back, I saw they were in serious arrears and I attempted to

21   contact them and find out what was going on with the barge.

22          And at that point, basically the letters and

23   everything were returned from their firm and they went out of

24   business and I had no way -- I didn't know how to contact them

25   and I didn't know where the barge was, frankly.  And that's

1   when this whole process and trying to locate it began.

2   Q    Okay.  Let's go back to the initial charter.

3        Do you remember the what the rate of hire was for

4   that barge?

5   A    I think it was like $3,100 a month at the time.

6   Q    Okay.  That's sound a bit less than what Captain Henry

7   was talking about.

8        Why was it so much less?

9   A    The barge was originally chartered to them as a deck

10  barge in Philadelphia.  And at some point in time and I'm not,

11  I don't know when this happened because my father was running

12  the business, they converted it to a crane barge.  They put a

13  lot of equipment on it.  And that happens often.

14       Oftentimes people will charter a barge and they'll

15  put extra equipment on and it says you can do that with our

16  permission, but when you return the barge you either have

17  to -- you can either remove all the equipment and put it back

18  the way it was, or you can say okay, we'll leave the equipment

19  there, or you work out a deal with us saying we made some

20  improvements, what can we work out with the price of the

21  barge.  So, that's happened quite often that that's what a

22  contractor does.

23  Q    You said you weren't sure exactly when they did that.

24       Were you aware that it was a crane barge by the time

25  it went missing?

A. Sulzer - Direct / Maloney                    19

1    A    Yes, I was.

2    Q    Okay.  I assume that increased its value.

3         Do you have any idea how much it increased the value

4    of the barge?

5    A    Well, that size barge typically in that condition would

6    probably be worth about a hundred thousand dollars.  And with

7    the crane and all the equipment on, I purchased the barge not

8    too long after I took over the business and I would put that

9    up in the $200,000 range, the way it was outfitted.

10   Q    Okay.  And what would be the hire rate for a crane barge

11   like that in the Philadelphia area?

12   A    I have a crane barge very similar to that and I get rates

13   anywhere from 500 to a thousand dollars daily, and that

14   depends really on the length of the charter.  I just had one

15   out recently for six months and the daily charter hire was in

16   the neighborhood of $600 a day.

17        So, again it's a negotiation.  If they take more

18   than one barge, I'll put a package deal together.  But

19   generally, it's in the $500 to $700 range.

20   Q    You mentioned that you bought another barge.  Another

21   crane barge.

22        Why did you do that?

23   A    Well, we've always had crane barges as part of our

24   service to contractors because we like to offer a complete

25   package to a contractor.  If he's doing a dock or a pier, we'd

Case 1:06-cv-00105-KAM-JO   Document 66-2   Filed 06/27/08   Page 20 of 115 PageID #: 773

1   like to give him all of the equipment.  So, that could be

2   different sizes of barges.  It might be a work boat.

3   Generally, it's a crane barge.

4           So, we didn't have a crane barge since this one had

5   gone missing, and since that helps you get extra business,

6   I purchased the barge shortly after I found out that I wasn't

7   going to get go the release of the ADA in any kind of

8   foreseeable future.  I purchased a crane barge of similar

9   capacity.

10  Q    What the time frame that you made that purchase?  When?

11  A    I was notified of the individual that had the barge in

12  January of 2004, and my attorney attempted to contact them and

13  basically state, hey, we were the owner, could you please

14  release it.  They said no.

15          And so, approximately a month later, when it looked

16  like that was not going to happen, I had the opportunity to

17  purchase another crane barge, which I did.  And I put that in

18  service several months later.  I had to dry-dock it and paint

19  it because it's something we regularly do.  And I put that in

20  service in that year, which was 2004, I believe.

21  Q    Okay.  Let's go back to your conversation in reference to

22  recover -- efforts to recover the barge ADA.

23          At what point did you find out where the ADA

24  actually was and how did you find that out?

25  A    Well, I knew it was a Brooklyn, but that's really all I

A.  Sulzer - Direct / Maloney                    21

1    knew.  I was told that it was stored at Gowanus Industrial

2    Park and I had a phone number and a street address, which was

3    I think 600 Columbus Avenue, which is really not necessarily

4    where the dock is and we sent a letter up to the owner of that

5    facility, and I called.

6              When I drove up one day and I asked could you please

7    direct me to where your facility is, I'd like to inspect my

8    barge, which we had told you I was going to come up and do,

9    and at that time it was Mr. Quadrozzi who I actually talked to

10   on the phone, he said that he would not tell me where the

11   barge was, he would not let me look at the barge because there

12   was outstanding claims against the barge.  And that that's

13   where the matter rested.

14   Q    What was the time frame of that conversation with

15   Mr. Quadrozzi?

16   A    I believe that was last week in February.  Like the 29th

17   or the 30th.  Somewhere in that week.

18   Q    Of which year?

19   A    Of February 2004.

20   Q    Okay.  And by then, had you already made a demand for the

21   return of the barge to Mr. Quadrozzi in writing?

22   A    My attorney had sent a letter two weeks prior, shortly

23   after we finally knew where it was saying, we're the rightful

24   owners we have documentation to prove that, please allow the

25   owner to come up and inspect his barge and he'll be calling

A.  Sulzer - Direct / Maloney                    22

1    you, which is what I did.

2    Q    Is that the letter that was pre-designated as one of the

3    Defendant's Exhibits?  The letter dated February 17th, 2004,

4    from Donna Edelsberger?

5    A    That's correct.  That was my attorney that sent the

6    letter up, stating that I was the legal owner of the barge.

7    Q    Then it was after that, that you actually spoke to

8    Mr. Quadrozzi and he told you, you could not come and see your

9    barge on his property?

10   A    Yes.  It was about ten days later.

11   Q    Okay.  And the purchase of the replacement barge was

12   after that conversation?

13   A    It was about a month later.

14   Q    And why did you purchase that barge again?  Just to

15   clarify.

16   A    Well, it's a good source of revenue for our company.  And

17   in addition, it helps my company market several barges and

18   pieces of equipment to contractors because when they come in

19   to bid on a job, particularly if it's out of state, I can give

20   them all of the marine equipment they need instead of having

21   to go to multiple sources.  So, it tends to make me more

22   competitive.

23   Q    Did I ask you the date you purchased that?

24   A    I think it was the last part of February -- of March, I

25   believe.

A. Sulzer - Direct / Maloney                     23

1          MR. MALONEY:  May I approach the witness --

2          THE COURT:   Yes.

3          MR. MALONEY:  -- to offer a document.

4          I'm going to have you look at a document that's been

5    submitted as Exhibit 7 to this inquest.

6          (Handing.)

7          MR. MALONEY:  Do you need a copy, Mr. Paykin?

8          MR. PAYKIN:   Thank you.

9          MR. MALONEY:  And Your Honor, if it's helpful, if I

10   may I approach, I have a bound copy of all the Exhibits.  It

11   has color copies of all of the photos which are better than

12   what came in on ECF.

13         THE COURT:   Thank you.

14         (Handing.)

15   BY MR. MALONEY:

16   Q    I'd like you to take a look at what's been pre-marked as

17   Exhibit 7 to this inquest, Captain Sulzer, and tell me if you

18   recognize that document.

19   A    Yes.   That's the bill of sale for the barge that I bought

20   at the auction with Alex Lines and Son in Atlantic City.

21   Q    Okay.  Is that barge that's also a crane barge; is that

22   correct?

23   A    Yes, its.

24   Q    Is that similar in size and crane configuration to the

25   ADA?

A.  Sulzer - Direct / Maloney                    24

1    A    It's pretty close, yeah.  It's a little longer.  I think

2    ten-foot longer.

3    Q    Okay.

4    A    Maybe two-foot wide.  Basically the same.

5    Q    Did you put this barge into service and charter it out

6    right away?

7    A    No, it had some damage to the bottom of the barge so I

8    had to arrange with a shipyard locally to repair the bottom

9    damage.  It needed work on the crane so it took several months

10   until I could get a dry-dock in Philadelphia available and get

11   all repairs made to the barge.

12           MR. MALONEY:  As an aside, Your Honor, do you want

13   these to be formally introduced?

14           THE COURT:  If you'd like me to consider them.

15           MR. MALONEY:  Sure.  Well, you had the previously

16   submitted one through the ECF, so I thought they were being

17   considered on that basis.

18           Not all the exhibits that are submitted are

19   necessarily going to be discussed today, for example, but I'll

20   offer it in evidence.

21           And is there any objection?

22           MR. PAYKIN:  No objection.

23           THE COURT:  Okay.  So, that's this one, or all?

24           MR. MALONEY:  There are several others.

25           Can we ask if there's an objection to all the

A.  Sulzer - Direct / Maloney                    25

1   Exhibits?

2           THE COURT:  Eight from you and four from the

3   plaintiff.

4           Do you folks just want to offer them all in and have

5   them deemed admitted.

6           MR. PAYKIN:  That's fine, Your Honor.

7           MR. MALONEY:  Fine.

8           THE COURT:  So, Plaintiff's Exhibits 1 through 8.

9   And Defendant's Exhibits -- I'm sorry.  Counterclaim

10  Plaintiffs 1 through 8.

11          (Counterclaim Plaintiff's Exhibits 1 through 8 were

12  received in evidence.)

13          THE COURT:  And Counterclaim Defendants A through  D

14  are all deemed admitted.

15          (Counterclaim Defendant's Exhibit A through D were

16  received in evidence.)

17          MR. MALONEY:  Very good.

18  Q    When did you -- this barge that you bought was called the

19  Betty; is that correct?

20  A    It was renamed the Betsy.  It was originally, I think it

21  says the WHS-350.

22  Q    Okay.  I'm going to call it the Betsy.

23          When did you put the Betsy in service and start

24  chartering it out?

25  A    The first charter I got on that, I believe, was

A. Sulzer - Direct / Maloney                26

1    January 28th of 2005.

2              MR. MALONEY:  I'm going to -- if I may I approach?

3              I'm going to ask you to take a look at what's been

4    marked as Exhibit 5 and just introduced into evidence.

5              (Handing.)

6              MR. MALONEY:  Do you need a copy?

7              MR. PAYKIN:  Thank you.

8              MR. MALONEY:  And the cover sheet of course is just

9    the a cover sheet, but it's five or six pages.

10   Q    Could you tell me what that document is?

11   A    It's a number of invoices for -- from my company for the

12   rental of the barge Betsy to various contractors from a period

13   of, looks like March of '05 or June of '05 to June of '06.

14             So, it was a number of different contractors

15   different rates for the barge.

16   Q    Okay.  What kind of rates did you get for the barge down

17   in Philadelphia?

18   A    Well, one's at six hundred a day.  Another one's

19   four-fifty.  Another one's six hundred, seven hundred, seven

20   hundred.  So, there are various, you know, subject to

21   negotiation with a contractor.  And you know, as I, sometimes

22   they took multiple barges, so I gave them a better rate.

23   Q    Do you ever charter barges out to the New York area?

24   A    No, we don't work in the New York area.

25   Q    When you chartered the ADA out to CDS, was that supposed

A. Sulzer - Direct / Maloney                    27

1    to have been delivered back to you in Philadelphia?

2    A    Yes.

3    Q    Let's talk about, we didn't actually get to how you found

4    out where the ADA was.

5         Could you briefly tell the Court how you came to

6    know where the ADA was, eventually?

7         MR. PAYKIN:  Objection.  Relevance.  It's already

8    been established.

9         THE COURT:  Overruled.

10   A    I knew it was in the Brooklyn Gowanus area, but that

11   area, it consists of multiple piers and you can't really see

12   physically where it is from the road.  You can't approach the

13   piers.  And so I really didn't actually know specifically at

14   what dock the barge was at until August of 2005.

15   Q    Let me just backtrack.

16        What I'm really asking you is:  How did you first

17   find out where it was at all?  It was out there in the world

18   and you didn't know at all.  How did you come to know, after I

19   guess a year or so back, where the barge was?

20        What mechanism caused you to learn that?

21   A    Oh, when the letters of invoice were returned from the

22   company CDS, I hired a private investigator to find where

23   their office was and to locate them in Philadelphia, and they

24   had vanished and disappeared from the scene.  At that point in

25   time, I kind of just asked around the waterfront.

A.  Sulzer - Direct / Maloney                    28

1        We've been in the business 40 years and I kind of
2   put the word out that does anybody know what happened to the
3   crane barge that CDS had?  It's not in Philadelphia, I didn't
4   find it down there.  And eventually somebody said, oh, we
5   think it's up in the Brooklyn area.  And they actually gave me
6   a couple locations on Richmond Terrace.
7            And I drove around looking to try to find this crane
8   barge.  I actually drove up to Richmond Terrace where there's
9   a lot of barge operators and I tried to drive in and find
10  places, but most of these are private yards and you just can't
11  go in that and look for stuff.
12           So, at that point I got a hold of my attorney and I
13  said we need to file bankruptcy or I guess, I don't know what
14  the word is, but we filed a lien against CDS in court figuring
15  that that would give us some information on what was going on.
16  And eventually, through the bankruptcy attorney in January
17  of '04, we learned that the barge was at the Gowanus property
18  up in New York.  And that's when we wrote the letter.
19  Q    Did you have the exact location of that property and
20  location of the barge at that time?
21  A    No.  I had a street address which was 600 Columbus
22  Avenue, which really is not directly related to where the
23  barge was.  I guess that was a business address that we had of
24  the company.
25  Q    How did you come to eventually find out exactly where the

A.  Sulzer - Direct / Maloney                29

1   barge was?

2   A    Well, in I think it was in July of '04, after I returned

3   from Navy duty, I have -- a friend of mine took me out in his

4   pleasure boat and we cruised around that area looking for a

5   barge.  And we couldn't find it.  We looked over in the Eerie

6   Basin, and we looked over in some piers.

7        And actually, people don't let you do that anymore.

8   After 9/11, people get suspicious of people driving around in

9   a barge or rather, in a boat.  So, we weren't successful in

10  finding it at that time.

11  Q    And how did you eventually find it?

12  A    The following year again, I was out to sea a couple

13  periods with the Navy.  Another friend of mine who regularly

14  goes fishing, I said, I think it's up in the Gowanus Channel

15  somewhere.  Could you go look for it?  And I described the

16  barge.

17       And I said if you see any barges tied up there, it's

18  got a crane on it and it's got a white house in the back.  And

19  I described it, and he went up there and he said I found three

20  barges and the one on the outboard side seems to be your

21  barge.  And he described is to me and that's pretty much when

22  I knew that was it.

23  Q    When was that; the month and year?

24  A    I think it was August, late August of 2005.

25  Q    Okay.  And subsequent to that, you hired a gentleman who

A.  Sulzer - Direct / Maloney                    30

1    just testified before you, Captain Robert Henry, to retrieve

2    to barge for you; is that correct?

3    A    Yes, that's correct.

4    Q    Why did you resort to that method?

5    A    Well, I wanted my property back.  And I frankly, I had

6    explored other possibilities with some attorneys in New York

7    and they had basically said, well, the only way you can go

8    back through the system is to have the barge arrested and to

9    hire a marshal.  Land they kind of gave me a cost frame, which

10   was going to be like $10,000 or $20,000 to arrest my own barge

11   and go through the legal system.

12              And you know, then I came to the conclusion, I said

13   well, it's clearly my property.  I'm entitled to take my own

14   property back and I went and got it.  And there again, you

15   know, respecting the other person's property, I didn't go on

16   their property.  I just took my own property back, which was

17   clearly mine.

18   Q    Okay.  Were you concerned about leaving the barge there

19   since you hadn't seen it in several years?

20   A    I was very concerned.  I've been in this business since I

21   was in fourth grade and barges tend to sink.  And in this day

22   and age, a barge -- particularly a barge outfitted with oil

23   tanks and a crane with oil -- if that barge would have sunk

24   and caused a pollution incident, I can assure you somebody

25   would have contacted me and said you're the owner the barge

1    you're liable for all this.  So, I was very concerned.

2          The other thing is, our barges all operate in the

3    Delaware River, which is fresh water.  Now, we have a regular

4    policy; we typically dry-dock our barges every eight to ten

5    years because we're in fresh water.  And of course, we monitor

6    the condition of the zincs on the side and we can replace

7    those in the water if we need to.

8          Once I knew the barge was up here in New York

9    Harbor, which is salt water and brackish water, I was

10   particularly concerned with the condition of the barge.  Just

11   as a matter of fact, the last time we had hauled the barge to

12   paint it was in 1999, just before it went out for charter in

13   2000.  And so, it wasn't many years, it was only a couple

14   years later; but again, it wasn't in fresh water.  So, I did

15   have some concerns about the condition of the barge and not

16   having seen it.

17   Q    And so, you were worried about your own liability should

18   the barge sink or pollute or anything like that?

19   A    As a legal owner, I have to register my barges.  Every

20   year the Army Corps of Engineers sends me a document that

21   lists all my barges and what I have to do is say I'm still the

22   legal owner.  And if I sell a barge, or cut it up for scrap,

23   or give it away, I have to tell the Army Corps of Engineers

24   who that barge went to because just like with cars, you know,

25   they don't want barges and marine equipment abandoned all over

A.  Sulzer - Direct / Maloney                    32

1  the harbor for somebody else to have to clean up or whatever.

2  So, they very much regiment the ownership of barges now.

3  Q    You mentioned that the Army Corps of Engineers actually

4  keeps track of barges.

5           Does that mean that someone who had an unidentified

6  barge and wanted to know who really owned it could call up the

7  Army Corps of Engineers and find out?

8  A    They could to that.  Some barges have numbers welded into

9  the hull and some don't.  If the number is registered, that's

10  with the Coast Guard.  So, if you went on a barge for instance

11  that was laying on the side of the river and you found a

12  number in there, you could go to the Army Corps or the

13  Coast Guard and say barge 37550 was abandoned here, who owns

14  it?  And they can tell you.

15  Q    Did the ADA have a number?

16  A    No, she did not.

17  Q    Okay.  Would they be able to identify it by name?

18  A    The name is one indication.  Of course, what I have to do

19  is tell them the dimensions and the construction of it and the

20  equipment.  So, it's not the easiest thing in the world, but

21  certainly there are ways to do that.

22  Q    Okay.  Let's go back to your decision to have

23  Captain Henry retrieve the barge for you.

24           This was some months after Mr. Quadrozzi had told

25  you that you could not come in and see it or look at it; is

1   that correct?

2   A     Yes, it was quite a few months later.

3   Q     And the reason for the delay was that you still didn't

4   know when it was until you said summer of '07 when a friend of

5   yours with a pleasure boat actually took a tour around and

6   found it for you?

7   A     Actually, I really didn't know physically whether the

8   barge, where it was until August of '05.

9   Q     And then you had it retrieved?

10  A     Didn't even know it could be retrieved until August '05,

11  when he described it as the outboard barge.

12  Q     And then it was October of '05 you retrieved it?

13  A     Yes.

14  Q     Or had the Captain retrieve it.

15        Two months may not be a big delay, but why did it

16  take two  months?  Why don't you do it the following week?

17  A     I don't have any marine resources in New York Harbor.

18  I'm not familiar with tug boat operators up here.  It wasn't

19  the kind of a job that you could just call a big company like

20  MacAlister and say go get this barge.

21        So, what I did was I asked one of my associates in

22  Philadelphia, did they know a small -- also there's cost

23  involved, too.  You know, a big tug boat costs you a lot of

24  money.  And I asked an associate did he know of any small

25  operators that were good.  And I also wasn't totally sure of

A.  Sulzer - Direct / Maloney                34

1   the condition of the barge.   It could have been partially

2   sunk.   So, you know, I wanted somebody that had some expertise

3   that was going to get it out of there no matter what.

4        And my associate gave me the name of Mr. Henry.   A

5   called him up, I said I have a barge I'd like to you go and

6   retrieve in Brooklyn and would you do the job for me.   And he

7   agreed.

8   Q    And Captain Henry had salvage experience.

9        Was that one of the reasons you picked him?

10  A    Yes, because I knew he was get the job done no matter

11  what problems he ran into.

12  Q    And what did you instruct him to do with the barge once

13  he retrieved it?

14  A    I made arrangements with May Shipyard because again, not

15  having seen the barge in five or six years, before I attempted

16  to tow it to Philadelphia, which is also a Coast Guard

17  requirement -- they want to see barges have been inspected

18  before they'll allow you to tow a barge -- I made arrangements

19  with May Ship to take it over there and dry-dock it for me so

20  that if I had to make any repairs or do anything, I could do

21  that.   So, that's why I asked him it take to May Ship.

22  Q    So, it was taken right away to May Ship?

23  A    Yes.

24  Q    Was it dry-docked right away?

25  A    No, actually they had some other customers that came in

A. Sulzer - Direct / Maloney                    35

1    and they actually had to delay it until like late December.

2    And then actually, then I had to go out to sea with the Navy,

3    so I was away for two months.

4           So, we agreed that they would store it for me until

5    March of '06.  And then, when I came back from my Navy duty,

6    they dry-docked the beginning of March.

7    Q    Okay.  And was it, in fact, dry-docked in March?

8    A    Yes, it was.

9    Q    Were you present when this was dry-docked?

10   A    Yes, I was.

11   Q    Okay.  Did you have a look at the hull of the barge?

12   A    After they dry-docked it.

13          The barge obviously -- again, salt water tends to

14   have marine growth, barnacles and seaweed and all that grows

15   much better in salt water than fresh water.  So, it would very

16   much coated with seaweed.  So, I said I wanted the barge

17   sand-blasted, which is where they blast off all of the marine

18   growth and see what was under there.

19          And when they did that, all of the seams on the

20   barge were completely corroded away.  You could actually see

21   into the hull of the barge.  So, I'm actually astounded that

22   the barge didn't sink at the dock given its condition.  The

23   only thing that kept the water out was the seaweed.

24   Q    You mean you could see right through the opening in the

25   hull?

A. Sulzer - Direct / Maloney                    36

1   A    Yes.

2   Q    Where were these openings in the hull?  Were they just in

3   the middle of the plates?  At certain spots?  Where were they?

4   A    No, every one of the welded seams on the, what they call

5   the turn of the bilge or the wrapper plate, that's where the

6   horizontal side meets the vertical bottom, it's generally a

7   rolled plate that's attached and they're welded together.

8           Every one of those on the port and the starboard

9   side and the bow and the stern in the area of the weld, which

10  is about three feet, was corroded away.  The plates were fine.

11  Q    Why does it get corroded on the welds like that?

12  A    That basically came from galvanic action or corrosion.

13          Typically, you have two types of problems with a

14  barge.  You have oxidation which we know is rust, that occurs

15  as a result of air and water and steel above the water.  And

16  then you have corrosion, which is a result of electrolysis of

17  electrons traveling from the water to the steel and back to

18  the water again.  They are constantly flowing through the

19  metal.

20  Q    So, this electrolysis caused the welds and not the plates

21  of steel but the weld themselves, to be eaten away by the

22  corrosion?

23  A    That's correct.  One of the things you need for

24  electrolysis is to two dissimilar metals.  Now, that can be

25  aluminum and steel, but it can also be steel and steel.  If

1  they're not identical to each other, there is a difference.

2          And a weld is obviously a different type of metal

3  than the steel plates.  So, typically the welds are more

4  active.  And active means that they tend to attract electrons.

5  So, welds are typically where your corrosion is going to

6  occur.

7  Q    How do you prevent that kind of corrosion from occurring

8  along the welds?

9  A    Well, the first thing you do is you paint the bottom of

10  the barge periodically.  You make sure the paint's on there to

11  protect it, the steel, from coming in contact with the water.

12          The second thing you do is you put what they call

13  anodes or sacrificial anodes on there.  This is a metal that

14  has a greater activity or reactivity to the electrons and

15  steel.  What that does is, the electrons from the water travel

16  into the steel on the barge and they go to the cathode first,

17  which is a lower value steel, and then they go to the anode

18  which is more active.

19          So, if you put a zinc on there, instead of going to

20  the weld, they'll go to the zinc.  And then, they'll pull the

21  zinc plate away as they travel back into the water.  So, it's

22  just almost like a wearing process.

23  Q    Did this barge had zincs on it?

24  A    It had two little ones that were remaining, yes.

25  Q    How many was it supposed to have?

A. Sulzer - Direct / Maloney                38

1    A    I don't know the exact number that was on there.  I mean

2    there's a formula; there's so much space of the zinc for so

3    much area of the barge under water, and I'd have to look it

4    up.

5          Typically, like I replaced 16 zincs on this barge,

6    is what the shipyard told me would be an appropriate number to

7    put back.  I put 16 back.

8    Q    Okay.  Now, we talked about painting and the zincs as a

9    way of preventing this electrolytic corrosion.  What about the

10   mooring techniques?

11         Is it there anything you can do to prevent corrosion

12   with the mooring?

13   A    Well, electrons and electricity can come from two

14   sources.  Obviously, you can't prevent the electrons coming

15   from the water.

16         Another problem, particularly in old piers -- and

17   this occurs even with anything in the ground -- is there's

18   electricity in the ground all around piers and everything

19   because of wires that are frayed or broken.  And the

20   electricity goes into the ground and it finds pipes and metal

21   and it travels around.

22         So, one of the things you never want to do long-term

23   is tie any kind of marine structure to a pier in a metal

24   bollard because what you're basically doing is throwing a

25   switch.  And that direct current that's running around the

1  piers goes right from the bollard, to the cable, onto the

2  barge.  It flows through the barge, it takes some the metal

3  away and goes into the water.

4  Q    You say it flows through the cable.

5          Couldn't you tie it up with rope and then it would

6  be okay?

7  A    Well, that's why you don't use cable, other than in the

8  very short period of time or an emergency.

9          Or sometimes what they'll do is they'll take steel

10  cables and they'll actually put them onto what they call a

11  snotter, which is a very heavy piece of rope.  And the rope

12  breaks the pathway from the steel cable to the dock because

13  obviously, you know, electricity can't go through rope.

14  Q    Obviously, you didn't see this barge when it was tied up

15  at the Gowanus Industrial Park dock, but Captain Henry told us

16  earlier it was tied up with steel cables.  And I believe

17  Mr. Quadrozzi admitted as much in his deposition.

18          Would you attribute this extreme corrosion to the

19  fact it was tied up with steel cables?

20          MR. PAYKIN:  Objection.

21          THE COURT:  On what basis?

22          MR. PAYKIN:  He's talking about what Mr. Quadrozzi

23  said at his deposition.

24          MR. MALONEY:  I withdraw that part.

25          THE COURT:  All right.  That's withdrawn.

A. Sulzer - Direct / Maloney                    40

1        Any other objection?

2        MR. PAYKIN:  Could you repeat the question?

3        THE COURT:  Why don't you start the question again.

4        MR. MALONEY:  I'll start the questions again, a

5    little shorter.

6    Q    Based on what Captain Henry testified, that this barge

7    was tied up with steel cables, and based on what you observed

8    with the extreme corrosion along the welds once you blasted

9    away the marine growth, would you believe there's a causal

10   connection between those to events?  Those two things?

11   A    Absolutely.  That was the major cause.  I've never seen a

12   barge this corroded, consistently, in my entire 40 years of

13   doing barges.  Every weld was corroded.  Every one.

14   Q    Did you have any kind of a second set of eyes or surveyor

15   when you when you looked at that barge?

16   A    Well, I was on a very short time frame to get the barge

17   done.  And so, after I saw this, I basically called somebody

18   that was local that I could bring down, and asked them to

19   survey the barge along with me and to verify that this is what

20   happened.  Because obviously we were welding the welds up and

21   we were trying to get the barge back in the water.

22        So -- yes, I did.  I'm sorry.

23   Q    Okay.  Were any pictures taken when you and the

24   additional person looked at it?

25   A    Yes, we did take pictures.

A. Sulzer - Direct / Maloney                41

1  Q     Okay.

2            MR. MALONEY:   I'd like to approach the witness with

3  Exhibit 3.

4            THE COURT:   Yes.

5            (Handing.)

6            MR. MALONEY:   And I'd like you to take a look.   Not

7  so much at the first two written pages, but at the two pages

8  of color photos attached.   I don't believe you have the color

9  ones.

10  Q     And could you tell the Court what those photos are and

11  what they mean?

12  A     Well, as soon as you blast the barge and take the

13  remaining paint ant seaweed off you want to paint it right

14  away.   If you don't it will continue to rust.   So, what you

15  typically do is put a first coat of paint on.

16            So, the one picture shows basically, the open seam.

17  You can see the holes into the barge.   Those little black

18  holes there.

19  Q     Let me just interrupt you.

20            You say one picture.   You're talking about the first

21  page with two photos on it?

22  A     Yes.

23  Q     Okay.   And you mean the one on the right?

24  A     The one on the right, it says open seam.   You can see

25  basically the holes through the barge.   And then, on the

A.  Sulzer - Direct / Maloney                    42

1   left-hand side, you can see where it's been re-welded up.

2   Q    Okay.   Are these pictures that you took or somebody with

3   you took?

4   A    I took these pictures.

5   Q    Okay.   Anything else in there that's significant?

6   A    On that page?

7   Q    Well, yeah.   On that page.

8           What's the significance of the fact that it's a

9   welded seam?

10  A    Well, the weld is the dissimilar metal.   That's why the

11  corrosion occurs at the welds and not the plates.

12  Q    Okay.   Now, did you have all this fixed when you were at

13  May Shipyard?

14  A    Yes, I did.

15          THE COURT:   Is there anything I was supposed to see

16  on the second page of photographs?

17          THE WITNESS:   Well, the second page you can see two

18  photos of the barge when it was first dry-docked.   You can see

19  the marine growth and the matting and the corrosion that's on

20  there in the first upper two pictures.

21          And then, at the lower two pictures, you can see how

22  many seams there were. That's an indication at the bow area

23  that the seams, because they bend the plate basically every

24  two or three feet, and you can see the extent of the weld.   We

25  basically had to go from above the water line right around to

A.  Sulzer - Direct / Maloney                    43

1   the bottom plate.  And that occurred basically all around the

2   whole barge.

3   Q    You talk about that right photo.

4            Is that the marine growth you see on the bottom of

5   the hull there?

6   A    Yes.

7   Q    And essentially, that's what was keeping it from sinking?

8   A    Yes.

9   Q    And did you have all that repaired in May Shipyard?

10  A    Yes, I did.

11           MR. MALONEY:  I'd like to show you another document

12  that's been marked as Exhibit 4.

13           (Handing.)

14  Q    And I'll ask you if you can tell me what that is.

15  A    That's the bill from May Ship to dry-dock and repair the

16  barge ADA.

17  Q    And did you pay this bill?

18  A    Yes, I did.

19  Q    Okay.  How much of this bill would you say is

20  attributable to the corrosion that occurred because of the

21  mooring, the prolonged mooring, with steel cables?

22  A    Well, number nine is the principle amount of weld that

23  had to be done on the welds, which is $12,000.

24           And there's some miscellaneous work, for instance,

25  removing the skegs.  And there's some hull plates that, you

A.  Sulzer - Direct / Maloney                    44

1    know,  could possibly have been aggravated with the corrosion,

2    but the welds are the major part of this bill.

3    Q    And the welds, is that item nine on the bottom there?

4    A    Yes.

5    Q    Okay.  So, all told, your repair costs as a result of

6    this extreme corrosion were how much?

7    A    Probably in the maybe $15,000, $16,000 of this bill was

8    related to that.

9    Q    Okay.  Would you say the rest was, to put it in simple

10   terms, for your account not really damages you're claiming in

11   this lawsuit?

12   A    Yes, the sand-blasting and the dry-docking and all that,

13   I would have done that whenever I got my barge back.

14   Q    Okay.  Now, earlier you talked about having bought a

15   barge to essentially replace the ADA when you realized you

16   weren't going to get it back.

17        That's the one that you renamed the Betsy?

18   A    Yes.

19   Q    And we looked at Exhibit 5 and the rates you charted on

20   there.

21        Is it fair to say you would be able to charter out a

22   barge if you owned a crane barge year-round or would it be a

23   portion of the year?  What's the percentage of time that you'd

24   have one chartered out?  I know it's going to be variable.

25   A    I'd certainly like to charter out for a whole year and I

1   have chartered some barges out for a year.  I think the Betsy

2   was recently out for eight months out of the year.  So,

3   typically somewhere in the six, seven months range would be a

4   good year for chartering a barge out.

5   Q    Okay.  And the ADA was withheld from you.

6        I believe, you spoke to Mr. Quadrozzi you said, in

7   February of '04?

8   A    Yes.

9   Q    And you got in back in October, late October of '05?

10  A    Yes.

11  Q    So, 20 months?

12  A    Approximately.

13  Q    Okay.  So, a fair estimate, if you had had that barge

14  during that time, how many months do you think you would have

15  been able to charter it out?

16  A    I would say half of that time at least.

17  Q    Ten months?

18  A    Ten months.

19  Q    And what was the average rate of hire that you probably

20  would have gotten for that?

21  A    In New York?  In where?

22  Q    Actually, well, tell me in New York and tell me in

23  Philadelphia.

24  A    Well, I don't really rent barges out in New York.  So, I

25  wouldn't want to say that.

A. Sulzer - Cross / Paykin                46

1           MR. MALONEY:   Strike that question.

2   A    In Philadelphia, an average of $600 a day for a barge in

3   Philadelphia, had I had the barge there.

4   Q    Six hundred a day, 30 days a month, ten months?

5           THE COURT:   180,000.

6           MR. MALONEY:   You beat me to it.   You've got that

7   for the record; a judicial calculation.

8           Okay.   I have nothing further, at this time.

9           THE COURT:   All right.   Mr. Paykin?

10  CROSS-EXAMINATION

11  BY MR. PAYKIN:

12  Q    You testified earlier that your business always had a

13  crane barge; isn't that correct?

14  A    Yes.

15  Q    But you also testified earlier that the ADA was your only

16  crane barge; is that correct?

17  A    No.

18  Q    Prior to the Betsy, did you have any other crane barges

19  besides the ADA?

20  A    Yes.

21  Q    And what was that crane barge?

22  A    I don't really remember the name.   We've been in business

23  almost 40 years.   So, I don't remember the names of the other

24  crane barges we've had over the years.

25  Q    But you indicated that when the ADA was out of your

A. Sulzer - Cross / Paykin                    47

1   possession, you didn't have another crane barge; isn't that

2   correct?

3   A    I wasn't in the business in 2001.  So, in 2003, when I

4   took over the business, the ADA was our only crane barge, you

5   know.

6          I think my father had sold some other crane barges

7   previously.  I don't really remember -- I don't know what he

8   did in the business at the time.

9   Q    But, from 2003 until you purchased the Betsy, other than

10  the ADA, your company didn't have any other crane barges;

11  isn't that correct?

12  A    That's correct.

13  Q    Now, you also testified that when you leased the ADA to

14  CDS Marine it wasn't a crane barge; is that correct?

15         Isn't that correct?

16  A    Yes.

17  Q    So, your statement that your company always wanted to

18  provide full service to different industries is incorrect

19  because you actually did not have a crane barge from 2003

20  going forward; isn't that correct?

21  A    I had the ADA.

22  Q    But the equipment on the ADA was not yours; isn't that

23  correct?

24  A    Yes.

25  Q    You testified that when they returned it, they were

A. Sulzer - Cross / Paykin                    48

1    supposed to take that equipment off; isn't that correct?

2              MR. MALONEY:   Objection.

3    A    No, I testified they had the option to take the equipment

4    off or they could have worked something out with us and said

5    we'll leave the equipment on, make a rate adjustment.

6              We've operated barges for almost 40 years.  I don't

7    even have access to all the records over the years.   But

8    typically, we usually had a crane barge available in

9    Philadelphia.   I do not -- I wasn't working with my father

10   last couple years in the business.   And I don't really know

11   when he disposed of his last crane barge before he got the

12   ADA.

13             The ADA was also only out, supposedly, on a

14   four-month charter and that kept getting extended.  So, you're

15   asking me to make some statements about a business that I was

16   not running.

17   Q    Okay.   Now, you just said that if they left the cranes on

18   the barge, CDS, when it returned it to you, the rate would be

19   adjusted; isn't that correct?

20   A    Yes.

21   Q    The rate would be adjusted downward; isn't that correct?

22   A    No.   They would have, had two options.   They could

23   have --

24   Q    Just answer the question.

25             THE COURT:   I thought he was trying to answer the

1   question.   Let's see what he has to say and then if he hasn't,

2   you'll ask him another one.

3   A    Let's just say, for argument's sake, that CDS called me

4   up and said, we're done with the ADA, we'd like to return it.

5         I would have gone down, inspected the barge and seen

6   they'd made a lot of changes to the barge, added a lot of

7   equipment.   At that point I would have said, okay -- and the

8   contract states that more or less -- you can return the barge

9   to me when you take all your equipment off the barge and put

10  it back in the condition it was when it was started.

11        They might elect to say to me, well that's going to

12  cost us a lot of money, we'd rather leave the stuff on there.

13  And do you have an objection?   And that happens quite often,

14  they'll but an extra bit on, they'll hang some tires, they'll

15  do something.   And I'll say, no, you can leave the

16  improvements onto it, that's fine with me.   Or I'll say no,

17  that's improvement to you is a disadvantage to me.

18        I just had that recently happen where they used one

19  of my barges to move some aircraft and they put all these

20  cleats on the deck.   And I said you have to take them off.

21  They said why?   I said, they're a tripping hazard and it gets

22  in the way of other people using it.   So, they came down and

23  took them all off.   But others times they might have been in a

24  place where they didn't hurt anything, so I said leave them.

25        In the case of CDS, again, you're asking me -- I

A. Sulzer - Cross / Paykin                    50

1    don't know what I would have said to remove and what I would

2    have said to leave.  They might said to me, what about the

3    crane?  I might have said, well, I don't really want the

4    crane.  Or yeah, I can use the crane.  Okay, here's X dollars

5    for the crane or the fact that you now owe me $45,000 in back

6    rent -- which they did when they went bankrupt, they were in

7    hole -- I said basically, I'll take the crane and the

8    improvements as an offset to what you owe me.  And that's what

9    would have happened in the case of CDS, if they had come

10   forward.

11   Q    But you testified the equipment CDS put on the barge

12   raised its value from approximately $100,000 to $200,000; is

13   that correct?

14   A    Yes.

15   Q    So, assuming that CDS had paid and hadn't gone into

16   bankruptcy, they would have gotten credit for that on the

17   barge; correct?

18   A    No, because that doesn't mean that I'm going to give them

19   a hundred thousand dollars for those improvements.

20        I said that a crane barge of that size with that

21   equipment is in the $200,000 range.  I didn't say that I was

22   going to write them a check for all that stuff on my barge for

23   a hundred thousand dollars because there's lots of stuff on

24   there I have no use for.

25   Q    But, in reality, your barge was not a crane barge.

A. Sulzer - Cross / Paykin                        51

1      You took equipment that didn't belong to you; is

2  that correct?

3  A    I didn't take anything.

4  Q    Did you reach a deal with CDS that transferred title of

5  that equipment on the barge to you?  To your company?

6  A    I would have liked to, but they went underground.  I've

7  never had any contact with CDS.

8  Q    And what is the rate for, to rent out the ADA if it does

9  not have the equipment on it that it presently has?

10  A    About $3,500 a month.  For a deck barge.

11  Q    And you're aware that Gowanus Industrial Park as a claim

12  against CDS Marine?

13              MR. MALONEY:   Objection.

14  A    No, I don't, I'm not aware of that.

15              THE COURT:   Overruled.

16  Q    So, what you're testifying is, the equipment that

17  CDS Marine put on that barge raised its monthly rates from

18  about $3,500 a month to $21,000 a month; isn't that correct?

19  A    Yes.

20  Q    Now, earlier you testified that your attorney sent a

21  letter to Gowanus Industrial Park on February 17th, '04 asking

22  to allow to you inspect the barge; isn't that correct?

23  A    Yes.

24  Q    And then you testified that you went to inspect the barge

25  and you were refused admission to the premises; is that

A. Sulzer - Cross / Paykin                52

1   correct as well?

2   A    Yes.

3   Q    Isn't it correct that the letter of your attorney, dated

4   February 17th, '04, stated that you were coming to pick up the

5   barge?

6   A    I have to read the letter, but that was, you know, was

7   probably the words she used.  I didn't write the letter.

8   Q    Didn't you, in fact, go to pick up the barge, not to

9   inspect the barge?

10  A    No, I went to inspect the barge.

11            (Discussion held off the record.)

12            (Pause in the proceedings.)

13            THE COURT:  The February 17th letter is Exhibit C.

14            MR. PAYKIN:  I have here the February 17th, 2004,

15  letter that we just referred to.

16  Q    I'd like you to review it and tell me if it indicates

17  that you were going to pick up the barge or to inspect the

18  barge.

19            MR. PAYKIN:  May I approach?

20            THE COURT:  Yes.

21            (Handing.)

22  A    It says I would like to pick up the barge as soon as

23  possible.

24  Q    Does it anywhere state that you wanted to inspect the

25  barge?

A. Sulzer - Cross / Paykin                    53

1   A    No.  It doesn't.

2   Q    Did you provide my client with insurance when you wanted

3   to go on to his property to look at the barge?

4   A    I would have been happy to if he had asked, but when I

5   called him on the phone, I asked, I requested that I could

6   come in and inspect my barge.

7           I certainly couldn't arrange to pick up a barge

8   without knowing its condition or how it was tied up or

9   anything.  And I mean, that was the purpose of my visit to

10  New York; was to ascertain the condition of the barge and then

11  I would have made appropriate arrangements.  Had he said to me

12  you need to provide me with insurance, you need to do any of

13  the following, I would have been happy to comply.  He did not

14  ask me for any of those things, verbally or in writing.

15  Q    Based on this letter, wouldn't it be reasonable for my

16  client to believe that you were coming to pick up the barge,

17  not inspect it?

18          MR. MALONEY:   Objection.

19  A    No.

20          THE COURT:   Sustained.

21  A    I didn't write this letter.  If I had written the letter,

22  I would have used a different words.  I would have used I

23  wanted to come and tow the barge.  This was written by my

24  attorney, who is an attorney that used words, okay?  That's

25  not what I would have put down.

A.  Sulzer - Cross / Paykin                54

1   Q     Since you retrieved the A-D-A, or the ADA you call it,

2   how many days has it been rented out?

3   A     It hasn't been rented out at all.

4   Q     Now, you indicated earlier that you had a long-term lease

5   on the Betsy for about four months; is that correct?

6   A     I think it was six months, but yes.

7   Q     Six months.

8         And what rate did you get on that long-term lease?

9   A     I think it was about six hundred a day.

10  Q     Now, you provided in your submissions a bunch of

11  contracts or invoices for the leasing of the Betsy.

12        None of them were for a six-month time period; isn't

13  that correct?

14  A     Those are invoices.  That's not charter parties.  Okay?

15  Invoices is a bill that you send at the end of month.  I

16  didn't provide the charters.

17        The charters are a written agreement that I enter

18  into with whoever's going to rent the thing.  It will say four

19  months, six months, a year, and it can go on and on.  I have

20  charter parties.  That's not what I put in there, though.

21  Q     But the invoices that you provided have specific time

22  frames; four days, 60 days.

23        So, they seem to indicate a little bit more than

24  just monthly invoice; isn't that correct?

25  A     Well, they're, again -- well, you don't bill on a month.

A. Sulzer - Cross / Paykin                    55

1   A calendar month.  For instance, I'll look at the very first

2   one.  Riverside Construction, okay?  They chartered the barge

3   from February 27th to March 29th.  Well, that was 33 days.

4   So, that was, they returned the barge at the end of 33 days

5   and I just billed them for 33 days.

6   Q     And you're referring to which invoice?  2005-19?

7   A     No, 2006-04.  The very first one.

8   Q     Okay.  But each one of these invoices has a particular

9   time.  It seems to indicate the extent of the hire period.

10            I'm looking at 2006-02.  Two says:  Charter hire for

11   the period 2/27/06 through 3/29/06.  33 days?

12            Is this just a monthly invoice?

13   A     That's a monthly.  I'd have to look at, I don't remember

14   each one of these things.

15            For instance, I'll give you another one which is a

16   better example.  2006-20, which is about the third or fourth

17   one in there.  The Bayside Marine Construction.  Okay?  That's

18   one of the earliest invoices.

19            Those people had the barge for about six months.

20   And they actually had the barge chartered out to I think June

21   of '07.  So, this is just one of a whole series of invoices

22   that my attorney asked me to provide to give an indication of

23   typical daily rates.  I can give you all of the invoices for

24   Bayside Marine Construction, which is about seven or eight

25   months, but I didn't put them all in there.  That wasn't my

A. Sulzer - Cross / Paykin                          56

1  intent.

2  Q    When was the repair work completed on the ADA?

3  A    March of 2005.

4  Q    And so, from March --

5  A    Excuse me, March of 2006.

6  Q    So, from March of 2006 until May of 2008, that barge has

7  not been chartered; is that correct?

8  A    That's correct.

9  Q    But you indicated earlier that typically you rent your

10 barges out for about ten months out of -- I believe you said

11 about half the time, six months oust year ask that what you

12 said?

13 A    Yeah, the problem I have right now is the ADA's in

14 New York.  Okay?  I operate a company in Philadelphia.  The

15 crane barge that I rent out on a regular basis is in

16 Philadelphia.  I now have two crane barges.  Okay?  It was

17 never my intent to have two crane barges.  I don't need two

18 crane barges.  My business doesn't sustain that.

19         I bought the Betsy to replace the ADA which I could

20 not retrieve or get ahold of.  My dilemma now is two barges.

21 The reason that the ADA is still in New York is I'm trying to

22 sell the barge because it's superfluous to my business needs

23 right now.

24 Q    Well, you keep testifying that you bought the Betsy to

25 replace the ADA.  But at the time you bought the Betsy you had

A. Sulzer - Cross / Paykin                    57

1    no reason to believe that when the ADA was returned to you it

2    would be a crane barge; isn't that correct?

3    A    No, I knew it was a crane barge.

4    Q    No, but the equipment on it wasn't yours.  You had no

5    reason to believe that CDS Marine would not take the equipment

6    off the barge; isn't that correct?

7               MR. MALONEY:   Objection.

8               THE COURT:   Overruled.  I'd like to hear the answer.

9    A    I had every reason to believe they weren't going to take

10   the equipment off.   The first reason is, they owed me a lot of

11   money.

12              Secondly, they were defunct and no longer in

13   business.   And had vanished.   There was nobody to take

14   equipment off the barge.   It was de facto, it was left on my

15   barge.

16              THE COURT:   I'd like to interrupt with a question.

17              Just as a matter of clarification, under the

18   agreement that you had with CDS, did it the equipment become

19   yours if they didn't take it off?

20              THE WITNESS:   That's standard practice.  It didn't

21   say that in the contract, but typically, if you leave

22   something on, you know, the barge at the end of period, either

23   you need to remove it or -- I've done this, Your Honor, I have

24   done this over 40 years and I can't remember each

25   circumstances.   But many times, as I said, people will put

A.  Sulzer - Cross / Paykin                58

1   another cleat or bit or something on the barge.

2          We do an off-hire, which means you inspect the barge

3   before you go out --

4          THE COURT:  You don't have to go through the whole

5   thing.

6          That's the standard practice?

7          THE WITNESS:  Yes.  And we would have arrived at

8   some agreement.

9          THE COURT:  Okay.

10         THE WITNESS:  Had I been able to speak to them, we

11  would have arrived at some agreement.

12         MR. MALONEY:  Your Honor --

13  Q    But at the time you purchased the Betsy --

14         THE COURT:  Excuse me.

15         Is there an objection?

16         MR. MALONEY:  Yeah, it's not an objection.  I want

17  to know something for the record that's very relevant.

18         THE COURT:  You'll get a turn.

19         MR. MALONEY:  Okay.

20         THE COURT:  Go ahead.

21  Q    At the time you purchased the Betsy, you did not know

22  whether or not the ADA would be returned with the crane on it;

23  isn't that correct?

24  A    I did know it would be returned with the cane.  Because

25  CDS was gone.  They had disappeared.  Vanished.  There was

A. Sulzer - Cross / Paykin                    59

1   nobody at CDS.

2           If I had picked my barge up in February when I found

3   its location, I would have had a crane barge that I would have

4   started operating as a crane barge because I certainly wasn't

5   going to take equipment off and stick it where?  Give it to

6   who?  There was nobody.  They were gone.

7   Q    CDS was in bankruptcy --

8           THE COURT:  Why don't you move on?

9   Q    Now, you indicated that typically, you lease your barges

10  for use in the Delaware River in fresh water; isn't that

11  correct?

12  A    Yes.

13  Q    Have you done any work in salt water with barges?

14  A    Yes.

15  Q    And what's the difference in the rate of corrosion

16  between salt water and fresh water?

17  A    It's significant.  I'm not a corrosion expert and I can't

18  tell you.  I don't like renting barges in salt water.  It

19  basically -- I'll be honest, too; if I rent a barge in salt

20  water for a long period of time, I would probably change the

21  rate because I would have to dry-dock that barge more often.

22          If I operated in New York as a barge operator, I

23  would probably dry-dock my barge no later than every five

24  years.  In Philadelphia I can get away with ten years.

25  Q    And the ADA was initially, the last time it had been

A. Sulzer - Cross / Paykin                    60

1    dry-docked, you testified, was in 1999; isn't that correct?

2    A    Yes.

3    Q    And when you finally dry-docked it, it was in '05; isn't

4    that correct?

5    A    Yes.

6    Q    So, that was more than five years; isn't that correct?

7    A    It was close.

8    Q    Well, '99 to '05 is six years?

9    A    It's close.

10   Q    So, based on your knowledge, if you had been leasing your

11   barges into salt water environments, it would have been

12   overdue to be dry-docked; isn't that correct?

13   A    I didn't know where the barge was.  Okay?  As I explained

14   earlier, after my father passed away, I didn't get back in the

15   dry receipt of the company until 2003, after my reserve duty

16   was up.  I didn't know where the barge was.  I thought it was

17   in Philadelphia.  CDS was in Philadelphia.

18        It wasn't until actually 2004 that I found out the

19   barge was in New York.  So, I couldn't have answered that

20   question.  I was concerned.  Very concerned about the

21   condition of the barge being up here in New York that long.

22   Q    Right.  No, I recognize that.

23        What I'm saying is, is that if you had known it had

24   been in salt water, you would have pulled it out after five

25   years, is what you testified?

A. Sulzer - Cross / Paykin                    61

1   A     That's an approximation.  I'm just saying, and I'm saying

2   I could ask ten different barge owners how often they dry-dock

3   their barges and they'll give you ten different answers.  A

4   lot depends on the activity.

5             If you've got a welding machine and you're doing a

6   lot of electrical work on a barge, that tends to introduce

7   stray electrical currents to the barge.  It depends on where

8   you have the barge docked.  If it's next to a pier -- for

9   instance, the side of the barge facing a steel pier will tend

10  to have more corrosion evidence than the side of the barge

11  facing away from the steel pier.

12            There's a thousand different variables as to what

13  causes barges to deteriorate.  It depends on the type of

14  paint.  You know, there's a lot of different variations.

15            (Pause in the proceedings.)

16  Q     So, from the time you purchased the Betsy, you didn't

17  have any work for the ADA; is that correct?

18  A     From the time...

19  Q     You testified you only needed one crane barge; isn't that

20  correct?

21  A     Right.

22  Q     So, once you had the Betsy, you did not miss any leasing

23  opportunities because you didn't have control of the ADA; is

24  that correct?

25  A     Once I put it in service, yes.  When I bought the Betsy,

1  I had two crane barges.  Okay?  Unfortunately, I couldn't put

2  the Betsy into service immediately because she needed work and

3  repair.  And that took several months.

4      MR. PAYKIN:  I have no further questions.

5      THE COURT:  Any redirect?

6      MR. MALONEY:  I actually have no redirect.

7      The point I wanted to raise is a legal one that was

8  not briefed by either side  and that is; that the bankruptcy

9  trustee in the CDS bankruptcy abandoned all those barges

10  mistakenly believing they were the property of CDS.

11  Therefore, the crane would have been abandoned.

12      I don't want to pursue this point here it's not the

13  appropriate time.

14      THE COURT:  No, it's not.

15      MR. MALONEY:  I would request the opportunity for

16  some post-inquest briefing.

17      THE COURT:  We'll discuss that later.

18      No redirect?

19      MR. MALONEY:  No redirect, but --

20      THE COURT:  If there's no redirect, let me continue

21  with this hearing, if I may.

22      MR. MALONEY:  May I do one more direct question?

23      THE COURT:  Of this witness?

24      MR. MALONEY:  Yes, I'll explain why.

25      THE COURT:  Just ask your question, sir.

A. Sulzer - Cross / Paykin                    63

1          MR. PAYKIN:  I have an objection.

2          THE COURT:  To what?

3          MR. PAYKIN:  To him asking questions that I didn't

4   raise on my cross.

5          MR. MALONEY:  You'll get another opportunity to

6   cross.

7          THE COURT:  Okay.  Had he asked it earlier, it would

8   have been okay; correct?

9          MR. PAYKIN:  Correct.

10         THE COURT:  What's the problem now?

11         MR. PAYKIN:  Because he stopped his direct.

12         THE COURT:  What's the problem now?  Are you going

13  to be prejudiced in any way if he asks this question?

14         MR. PAYKIN:  I don't know what the question is going

15  to be.

16         THE COURT:  Excuse me, if he asks the question then

17  you have an opportunity to cross, are you going to be

18  prejudiced?

19         MR. PAYKIN:  I don't know the answer.  I might have

20  formulated my cross differently.

21         THE COURT:  Let's find out.

22         MR. PAYKIN: Well --

23         THE COURT:  Seriously; you tell me if this would

24  have affected your cross.  We'll strike all of the

25  cross-examination testimony and you can start again.  Okay?  ?

A. Sulzer - Direct / Maloney                64

1   DIRECT EXAMINATION (Continued)

2   BY MR. MALONEY:

3   Q    My question is this:  Earlier you discussed ways you

4   could prevent this electrolysis damage.

5            Is there any way you can monitor the electrolysis

6   damage that might be occurring to a moored barge?

7   A    I have, I have a piece ever equipment we use regularly to

8   check barges just so see if they're properly protected by

9   cathodic protection.  It's called an Electro-Meter or a

10  corrosion meter.  A lot of different names.

11           And what you can do with this thin is you actually

12  put it in the water, you put a probe in the water and you

13  attach the metal to the barge and it gives you an electrical

14  reading.  It will tell you whether the barge is not having

15  current pass through or whether it is.

16           What I would have done, had I gone up to New York, I

17  would have had that meter with me.  I would have been appalled

18  at the condition of the cables.  I would have been very upset.

19  I would have put the meter in and then I would have found out

20  I was having problems.  I probably would have said take the

21  cables off -- there was a lot of things I would have done

22  immediately, so.

23  Q    Is that kind of meter a portable item or is it something

24  you install on the barge?

25  A    It's portable.

A. Sulzer - Cross / Paykin                65

1   Q     Is there one in this courtroom?

2   A     Yes, it's on the table.

3              MR. MALONEY:  I'll indicate that that's a

4   demonstrative Exhibit.  I'll leave it up to the Court to

5   decide if the Court wants to inspect it any further.

6              THE COURT:  Anything further?

7              MR. MALONEY:  I'm finished.

8              THE COURT:  Would that have changed your

9   cross-examination?

10             MR. PAYKIN:  No.

11             THE COURT:  Okay.  Do you want further

12  cross-examination?

13             MR. PAYKIN:  Two questions.

14             THE COURT:  Please, as much as you like.

15  CROSS-EXAMINATION (Continued)

16  BY MR. PAYKIN:

17  Q     Did you ever request Gowanus Industrial Park to test the

18  barge with the meter you just described?

19  A     No.

20  Q     And did you ever request Gowanus Industrial Park to check

21  the anodes on the ADA?

22  A     No.

23             MR. PAYKIN:  No further questions.

24             THE COURT:  All right.  I have a couple of questions

25  and, of course, Counsel on both sides will have an opportunity

A. Sulzer - The Court                    66

1    to follow up if you think it's appropriate.

2    EXAMINATION BY

3    THE COURT:

4         THE COURT:  I don't know if I have it in the record,

5    what was the purchase price of the Betsy?

6         THE WITNESS:  I think it was 105,000.

7         THE COURT:  And Counsel, do you know; do I have that

8    in the record?

9         MR. MALONEY:  I believe that you don't because the

10   bill of sale is an Exhibit, but I don't believe the bill of

11   sale reflects the purchase price.

12        THE COURT:  Right.

13        Oh, when you spoke to Mr. Quadrozzi you said when;

14   in about February or March?

15        THE WITNESS:  February 28th.

16        THE COURT:  All right.  Did you ask him for the

17   location of the vessel?

18        THE WITNESS:  Yes, I did.

19        THE COURT:  And what did he tell you?

20        THE WITNESS:  He said I'm not going to tell you.

21        THE COURT:  All right.  Was there anything further

22   to that conversation?

23        THE WITNESS:  No.  Really, I'm not going to tell you

24   and you can't visit the barge.  It was a long time ago and you

25   know, but I remember that because I was sort of shocked.

A. Sulzer - The Court                    67

1      THE COURT:  All right.  You talked about exploring

2  the possibility of with attorneys of having marshals arrest

3  the vessel.

4      THE WITNESS:  Yes.

5      THE COURT:  And you said that they told you that

6  process would cost you about ten to $20,000?

7      THE WITNESS:  Yes.  I guess there's a certain fee to

8  arrest the barge.

9      THE COURT:  Correct.

10      THE WITNESS:  And I guess you have to pay the

11  marshal or somebody to sit down there and keep an eye on it.

12  I'm not sure exactly how that goes.

13      THE COURT:  Did they give you, these attorneys, an

14  estimate of the time it would take?

15      THE WITNESS:  They said it takes a long -- it was a

16  firm of Mahoney & Keane and they said it takes a long time.

17  And it's gong to be expensive to do that.

18      THE COURT:  Did they give you any estimate of how

19  long a long time is?

20      THE WITNESS:  No.  They might have said a couple of

21  months, I think.

22      THE COURT:  And how much did Captain Henry charge

23  you for his services?

24      THE WITNESS:  It was $3,000.

25      THE COURT:  All right.  That's all I had, gentlemen.

A. Sulzer - The Court                 68

1       If there's any further follow-up?

2           MR. MALONEY:  I have none.

3           MR. PAYKIN:  There are certain Exhibits that were

4   entered into evidence, bills.  There's been no testimony about

5   them.  Again --

6           THE COURT:  Is there follow-up?

7           MR. PAYKIN:  No.

8           THE COURT:  All right.

9       Thank you, you're excused, sir.

10          THE WITNESS:  Thank you, sir.

11      Should I give these to somebody?

12          THE COURT:  Leave them there.

13          (Witness excused.)

14          THE COURT:  And Counsel on both sides, if there are

15  legal issues you want to take up, or housekeeping about

16  Exhibits, we'll take this up once -- we don't need to waste

17  the time of the witnesses.  But you're not, I'm not asking you

18  to give up any arguments you want to make.

19          MR. MALONEY:  I have a third and final witness, Your

20  Honor.  Captain Joseph Ahlström.

21          THE COURT:  All right.

22      I'm sorry, did you folks want to take a break?

23          (Discussion off the record.)

24          (Pause in the proceedings.)

25          THE COURT:  Yes, let's take five minutes and we'll

J. Ahlström - Direct / Maloney                69

1    start at 11:30.

2              (Recess taken.)

3              (In open court.)

4              THE COURT:  All right.

5              MR. MALONEY:  We call Captain Joseph Ahlström.

6              (Witness enters and takes stand.)

7

8              COURTROOM DEPUTY:  Please, raise your right hand.

9    C A P T A I N    J O S E P H    A H L S T R Ö M,

10             called by the Plaintiff, having been

11             first duly sworn, was examined and testified

12             as follows:

13             COURTROOM DEPUTY:  Please, state your state your

14   name for the record.

15             THE WITNESS:  Captain Joseph Ahlström --

16   A-H-L-S-T-R-O-M.

17             COURTROOM DEPUTY:  Thank you.

18             THE COURT:  Have a seat, please.

19             You may enquire.

20             MR. MALONEY:  One second, Your Honor.

21             Did you take those Exhibits?

22             COURTROOM DEPUTY:  There they are (indicating).

23             MR. MALONEY:  Then we're all set.

24   DIRECT EXAMINATION

25   BY MR. MALONEY:

J. Ahlström - Direct / Maloney                    70

1   Q    Captain Ahlström, could you briefly tell the Court the
2   nature and extent of your maritime education and experience?
3   A    Yes.  I'm a, I graduated from SUNY Maritime.  I went to
4   sea, I advanced to the rank of captain.  I was captain for
5   about six years.  Then, I took a job at SUNY Maritime as a
6   professor teaching maritime.
7            THE COURT:  Captain, I'm just going to ask you to
8   speak up a little louder and a little slower for the sake of
9   our court reporter.
10           THE WITNESS:  Yes, sir.
11  A    I went to sea for about 15 years.  My last five years
12  mostly as captain.  I came ashore.  I was appointed assistant
13  professor at SUNY Maritime.  I rose to the rank of professor
14  department chair as captain of the training ship for three
15  years.
16           And I do consulting on the side with my free time
17  from teaching.  And I'm also a captain in the Navy Reserve.
18  Q    And could you very slowly tell the Court what kind of
19  background you have with barges in particular?
20  A    Barges.  I teach barges as a professor.  I work as a
21  consultant for KC Marine and Warwick Maritime.  That's my
22  experience with barges.
23  Q    Okay.  Did there come a time when you assisted in an
24  inspection of the barge ADA, the barge that is the subject of
25  this dispute?

1   A    Yes.

2   Q    And did you write a report about that inspection?

3   A    Yes.  That's the report dated March 9th, 2006.  The owner

4   of the barge called me.  I came down and took a look at it in

5   May Shipyard.

6   Q    And is that second page of Exhibit 3 with the name

7   Captain Joseph Ahlström on top?  Is that a true copy of your

8   report?

9   A    Yes.

10  Q    Okay.  Now which parts of that report relate to the

11  damage that would have been caused by the mooring with steel

12  cables?

13  A    Well, a lot of this damage could have been done by

14  oxidation, as Captain Sulzer spoke about earlier.

15          But the one that I'm most concerned about is the

16  welds, the ones that he said that had worn away that we could

17  look right into the barge where we could see sunlight.  And

18  those are limited by zinc anodes put on the sides of barges at

19  certain distances.  And you can actually see them on outboard

20  motors.  Because when you have a barge in water, you have free

21  electrons that cause the corrosion.

22          And the way that the barge had appeared to me, I was

23  like, this is you know, where are the zinc anodes?  And we

24  looked around and I think we found two.  And that's basically

25  what happened.

J. Ahlström - Direct / Maloney                           72

1          And if what Captain Henry states is true, that it

2    was tied up with cables, that would give them, it would give

3    it the conductivity through the salt water into the barge to

4    cause that corrosion.

5    Q    No, in your report, which of the numbered items one

6    through five relate to that kind of corrosion?

7    A    I would say definitely four.  Four would be the major

8    thrust of that argument.

9    Q    Okay.  What about five; the welded seams?  Is that --

10   A    Yes.

11   Q    Okay.  Turning to the next two pages, there are some

12   photographs.

13          Were you present when those photographs were taken?

14   A    Yes, I was.

15   Q    Do these photographs represent an accurate picture of

16   what the barge looked like when it came up out of the water?

17   A    Yeah, I was contacted on March 9th to do the survey.  I

18   came down and told Captain Sulzer when I got to the dock, I

19   don't have a camera.  He says, I've got one.  I said, we'll

20   use yours.  And I went around and he took the pictures.

21   Q    Based on your experience in the maritime industry, would

22   you say that the $12,000 that Captain Sulzer attributed to the

23   corrosion damage out of the, I guess, total $35,000 bill is

24   about a fair apportionment?

25          MR. PAYKIN:  Objection.  He's not qualified.  He

J. Ahlström - Voir Dire / Paykin                    73

1    hasn't been declared an expert.

2              MR. MALONEY:  We can have --

3              THE COURT:  I've been receiving opinion testimony

4    from him, but do you wish to voir dire his qualifications?

5              MR. PAYKIN:  I would like to do so, yes.

6              THE COURT:  Go ahead.

7    VOIR DIRE

8    BY MR. PAYKIN:

9              MR. PAYKIN:  You indicated that you're a professor

10   at SUNY Maritime; is that correct?

11             THE WITNESS:  Yes, sir.

12             MR. PAYKIN:  And you indicated you've been a

13   captain of -- you were at sea for 15 years; isn't that

14   correct?

15             THE WITNESS:  That's correct.

16             MR. PAYKIN:  And were you in charge of repair of any

17   of the vessels that you were at sea with?

18             THE WITNESS:  I oversaw the repair and dry-dock,

19   yes.

20             MR. PAYKIN:  And you did use outside services to do

21   it or did you repair them in-house?

22             THE WITNESS:  The engineer would contract outside

23   services and then I would monitor their progress.

24             MR. PAYKIN:  And what is -- you indicated you went

25   to Maritime.  You did not state what your degree is in.

J. Ahlström - Voir Dire / Paykin                    74

1              THE WITNESS:   Marine transportation.

2              MR. PAYKIN:   So, do you have any engineering

3       background?

4              THE WITNESS:   Not academically.

5              MR. PAYKIN:   So, regarding oxidation reactions, you

6       don't have any formal training; is that correct?

7              THE WITNESS:   As a chief mate, I've seen it very

8       well and I've prevented oxidation.   I'm very familiar with

9       oxidation.   I teach oxidation to the cadets and how to prevent

10      is it.

11             MR. PAYKIN:   You teach a class called oxidation?

12             THE WITNESS:   Negative.   No.   I teach a class called

13      seamanship.

14             MR. PAYKIN:   So, you indicated you teach oxidation.

15             What does that mean?   What does that encompass?

16             THE WITNESS:   Well, oxidation is when air -- rust.

17      Rust on a ship and how do you prevent a ship from rusting.

18             You have to scrape it.   You have to chip it, you

19      have to red lead it, prime it and then you put paint on it,

20      which was indicated previously.   And that paint is a covering

21      will prevent oxidation.

22             MR. PAYKIN:   Okay.   I'm okay with him as an expert

23      on repair of the boat.

24             THE COURT:   Very well.

25             You may continue, Mr. Maloney.

1          MR. MALONEY:   Thank you.

2     DIRECT EXAMINATION (Continued)

3     BY MR. MALONEY:

4     Q    My question to you was out of the I think it was about

5     $36,000 repair bill to May Ship repair, Captain Sulzer

6     testified that he would attribute about $12,000 of it to

7     replacing of those old welded seams to the particularly

8     extreme corrosion that occurred along the welds.

9          Do you think that's a fair estimate of the

10    apportionment?

11    A    Yes.

12    Q    Okay.  Co you believe that this barge, having seen it

13    after it came out and was sand-blasted, could safely have been

14    towed anywhere outside the New York Harbor?

15    A    It's an un-inspected barge, so the Coast Guard doesn't

16    need to inspect department -- well, it does if it has to be

17    moved.  I've dealt with Coast Guard inspections on barges with

18    KC Marine.

19          In answer to your question:  No, I don't think so.

20    Q    Even aside from the Coast Guard inspections, would it be

21    good seamanship to pick up and tow it back to Philly?

22    A    No.  I think Captain Sulzer indicated, if anything had

23    happened, his liability would be humongous.  It's a situation

24    where any sort of environmental catastrophe, he would be in

25    serious trouble.  To move that barge in that condition.

J. Ahlström - Cross / Paykin                76

1        The fact that Captain Henry moved it to May Shipyard

2    is a tribute to his seamanship.

3    Q    Earlier, I believe it was Captain Sulzer, testified that

4    once the marine growth was blasted away, you could actually

5    see openings into hull.

6        You could right into the hull; is that correct?

7    A    Yes.

8        MR. MALONEY:  Okay.  I have nothing further.

9        THE COURT:  Cross?

10   CROSS-EXAMINATION

11   BY MR. PAYKIN:

12   Q    You testified just a few minutes ago about ways to

13   prevent oxidation.

14       Could you restate those ways that you prevent

15   oxidation?

16       THE COURT:  I recall it.  Why don't we just -- if

17   there's another question, by all means.  But it was very

18   briefly, a very short time ago.  I recall it.

19       MR. PAYKIN:  Okay.

20   Q    One of those methods was to paint the barge; is that

21   correct?

22   A    Yes.

23   Q    And a barge in salt water, how often would you recommend

24   it be painted?

25   A    Once a year.  It needs to be dry-docked.  It needs to be

J. Ahlström - Cross / Paykin                          77

1   what they say -- shaved.  It needs to be cleaned off of all

2   growth on the hull, primed and painted.

3   Q    So, if this barge had not been dry-docked or painted

4   since 1999, wouldn't that be a great contributor to the

5   oxidation or the deterioration of the welds that you found?

6   A    Well, yes.  Again, I go back to what I just said.  I'm

7   thinking more of ships.

8             But definitely, a barge needs to be dry-docked and

9   inspected.  And certainly your comment if it's painted, it

10  would have prevented oxidation, yes.

11  Q    And did you notice the material that was used on the

12  welds that had deteriorated?

13  A    The seams.

14  Q    The seams, correct.

15  A    Right.

16  Q    Did you notice what material was used?

17  A    It was metal that was deteriorated.  And that, what

18  happens is the electrons go and they rust away that metal so

19  it comes clean.

20  Q    Right.  But in an oxidation reaction, if you have two

21  different metals -- for instance, aluminum and steel -- that

22  will accelerate the oxidation; isn't that correct?

23  A    No.  No.  I think that's why I -- again, this is

24  corrosion.  This isn't oxidation.

25             Corrosion is the electrons that come in there and

1   waste away the metal.  Oxidation is a different process.

2   There's two processes here.  Oxidation and corrosion.

3   Q    Okay.  And what do you believe caused the damages to this

4   barge; corrosion or oxidation?

5   A    Corrosion.  On the ones that we talked about earlier, it

6   was corrosion.

7   Q    And would paint have prevented that corrosion?

8   A    To a degree, not completely.  That's why you need the

9   zinc anodes like you see on outboard motors and on ships

10  around the keel for some reason.  But certainly there were no

11  anodes and I believe that's why the corrosion occurred.

12  Q    There were no anodes or two anodes?

13  A    Two anodes left.  Two anodes.

14  Q    And could you tell by looking at the barge how many the

15  barge once held?

16  A    Captain Sulzer stated it was 16.  I think a barge that

17  size would be anywhere between 12 and 20, depending on what

18  its used and where it's serviced.

19  Q    And what's the life, typically, of anode?

20  A    It depends on exact -- again, I think we went into this

21  quite a bit.  It depends where it's used, is it close to a

22  metal dock?  There's a lot of variables there.  There's why we

23  do inspections.

24  Q    Now, if this barge was tied by a rope to another barge,

25  which was then tied by a rope to another barge, and that barge

J. Ahlström - Cross / Paykin                79

1    was then secured to a pier, a wooden pier by a metal cable, in

2    your opinion, is such a mooring dangerous?

3              Would that cause additional corrosion to the barge

4    all the way at the end?

5    A    No, I think Captain Sulzer stated that a lot of barges

6    are towed by tugs with cables, steel cables, but they use rope

7    to break that flow of electrons.  Electrons can't pass through

8    rope.

9              In my opinion, and again, it depends if there's

10   cables in the water near it.  The rope would limit it.

11   Q    Now, if the pier was not -- if the pier was not put into

12   metal, if the pier was just straight into the earth, and the

13   cables were not in the water connecting to the pier, and again

14   you're now -- there's three barges secured out.  So you have

15   barge one, barge two and then the ADA.

16             So, if the ADA's roped to barge to, two, barge two

17   is roped to barge one, and barge one is steel cabled to a pier

18   which doesn't have any metal it, in your estimation, does that

19   promote corrosion as a structure?

20   A    The, again, it's a variable question.  The rope will

21   limit.  It has to be touching the barge, the cable.  And I

22   believe the cables, as Captain Henry stated, were on the

23   barge.

24   Q    I'm asking you a hypothetical, as an expert.

25             Hypothetically, if that barge was roped to the next

1    barge, does that --

2    A    It's limited, if any.

3    Q    Now, you indicated the corrosion, $12,000 of the

4    corrosion of the repairs, you deemed to be as a result of not

5    having anodes; is that correct?  And having steel cables?

6    A    The corrosion, however it occurred -- and I assume it was

7    by the anodes -- then that, to repair that, the seams was

8    about $12,000; correct.

9    Q    But corrosion occurs naturally even if there were anodes;

10   isn't that correct?

11            If a barge is sitting in the water for six years in

12   salt water, not moving, there's going to corrosion; isn't that

13   correct?

14   A    If it's sitting for six years and there's no anodes, yes,

15   there will being corrosion.

16   Q    And what if it was sitting for six years and there were

17   anodes?

18   A    There would be limited corrosion.  There wouldn't be as

19   much as we saw.  And again, if any; depending on what type of

20   the dock and a few other variables.

21   Q    So, you could put a barge in water, salt water, for six

22   years with anodes and there would be no corrosion, is what

23   you're testifying to?

24   A    No, I'm not saying that.

25   Q    So, you really don't know how much of the corrosion was

J. Ahlström - Cross / Paykin                    81

1   attributable to the lack of anodes versus not being serviced

2   for six years; is that correct?

3   A    Well, I do know what causes it.  And again, we're not

4   talking an exact science here.  That's why they dry-dock and

5   do inspections.

6           Anodes limit corrosion.  And again, as

7   Captain Sulzer stated, I never saw a barge with holes at that

8   same spot along the seams.  There were no anodes.  That caused

9   the problem.

10  Q    Now, could that corrosion have been the result of the

11  welding being done improperly in the first place?

12  A    It's a possibility.  I mean, it's a very slight possibly,

13  but I don't see how, but yeah.  That could be, yeah.

14  Q    Did you inspect the welding to see if it had been done

15  properly?

16  A    I assume the barge had been floating and working safely

17  for those years.  I think that type of corrosion usually would

18  come out in a couple of the first voyages if it was done

19  incorrectly.  It would become apparent early on.

20  Q    Didn't we have testimony earlier that it only becomes

21  apparent once you sand-blasted all the growth off the barge?

22  A    Yes, we did.

23  Q    So, it wouldn't have been apparent; would it?

24  A    Well, no.  I mean before 1999, before that time, it's

25  when the barge was put into service.  If there were problems

Proceedings                                         82

1  with the welds and the seams, we would have had problems right

2  away.

3  Q    Well, we don't know if the barge had been rewelded in

4  1999; do we?

5  A    No.

6            MR. PAYKIN:  I have no further questions.

7            THE COURT:  Any redirect?

8            MR. MALONEY:  No redirect.

9            THE COURT:  All right.

10           Thank you.  You are excused.

11           (Witness excused.)

12           THE COURT:  Any further witnesses?

13           MR. MALONEY:  No.  The counter-claimant rests.

14           THE COURT:  Okay.  Mr. Paykin?

15           MR. PAYKIN:  I call John Quadrozzi, Junior.

16           MR. MALONEY:  I would like to request my client's

17  presence at Counsel table during this phase.

18           THE COURT:  Any objection.

19           MR. PAYKIN:  I'd rather not.

20           THE COURT:  Aside from preferences, do you have an

21  objection?

22           MR. PAYKIN:  I don't because --

23           THE COURT:  Just answer.

24           MR. PAYKIN:  There's going to be discrepancies

25  between their testimony.

Proceedings                                    83

1              THE COURT:  Mr. Paykin, this is a very simple

2    question.  You've told me what you'd rather.  I don't know if

3    that's a legal objection or not.

4              I'm just asking:  Are you objecting?

5              MR. PAYKIN:  I am objecting.

6              THE COURT:  Okay.  On what grounds?

7              MR. PAYKIN:  I believe that there are discrepancies

8    between the my client's testimony and his testimony and they

9    had their opportunity to take John's deposition.  And they, I

10   think it's improper to have --

11             THE COURT:  Do you anticipate calling anyone

12   further?

13             MR. MALONEY:  No.

14             THE COURT:  So, you don't want Mr. Maloney with his

15   client by his side to help him prepare his cross-examination;

16   is that it?

17             MR. PAYKIN:  Yes, correct.

18             THE COURT:  What's the basis for my precluding that?

19   Do I have authority do that?

20             MR. PAYKIN:  I'm not aware of any, no.

21             THE COURT:  So, I would being exceeding my authority

22   if I did that?

23             MR. PAYKIN:  I don't know if you're exceeding your

24   authority.  I think you could do it discretionary since I

25   didn't have my client at my side.

Proceedings                            84

1          THE COURT:   Did you wish to have him by your side?

2          MR. PAYKIN:   I would have liked it.

3          THE COURT:   Why didn't you have him by your side?

4          MR. PAYKIN:   I thought it was the Court's policy

5    that we didn't.

6          THE COURT:   When did I tell you that?

7          MR. PAYKIN:   You asked if we wanted the witnesses

8    out of the room.

9          THE COURT:   You said no.

10         MR. PAYKIN:   I said no.

11         THE COURT:   Sit down.

12         Do you want your client with you?

13         Mr. Paykin, you've never asked me to have your

14   client with you, in the gallery, somewhere else.   I asked you

15   if you wanted witnesses excluded, you said no.

16         MR. PAYKIN:   Right.

17         THE COURT:   If you didn't want your client by your

18   side, that was your business.   If you wanted him there, I

19   don't know why you didn't have him there.   But I certainly

20   didn't do anything.

21

22         COURTROOM DEPUTY:   Please, raise your right hand.

23   J O H N    Q U A D R O Z Z I,    J R.,

24         called by the Defense, having been

25         first duly sworn, was examined and testified

                 J. Quadrozzi, Jr. - Direct / Paykin            85

1            as follows:

2            COURTROOM DEPUTY:  State your name for the record,

3    please.  You may be seated.

4            THE WITNESS:  John Quadrozzi.

5            COURTROOM DEPUTY:  Spell your last name.

6            THE WITNESS:  Q-U-A-D-R-O-Z-Z-I.

7            COURTROOM DEPUTY:  Thank you, you may be seated.

8            THE COURT:  You may enquire.

9    DIRECT EXAMINATION

10   BY MR. PAYKIN:

11   Q    Mr. Quadrozzi, did there come a time when the ADA barge

12   was docked at a facility which you controlled?

13   A    Yes.

14   Q    And when was that?

15   A    I'm not exactly sure of the time frame.

16   Q    And how did the ADA come to be docked at such facility?

17   A    CDS Marine had docked it there.

18   Q    And why did they do it there, to your knowledge?

19   A    They were going to be hired to do some work at our

20   facility and that was their equipment.

21   Q    And what happened after the ADA was docked at such

22   facility?

23   A    In respect to?

24   Q    What happened to CDS Marine?

25   A    Oh.  They, at some point they disappeared.

J. Quadrozzi, Jr. - Direct / Paykin                    86

1    Q    And they left the barge; is that correct?

2    A    Yes.

3    Q    Did they attempt to come retrieve the barge?

4    A    No.

5    Q    Did you attempt to have them come retrieve the barge?

6    A    Yeah.

7    Q    And what happened?

8    A    They did not.

9    Q    And was this barge then left under your care?

10   A    It was left, yes, for -- and we were forced to care for

11   it.

12   Q    And what was the size of this barge?

13   A    It's about a hundred-foot barge in length.  I don't know

14   the beam.

15   Q    Did you have concerns that this barge could damage

16   anything?

17   A    Yes.

18   Q    And what were those concerns?

19   A    It was in inclement weather and so forth.  The barge had

20   broken loose several times because they weren't really moored

21   properly by CDS Marine.  So, we had to retrieve them, stop

22   them from breaking our property, our neighbor's property.

23   Q    Could a barge this size have broken loose and caused

24   substantial damage in your estimation?

25   A    Yes.

1   Q    So, after the barge broke loose a few times, did you take

2   steps to secure it so that it would not break loose?

3   A    Yes.

4   Q    And how did you secure it?

5   A    We would refasten the lines.  There was one time we

6   actually had to hire a tug boat in a storm to bring it over.

7   Q    And how was it fastened?

8   A    You mean physically?

9   Q    Correct.

10  A    Ropes and cable.

11  Q    And what was it fastened to?

12  A    It was, there were three barges.  This barge, I believe,

13  was on the outside.  Each one was nested to the other with

14  ropes and they were, the one that was against the dock was

15  held by cables, which was operated by a winch.  And that winch

16  is what we would use to bring it in, if it had pulled away

17  from the took or loosened up.

18  Q    So, any steel cables used were connected to a winch; is

19  that correct?

20  A    Yes.

21  Q    Were any steel cables connected to the ADA?

22  A    Not that I'm aware of.

23  Q    And what was the winch sitting on that this steel cable

24  was connected to?

25  A    It was on the deck barge that was against the dock.

J. Quadrozzi, Jr. - Direct / Paykin                88

1   Q    And what was the cable secured against?

2   A    This was a, this was a pier that wasn't operational.  So,

3   it was just, it had no cleats on it.  There were no metal

4   cleats or fasteners, so it was just tied around the wooden

5   piles.

6   Q    And what are the wooden piles based in?

7   A    They're wooden piles on the dock.  They're driven into

8   the mud.

9   Q    Is there any metal on those wooden piles?

10  A    No.  No, only fasteners, but basically this was a wooden

11  dock.

12  Q    Was there anything else between the barges?

13  A    There are what you referred to as fenders.  They're

14  rubber balls that float in the water.

15          And also, rubber tires are hung between them to keep

16  them from banging together and so that when you tighten them,

17  you can hold them fast to one another without them touching

18  one another.

19  Q    Did you ever speak to Mr. Sulzer?

20  A    No.

21  Q    Do you have an office at Gowanus Industrial Park?

22  A    There's physically, at Gowanus Industrial Park, there is

23  an office trailer.

24  Q    Do you work out of that office trailer?

25  A    Sometimes, yeah.

J. Quadrozzi, Jr. - Direct / Paykin                89

1  Q    Is there a receptionist there?

2  A    There's a security and security personnel and people that

3  tend to paperwork there, yes.

4  Q    Did Mr. Sulzer ever call you and request to inspect the

5  barge?

6  A    No.

7  Q    To your knowledge, did Mr. Sulzer ever call anybody at

8  Gowanus Industrial Park and ask them to inspect the barge?

9  A    There was, there were people that had just shown up at

10  the site.  I had gotten word that there were people there

11  requesting access to the barge, but not necessarily showing

12  proof or ID, and it was disregarded.

13  Q    And who told you this?

14  A    I security personnel.

15  Q    So, somebody showed up without proof that they owned the

16  barge and wanted to go in and look at it; is that correct?

17  A    Somebody showed up and said they wanted to see the barge.

18  No proof, no, no real rationale as to why.

19        This is a large facility.  We get people all the

20  time trying to come into the property and see things that are

21  inappropriate.  So, we have security there that prevents

22  unauthorized access.

23  Q    And prior to this person showing up, were you aware of a

24  letter that had been sent to your attorneys from Mr. Sulzer's

25  attorney requesting to permission to retrieve the barge?

J. Quadrozzi, Jr. - Direct / Paykin          90

1   A     I don't, I was told about a letter.  I don't think it was
2   prior.  I think it was afterwards that a letter was sent, but
3   again, the date is not clear.  But I do remember a letter
4   being sent to the attorney somewhere thereafter.
5   Q     Mr. Quadrozzi, do you have any experience as a welder?
6   A     Yes.
7   Q     And could you describe that for me?
8   A     Describe welding?
9   Q     Your experience as a welder.
10  A     I, I've, I've been around steel and done welding my whole
11  life.  My father was a welder, truck body builder.  My
12  grandfather was a blacksmith when he came to this country.
13  Q     And what's your experience with boats and ships?
14  A     I've been around boats my whole life.  On the water my
15  whole life.  I've run a 500 some-odd-foot bulk carrier for the
16  last 25 years in the same area of Brooklyn.
17  Q     And to your knowledge, if the welding on a ship or barge
18  is done improperly, does that have any impact on the corrosion
19  that the salt water causes?
20  A     Certainly.
21  Q     Did you ever have a chance to inspect the welding on the
22  ADA?
23  A     No.  No reason to.
24  Q     Did anybody ever contact you and ask you to check the ADA
25  for electrolysis --

J. Quadrozzi, Jr. - Direct / Paykin                    91

1   A     No.

2   Q     -- reactions?

3         Did anybody ever contact you and ask you to check

4   the ADA to make sure it had anodes on it?

5   A     No.

6   Q     Have you seen, in your experience with ships and boats,

7   have you seen corrosion caused by salt water and electric

8   reactions?

9   A     Yes.

10  Q     And to your knowledge, is a rope an insulator against the

11  corrosion?

12  A     A hundred percent.

13  Q     And to your knowledge, are the bumpers between the barges

14  and insulator against corrosion?

15  A     Yeah.

16  Q     And to your knowledge, are the rubber tires between the

17  barges an insulator against corrosion?

18  A     Yes.

19        And also, to point out that the pier itself is an

20  insulator against corrosion.  As this pier was under repair,

21  it was not even connected to the land.  In fact, that was some

22  of the early work that CDS did, was -- when they first arrived

23  is, they cut some of the broken concrete away from the land

24  and disconnected the pier from the land.

25                 (Continued on following page.)

Quadrozzi - Direct/Mr. Paykin                    92

1    BY MR. PAYKIN:

2    Q    Do you have a claim against CDS Marine for leaving this

3    barge on your property?

4    A    Yes, I did.

5    Q    And, as such, do you have a claim against the equipment

6    that was on the barge which was CDS Marine's?

7    A    Yes; we did we put a claim against the equipment.

8    Q    And what equipment was on that barge besides the crane?

9    A    Well, are we talked about the ADA.

10   Q    Yes?

11   A    The ADA had a crane and it had a concrete pumping system

12   inside and I don't know anything else of significance.

13   Q    Is a concrete pumping system of value to you?

14   A    Sure.  Could be what we would have used to repair the

15   facility.

16            MR. PAYKIN:  I have no further questions.

17            THE COURT:  Mr. Maloney.

18   CROSS-EXAMINATION

19   BY MR. MALONEY:

20   Q    Good afternoon.

21            You just testified that you had a claim against

22   CDS for money they owed you; is that correct?

23   A    Yes.

24   Q    Did you file a Notice of Claim in the bankruptcy

25   proceeding in CDS's bankruptcy?

1    A    My lawyer was handling it, I don't know exactly the

2    procedure that he did.

3    Q    Do you recall whether you owed CDS any money?

4    A    No, I didn't owe CDS any money.

5    Q    Are you aware there was you were listed as a creditor in

6    the bankruptcy petition Gowanus Industrial Park was listed as

7    a creditor?

8    A    I know that they had submitted some invoices for work

9    that was never done.

10   Q    Were you aware --

11        I meant to say, "debtor."  Were you aware that

12   you were listed on the bankruptcy petition as a debtor to CDS

13   in the amount of $27,000?

14   A    I don't recall.  Like I said, I know that they had

15   submitted some invoices for work they didn't do.

16   Q    Okay.  Now, you testified earlier that these barges were

17   breaking away and they became a problem?

18   A    Mm-hmm.

19   Q    So, you or your people re-moored them.

20        So, you put the cables and ropes on them to

21   moor them; is that correct?

22   A    Several times, because the material that was on the barge

23   was were old ropes and old cables, so they would break free or

24   loosen and we would have to keep refastening them.

25   Q    The outer most barge the ADA that was moored to the next

Quadrozzi - Cross/Mr. Maloney                    94

1    barge by rope or cable?

2    A    All of them were moored together by rope.

3    Q    Where were the cables?

4    A    Cables would be on the winch that was holding the barge

5    closest to the dock and the other barges were attached to each

6    other.

7    Q    And, the other barges that were attached to that, were

8    you attached only by rope or by a combination of rope and

9    cable?

10   A    They were attached by ropes.

11   Q    What about any cable, were any cables out?

12   A    I answered that already, it was cable.

13   Q    I understand.  The cable on the inside?

14   A    That was on the dock.

15   Q    My question is, was there any cable between the dock and

16   the outer barges?

17   A    I answered that question.

18            THE COURT:  Answer it again.  If there is a reason

19   that you should not answer, Mr. Quadrozzi, your lawyer will

20   make an objection known "as asked and answered."  I will rule

21   on the objection, your job here is to answer the questions

22   that are asked of you unless instructed otherwise.

23            Do you understand?

24            THE WITNESS:  Okay.

25            THE COURT:  You roll yours eyes and smirk, so there

Quadrozzi - Cross/Mr. Maloney                    95

1    is a record of it, is there something about the instruction

2    you don't understand.

3                THE WITNESS:  No; I said, "I understand."

4                THE COURT:  Very good.  Good.

5    BY MR. PAYKIN:

6    Q    The question was:  Were there any cables connecting the

7    outer barges to one another?

8    A    Not that I'm aware of, no.

9    Q    Now, you said that the winch was on the dock, right?

10   A    No.

11   Q    Where was the winch?

12   A    On the barge against the dock.

13   Q    What powered the winch?

14   A    Diesel or gasoline powered motor.

15   Q    Did it have any electrical battery on it?

16   A    To start it, yes.

17   Q    And you said that the wires connecting the inner most

18   barge were connected to wooden pilings, correct?

19   A    Yes.

20   Q    Did those have metal bolts on them?

21   A    Yes.

22   Q    Could an electrical pathway by virtue of the metal

23   components in the pilings?

24   A    No.

25   Q    How could you be sure?

Quadrozzi - Cross/Mr. Maloney                          96

1    A    Because the rope was tied to the wood and not the bolts.

2    Wood is not a conductor of electricity.

3    Q    You said "rope," but earlier you said it was wire which

4    was --

5    A    The fasteners.

6    Q    The fasteners were made out of metal?

7    A    The fasteners that were wire.

8    Q    Okay.  So they were connected to the wood?

9    A    Yes.

10   Q    Which had metal bolts on the side of it?

11   A    There were metal bolts in the wood not touching the

12   cable.

13   Q    How do you know he didn't touch the cable at any time?

14   A    Because I would look at it.

15   Q    So, you regularly inspected this yourself?

16   A    From time to time, yes, to make sure it was secure.

17   Q    Did you ever use one of those devices called a potential

18   meter?

19   A    No.

20        MR. MALONEY:  I have nothing further.

21        THE COURT:  Any redirect.

22        MR. PAYKIN:  No, Your Honor.

23        THE COURT:  I think I had a couple of follow-up

24   questions and, of course, Counsel, you will get a chance to

25   follow up.

Quadrozzi - By the Court                    97

1           I was unclear on the timing of the incident

2    with a security guard turning somebody away.

3           Do you know what I'm referring to?

4           THE WITNESS:  Yes.

5           THE COURT:  Okay.  Was that before or after you were

6    aware that somebody had contacted your attorney about the ADA?

7           THE WITNESS:  That was before.

8           THE COURT:  All right.  And how did you come to have

9    an attorney representing you about the ADA?

10          THE WITNESS:  Well, the attorney was representing me

11   against CDS Marine.

12          THE COURT:  I see.

13          THE WITNESS:  So then when the ADA people got

14   involved, then, they were handling that.

15          THE COURT:  I understand.  You said that rubber

16   tires insulate against corrosion; is that correct?

17          THE WITNESS:  Yes.

18          THE COURT:  Am I misunderstanding?  I thought

19   corrosion was what happens below the water and oxidation is

20   what happens in the air, correct?

21          THE WITNESS:  No.  No.  Oxidation is just the

22   reaction of the air with the metal that creates corrosion.

23   What they're referring to is it electrolysis which is the

24   electricity that travels either through the water or from the

25   land to the boat.

Quadrozzi - By the Court                    98

1           THE COURT:  I see.

2           THE WITNESS:  So, what they're trying to clarify is

3    a means for more rapid electrolysis to get to the barge

4    because of a wire as opposed to what would normally just be in

5    the water.

6           THE COURT:  And, so, the rubber tires prevent

7    corrosion how?

8           THE WITNESS:  Well, if the barge was tied to another

9    barge and there were either ropes or tires between them there

10   is no conductivity.

11          THE COURT:  It doesn't contact, I understand.

12          THE WITNESS:  Okay.

13          THE COURT:  Your claim against the equipment on the

14   barge, was that -- do you know -- did you seek money from CDS

15   or did you have an action pending somewhere seeking title to

16   the equipment?

17          THE WITNESS:  We were seeking money from CDS because

18   this is a rental facility.

19          THE COURT:  Okay.  It was a claim for money?

20          THE WITNESS:  At some particular point they wouldn't

21   remove their material, a long time passed, and we started

22   charging them to encourage them to leave or keeping the stuff

23   there.

24          THE COURT:  Anything else, folks?

25          MR. PAYKIN:  No.

Quadrozzi - By the Court                    99

1        MR. MALONEY:   No.

2        THE COURT:   Thank you.   You're excused.

3        (Witness leaves the witness stand.)

4        THE COURT:   Mr. Paykin any further witnesses.

5        MR. PAYKIN:   No, Your Honor.

6        THE COURT:   Any rebuttal.

7        MR. MALONEY:   No, Your Honor.

8        THE COURT:   The evidence is closed.

9            Now, Counsel, do you wish to argue today?  Do

10   you wish to submit follow-up memoranda?  How do you prefer to

11   proceed?

12        MR. PAYKIN:   I think the best would be to get the

13   transcript and do the follow-up memoranda.

14        THE COURT:   How soon did you do want to do it.

15        MR. PAYKIN:   The first is how soon we can get the

16   transcript.  I will contact the court reporter.

17        THE COURT:   Send me a letter by next week proposing

18   a briefing schedule.

19            Anything further that we can accomplish today.

20        MR. PAYKIN:   No.

21        MR. MALONEY:   No.

22        THE COURT:   Thank you, all.

23        (WHEREUPON, the proceedings were adjourned.)

24                        *   *   *

25

100

1                       I N D E X

2  WITNESS                                    PAGE

3

   C A P T A I N   R O B E R T   H E N R Y
4
        DIRECT EXAMINATION
5       BY MR. MALONEY                          3
        CROSS-EXAMINATION
6       BY MR. PAYKIN                          10
        REDIRECT EXAMINATION
7       BY MR. MALONEY                         13

8

   A R T H U R   H.   S U L Z E R
9
        DIRECT EXAMINATION
10      BY MR. MALONEY                         16
        CROSS-EXAMINATION
11      BY MR. PAYKIN                          46
        DIRECT EXAMINATION (Continued)
12      BY MR. MALONEY                         64
        CROSS-EXAMINATION (Continued)
13      BY MR. PAYKIN                          65
        EXAMINATION BY
14      THE COURT:                             66

15

   C A P T A I N
16        J O S E P H   A H L S T R Ö M

17      DIRECT EXAMINATION
        BY MR. MALONEY                         69
18      VOIR DIRE
        BY MR. PAYKIN                          73
19      DIRECT EXAMINATION (Continued)
        BY MR. MALONEY                         75
20      CROSS-EXAMINATION
        BY MR. PAYKIN                          76
21

22  J O H N   Q U A D R O Z Z I,   J R.

23      DIRECT EXAMINATION
        BY MR. PAYKIN                          85
24      CROSS-EXAMINATION
        BY MR. MALONEY                         92

25

101

1                              E X H I B I T S

2

3          Counterclaim Plaintiff's
           Exhibits 1 through 8                              25

4

5          Counterclaim Defendant's
           Exhibit A through D                               25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$10,000** [1] - 30:10
**$100,000** [1] - 50:12
**$12,000** [5] - 43:23, 72:22, 75:6, 80:3, 80:8
**$15,000** [1] - 44:7
**$16,000** [1] - 44:7
**$20,000** [2] - 30:10, 67:6
**$200,000** [3] - 19:9, 50:12, 50:21
**$21,000** [1] - 51:18
**$27,000** [1] - 93:13
**$3,000** [1] - 67:24
**$3,100** [1] - 18:5
**$3,500** [2] - 51:10, 51:18
**$35,000** [1] - 72:23
**$36,000** [1] - 75:5
**$45,000** [1] - 50:5
**$500** [1] - 19:19
**$600** [2] - 19:16, 46:2
**$700** [1] - 19:19

## '

**'04** [5] - 28:17, 29:2, 45:7, 51:21, 52:4
**'05** [10] - 4:24, 4:25, 26:13, 33:8, 33:10, 33:12, 45:9, 60:3, 60:8
**'06** [2] - 26:13, 35:5
**'07** [2] - 33:4, 55:21
**'89** [1] - 4:5
**'99** [1] - 60:8

## 0

**06-CV-00105** [1] - 1:4

## 1

**1** [4] - 25:8, 25:10, 25:11, 101:3
**10** [1] - 100:6
**10016** [1] - 1:18
**105,000** [1] - 66:6
**10th** [1] - 1:17
**11050** [1] - 1:20
**11:30** [1] - 69:1
**12** [1] - 78:17
**13** [1] - 100:7
**15** [2] - 70:11, 73:13
**16** [4] - 38:5, 38:7, 78:16, 100:10
**17th** [5] - 22:3, 51:21, 52:4, 52:13, 52:14
**180,000** [1] - 46:5
**185** [1] - 1:17
**1964** [1] - 16:20
**1965** [1] - 4:2
**1971** [1] - 4:3
**1987** [1] - 4:3
**1989** [1] - 4:4
**1999** [5] - 31:12, 60:1, 77:4, 81:24, 82:4

## 2

**2/27/06** [1] - 55:11
**20** [3] - 1:8, 45:11, 78:17
**200,000** [1] - 13:3
**2000** [2] - 17:11, 31:13
**2001** [2] - 17:6, 47:3
**2003** [5] - 17:17, 47:3, 47:9, 47:19, 60:15
**2004** [6] - 20:12, 20:20, 21:19, 22:3, 52:14, 60:18
**2005** [6] - 8:15, 9:9, 26:1, 27:14, 29:24, 56:3
**2005-19** [1] - 55:6
**2006** [3] - 56:5, 56:6, 71:3
**2006-02** [1] - 55:10
**2006-04** [1] - 55:7
**2006-20** [1] - 55:16
**2008** [2] - 1:8, 56:6
**25** [3] - 90:16, 101:3, 101:5
**25th** [1] - 6:3
**26th** [1] - 6:3
**27th** [1] - 55:3
**28th** [2] - 26:1, 66:15
**29th** [2] - 21:16, 55:3

## 3

**3** [3] - 41:3, 71:6, 100:5
**3/29/06** [1] - 55:11
**30** [2] - 13:1, 46:4
**30th** [1] - 21:17
**33** [5] - 1:20, 55:3, 55:4, 55:5, 55:11
**37550** [1] - 32:13

## 4

**4** [1] - 43:12
**40** [6] - 16:22, 28:1, 40:12, 46:23, 48:6, 57:24
**40-something** [1] - 16:22
**46** [1] - 100:11

## 5

**5** [2] - 26:4, 44:19
**50** [1] - 16:22
**500** [2] - 19:13, 90:15

## 6

**60** [1] - 54:22
**600** [2] - 21:3, 28:21
**613-2324** [1] - 1:24
**613-2607** [1] - 1:23
**64** [1] - 100:12
**65** [1] - 100:13
**66** [1] - 100:14
**69** [1] - 100:17

## 7

**7** [2] - 23:5, 23:17
**718** [2] - 1:23, 1:24
**73** [1] - 100:18
**75** [1] - 100:19
**76** [1] - 100:20

## 8

**8** [4] - 25:8, 25:10, 25:11, 101:3
**85** [1] - 100:23

## 9

**9/11** [1] - 29:8
**92** [1] - 100:24
**95** [1] - 4:15
**9:30** [1] - 1:8
**9th** [2] - 71:3, 72:17

## A

**A-D-A** [1] - 10:6
**A-H-L-S-T-R-O-M** [1] - 69:16
**a.m** [1] - 1:8
**abandoned** [4] - 31:25, 32:13, 62:9, 62:11
**ability** [1] - 17:13
**able** [6] - 13:19, 14:1, 32:17, 44:21, 45:15, 58:10
**Absolutely** [1] - 40:11
**academically** [1] - 74:4
**accelerate** [1] - 77:22
**accept** [1] - 3:4
**access** [3] - 48:7, 89:11, 89:22
**accomplish** [1] - 99:19
**account** [1] - 44:10
**accurate** [1] - 72:15
**accurately** [1] - 14:20
**action** [7] - 7:12, 13:24, 14:8, 14:15, 14:24, 36:12, 98:15
**active** [4] - 9:17, 37:4, 37:18
**Active** [1] - 16:10
**activity** [2] - 37:14, 61:4
**ADA** [53] - 10:6, 12:21, 17:11, 20:7, 20:22, 20:23, 23:25, 26:25, 27:4, 27:6, 32:15, 43:16, 44:15, 45:5, 46:15, 46:19, 46:25, 47:4, 47:10, 47:13, 47:21, 47:22, 48:12, 48:13, 49:4, 51:8, 54:1, 56:2, 56:19, 56:21, 56:25, 57:1, 58:22, 59:25, 61:17, 61:23, 65:21, 70:24, 79:15, 85:11, 85:16, 85:21, 87:21, 90:22, 90:24, 91:4, 92:9, 92:11, 93:25, 97:6, 97:9, 97:13
**ADA's** [2] - 56:13, 79:16
**added** [1] - 49:6
**addition** [1] - 22:17
**additional** [2] - 40:24, 79:3
**address** [3] - 21:2, 28:21, 28:23
**adjourned** [1] - 99:23
**adjusted** [2] - 48:19, 48:21
**adjustment** [1] - 48:5
**admission** [1] - 51:25

**admitted** [3] - 25:5, 25:14, 39:17
**advanced** [1] - 70:4
**affected** [1] - 63:24
**afternoon** [1] - 92:20
**afterwards** [1] - 90:2
**age** [1] - 30:22
**aggravated** [1] - 44:1
**ago** [3] - 66:24, 76:12, 76:18
**agree** [2] - 2:18, 2:19
**agreed** [2] - 34:7, 35:4
**agreement** [4] - 54:17, 57:18, 58:8, 58:11
**ahead** [3] - 10:9, 58:20, 73:6
**Ahlström** [5] - 68:20, 69:5, 69:15, 70:1, 71:7
**ahold** [1] - 56:20
**aided** [1] - 1:25
**air** [4] - 36:15, 74:16, 97:20, 97:22
**aircraft** [1] - 49:19
**Alex** [1] - 23:20
**allow** [3] - 21:24, 34:18, 51:22
**almost** [3] - 37:22, 46:23, 48:6
**aluminum** [2] - 36:25, 77:21
**amount** [2] - 43:22, 93:13
**anchor** [1] - 13:2
**anode** [2] - 37:17, 78:19
**Anodes** [1] - 81:6
**anodes** [20] - 37:13, 65:21, 71:18, 71:23, 78:9, 78:11, 78:12, 78:13, 80:5, 80:7, 80:9, 80:14, 80:17, 80:22, 81:1, 81:8, 91:4
**Answer** [1] - 94:18
**answer** [8] - 48:24, 48:25, 57:8, 63:19, 75:19, 82:23, 94:19, 94:21
**answered** [4] - 60:19, 94:12, 94:17, 94:20
**answers** [1] - 61:3
**ant** [1] - 41:13
**anticipate** [1] - 83:11
**appalled** [1] - 64:17
**apparent** [3] - 81:19, 81:21, 81:23
**appeals** [1] - 3:1
**appearance** [1] - 10:24
**appeared** [2] - 11:19, 71:22
**appointed** [1] - 70:12
**apportionment** [2] - 72:24, 75:10
**approach** [8] - 5:25, 6:1, 23:1, 23:10, 26:2, 27:12, 41:2, 52:19
**appropriate** [4] - 38:6, 53:11, 62:13, 66:1
**approximation** [1] - 61:1
**area** [13] - 6:4, 8:3, 19:11, 26:23, 26:24, 27:10, 27:11, 28:5, 29:4, 36:9, 38:3, 42:22, 90:16
**argue** [1] - 99:9
**argument** [1] - 72:8
**argument's** [1] - 49:3
**arguments** [1] - 68:18
**Army** [5] - 31:20, 31:23, 32:3, 32:7, 32:12
**arrange** [2] - 24:8, 53:7
**arrangements** [3] - 34:14, 34:18, 53:11
**arrears** [1] - 17:20
**arrest** [3] - 30:10, 67:2, 67:8
**arrested** [1] - 30:8

**arrived** [3] - 58:7, 58:11, 91:22
**Arthur** [5] - 2:14, 5:4, 15:15, 15:25, 16:19
**ARTHUR** [1] - 1:9
**as..** [1] - 2:23
**ascertain** [1] - 53:10
**ashore** [1] - 70:12
**Aside** [1] - 82:20
**aside** [2] - 24:12, 75:20
**assistant** [1] - 70:12
**assisted** [1] - 70:23
**associate** [2] - 33:24, 34:4
**Associates** [1] - 16:19
**ASSOCIATES** [1] - 1:9
**associates** [1] - 33:21
**assume** [4] - 2:8, 19:2, 80:6, 81:16
**assuming** [1] - 50:15
**assure** [1] - 30:24
**astounded** [1] - 35:21
**Atlantic** [1] - 23:20
**attach** [1] - 64:13
**attached** [6] - 6:12, 6:13, 36:7, 41:8, 94:5, 94:7, 94:8, 94:10
**attachments** [1] - 13:22
**attempt** [2] - 86:3, 86:5
**attempted** [3] - 17:20, 20:12, 34:15
**attorney** [15] - 20:12, 21:22, 22:5, 28:12, 28:16, 51:20, 52:3, 53:24, 55:22, 89:25, 90:4, 97:6, 97:9, 97:10
**attorneys** [4] - 30:6, 67:2, 67:13, 89:24
**attract** [1] - 37:4
**attributable** [2] - 43:20, 81:1
**attribute** [2] - 39:18, 75:6
**attributed** [1] - 72:22
**auction** [1] - 23:20
**August** [5] - 27:14, 29:24, 33:8, 33:10
**authority** [1] - 83:19, 83:21, 83:24
**available** [3] - 9:7, 24:10, 48:8
**Avenue** [4] - 1:17, 1:20, 21:3, 28:22
**average** [2] - 45:19, 46:2
**aware** [11] - 18:24, 51:11, 51:14, 83:20, 87:22, 89:23, 93:5, 93:10, 93:11, 95:8, 97:6

## B

**backed** [1] - 11:17
**background** [4] - 4:1, 16:6, 70:19, 74:3
**backtrack** [1] - 27:15
**balls** [1] - 88:14
**banging** [1] - 88:16
**bankrupt** [1] - 50:6
**bankruptcy** [10] - 28:13, 28:16, 50:16, 59:7, 62:8, 62:9, 92:24, 92:25, 93:6, 93:12
**bare** [1] - 11:6
**barge** [332] - 2:13, 4:21, 5:10, 5:16, 5:19, 6:6, 6:10, 6:12, 6:13, 6:14, 6:16, 7:2, 7:4, 7:9, 7:11, 7:22, 8:3, 8:7, 8:17, 8:22, 9:7, 9:10, 9:11, 9:17, 9:25, 10:1, 10:5, 10:16, 10:19, 10:23, 11:2, 11:4, 11:9, 11:11, 11:12, 11:14, 11:22, 12:3, 12:5, 12:8, 12:16, 12:20, 12:22, 12:24, 12:25, 13:4, 13:11, 13:12, 13:20, 13:22, 14:2, 14:16, 14:18, 16:13, 16:21, 17:11,

17:21, 17:25, 18:4, 18:9, 18:10, 18:12, 18:14, 18:16, 18:21, 18:24, 19:4, 19:5, 19:7, 19:10, 19:12, 19:18, 19:20, 19:21, 20:3, 20:4, 20:6, 20:8, 20:11, 20:17, 20:22, 21:8, 21:11, 21:12, 21:21, 21:25, 22:6, 22:9, 22:11, 22:14, 23:19, 23:21, 24:5, 24:7, 24:11, 25:18, 26:12, 26:15, 26:16, 27:14, 27:19, 28:3, 28:8, 28:9, 28:17, 28:20, 28:23, 29:1, 29:5, 29:9, 29:16, 29:21, 30:2, 30:8, 30:10, 30:18, 30:22, 30:23, 30:25, 31:8, 31:10, 31:11, 31:15, 31:18, 31:22, 31:24, 32:6, 32:10, 32:13, 32:23, 33:8, 33:11, 33:20, 34:1, 34:5, 34:12, 34:15, 34:18, 35:11, 35:13, 35:16, 35:20, 35:21, 35:22, 36:14, 37:10, 37:16, 37:23, 38:3, 38:5, 39:2, 39:14, 40:6, 40:12, 40:15, 40:16, 40:19, 40:21, 41:12, 41:17, 41:25, 42:18, 43:2, 43:16, 44:13, 44:15, 44:22, 45:4, 45:13, 46:2, 46:3, 46:13, 46:16, 46:21, 47:1, 47:4, 47:14, 47:19, 48:8, 48:11, 48:18, 49:5, 49:6, 49:8, 49:9, 50:11, 50:17, 50:20, 50:22, 50:25, 51:5, 51:10, 51:17, 51:22, 51:24, 52:5, 52:8, 52:9, 52:10, 52:17, 52:18, 52:22, 52:25, 53:3, 53:6, 53:7, 53:10, 53:16, 53:23, 55:2, 55:4, 55:19, 55:20, 56:6, 56:15, 56:22, 57:2, 57:3, 57:6, 57:14, 57:15, 57:22, 58:1, 58:2, 59:2, 59:3, 59:4, 59:19, 59:21, 59:22, 59:23, 60:13, 60:16, 60:19, 60:21, 61:2, 61:6, 61:7, 61:8, 61:9, 61:10, 61:19, 64:6, 64:13, 64:14, 64:24, 65:18, 66:24, 67:8, 70:24, 71:4, 71:17, 71:20, 71:22, 72:3, 72:16, 75:12, 75:15, 75:25, 76:20, 76:23, 77:3, 77:8, 78:4, 78:14, 78:15, 78:16, 78:24, 78:25, 79:3, 79:15, 79:16, 79:17, 79:21, 79:23, 79:25, 80:1, 80:11, 80:21, 81:7, 81:16, 81:21, 81:25, 82:3, 85:11, 86:1, 86:3, 86:5, 86:9, 86:12, 86:13, 86:15, 86:19, 86:23, 87:1, 87:12, 87:25, 89:5, 89:8, 89:11, 89:16, 89:17, 89:25, 90:17, 92:3, 92:6, 92:8, 93:22, 93:25, 94:1, 94:4, 95:12, 95:18, 98:3, 98:8, 98:9, 98:14
**barges** [74] - 4:13, 4:15, 4:17, 6:20, 6:24, 7:5, 7:6, 7:15, 7:16, 8:7, 8:10, 9:4, 11:1, 12:12, 16:22, 16:23, 17:2, 17:9, 19:23, 20:2, 22:17, 26:22, 26:23, 29:17, 29:20, 30:21, 31:2, 31:4, 31:19, 31:21, 31:25, 32:2, 32:4, 32:8, 34:17, 40:13, 45:1, 45:24, 46:18, 46:24, 47:6, 47:10, 48:6, 49:19, 56:10, 56:16, 56:17, 56:18, 56:20, 59:9, 59:13, 59:18, 60:11, 61:3, 61:13, 62:1, 62:9, 64:8, 70:19, 70:20, 70:22, 71:18, 75:17, 79:5, 79:14, 87:12, 88:12, 91:13, 91:17, 93:16, 94:5, 94:7, 94:16, 95:7
**Barges** [1] - 70:20
**barnacles** [1] - 35:14
**Based** [3] - 40:6, 53:15, 72:21
**based** [4] - 8:5, 40:7, 60:10, 88:6
**Basin** [1] - 29:6
**basis** [5] - 17:16, 24:17, 39:21, 56:15, 83:18
**battery** [1] - 95:15
**Bay** [1] - 5:11

**Bayside** [2] - 55:17, 55:24
**Bayview** [1] - 1:20
**beam** [1] - 86:14
**beat** [1] - 46:6
**became** [1] - 93:17
**become** [2] - 57:18, 81:19
**becomes** [2] - 12:10, 81:20
**BEFORE** [1] - 1:14
**began** [1] - 18:1
**beginning** [1] - 35:6
**belief** [1] - 11:17
**belong** [1] - 51:1
**below** [2] - 13:14, 97:19
**bend** [1] - 42:23
**best** [1] - 99:12
**Betsy** [20] - 25:20, 25:22, 25:23, 26:12, 44:17, 45:1, 46:18, 47:9, 54:5, 54:11, 56:19, 56:24, 56:25, 58:13, 58:21, 61:16, 61:22, 61:25, 62:2, 66:5
**better** [4] - 23:11, 26:22, 35:15, 55:16
**Betty** [1] - 25:19
**between** [12] - 6:16, 40:10, 59:16, 78:17, 82:25, 83:8, 88:12, 88:15, 91:13, 91:16, 94:15, 98:9
**bid** [1] - 22:19
**big** [3] - 33:15, 33:19, 33:23
**bilge** [1] - 36:5
**bill** [12] - 23:19, 43:15, 43:17, 43:19, 44:2, 44:7, 54:15, 54:25, 66:10, 72:23, 75:5
**billed** [1] - 55:5
**bills** [1] - 68:4
**bit** [5] - 18:6, 49:14, 54:23, 58:1, 78:21
**black** [1] - 41:17
**blacksmith** [1] - 90:12
**blast** [2] - 35:17, 41:12
**blasted** [5] - 35:17, 40:8, 75:13, 76:4, 81:21
**blasting** [1] - 44:12
**boat** [11] - 4:2, 16:13, 20:2, 29:4, 29:9, 33:5, 33:18, 33:23, 74:23, 87:6, 97:25
**boats** [6] - 4:7, 4:10, 16:23, 90:13, 90:14, 91:6
**body** [1] - 90:11
**bollard** [2] - 38:24, 39:1
**bolts** [4] - 95:20, 96:1, 96:10, 96:11
**bottom** [7] - 24:7, 24:8, 36:6, 37:9, 43:1, 43:4, 44:3
**bought** [9] - 16:21, 19:20, 23:19, 25:18, 44:14, 56:19, 56:24, 56:25, 61:25
**bound** [1] - 23:10
**bow** [2] - 36:9, 42:22
**brackish** [1] - 31:9
**break** [4] - 68:22, 79:7, 87:2, 93:23
**breaking** [2] - 86:22, 93:17
**breaks** [1] - 39:12
**briefed** [1] - 62:8
**briefing** [2] - 62:16, 99:18
**briefly** [5] - 3:25, 16:5, 27:5, 70:1, 76:18
**bright** [1] - 13:23
**bring** [5] - 5:11, 5:20, 40:18, 87:6, 87:16
**broke** [1] - 87:1
**broken** [4] - 38:19, 86:20, 86:23, 91:23
**Brooklyn** [8] - 1:6, 5:10, 6:4, 20:25, 27:10, 28:5, 34:6, 90:16

**brother** [1] - 17:4
**brought** [3] - 4:4, 4:5, 6:9
**build** [1] - 12:24
**builder** [1] - 90:11
**builders** [1] - 9:2
**bulk** [1] - 90:15
**bumpers** [1] - 91:13
**bunch** [1] - 54:10
**business** [34] - 4:7, 4:10, 4:13, 4:15, 7:19, 8:6, 8:10, 8:13, 12:9, 16:12, 16:17, 16:18, 16:20, 17:7, 17:10, 17:19, 17:24, 18:12, 19:8, 20:5, 28:1, 28:23, 30:20, 46:12, 46:22, 47:3, 47:4, 47:8, 48:10, 48:15, 56:18, 56:22, 57:13, 84:18
**Butler** [1] - 1:22
**BY** [33] - 1:18, 1:21, 3:23, 10:11, 13:9, 16:3, 23:15, 46:11, 64:2, 65:16, 66:2, 69:25, 73:8, 75:3, 76:11, 85:10, 92:1, 92:19, 95:5, 100:5, 100:6, 100:7, 100:10, 100:11, 100:12, 100:13, 100:13, 100:17, 100:18, 100:19, 100:20, 100:23, 100:24


# C


**cable** [21] - 10:20, 11:18, 11:20, 11:21, 39:1, 39:4, 39:7, 39:12, 79:1, 79:21, 87:10, 87:23, 88:1, 94:1, 94:9, 94:11, 94:12, 94:13, 94:15, 96:12, 96:13
**cabled** [1] - 79:17
**cables** [31] - 6:7, 7:1, 7:4, 7:20, 7:21, 11:15, 11:18, 11:23, 39:10, 39:16, 39:19, 40:7, 43:21, 64:18, 64:21, 71:12, 72:2, 79:6, 79:10, 79:13, 79:22, 80:5, 87:15, 87:18, 87:21, 93:20, 93:23, 94:3, 94:11, 95:6
**Cables** [1] - 94:4
**cadets** [1] - 74:9
**calculation** [1] - 46:7
**calendar** [1] - 55:1
**camera** [1] - 72:19
**cane** [1] - 58:24
**capacity** [1] - 20:9
**captain** [8] - 16:8, 16:11, 70:4, 70:12, 70:14, 70:17, 73:13
**Captain** [30] - 3:9, 3:24, 10:12, 18:6, 23:17, 30:1, 32:23, 33:14, 34:8, 39:15, 40:6, 67:22, 68:20, 69:5, 69:15, 70:1, 70:7, 71:7, 71:14, 72:1, 72:18, 72:22, 75:5, 75:22, 76:1, 76:3, 78:16, 79:5, 79:22, 81:7
**Captain's** [1] - 4:4
**care** [2] - 86:9, 86:10
**carrier** [1] - 90:15
**cars** [1] - 31:24
**case** [3] - 2:10, 49:25, 50:9
**catastrophe** [1] - 75:24
**cathode** [1] - 37:16
**cathodic** [1] - 64:9
**causal** [1] - 40:9
**CAUSE** [1] - 1:13
**caused** [8] - 27:20, 30:24, 36:20, 71:11, 78:3, 81:8, 86:23, 91:7
**causes** [5] - 13:24, 14:23, 61:13, 81:3, 90:19
**CDS** [38] - 17:10, 17:12, 26:25, 27:22,

28:3, 28:14, 47:14, 48:18, 49:3, 49:25, 50:9, 50:11, 50:15, 51:4, 51:7, 51:12, 51:17, 57:5, 57:18, 58:25, 59:1, 59:7, 60:17, 62:9, 62:10, 85:17, 85:24, 86:21, 91:22, 92:2, 92:6, 92:22, 93:3, 93:4, 93:12, 97:11, 98:14, 98:17
**CDS's** [1] - 92:25
**certain** [6] - 11:25, 14:22, 36:3, 67:7, 68:3, 71:19
**certainly** [8] - 13:17, 32:21, 44:25, 53:7, 59:4, 77:9, 78:10, 84:19
**Certainly** [1] - 90:20
**chair** [1] - 70:14
**chance** [2] - 90:21, 96:24
**change** [1] - 59:20
**changed** [1] - 65:8
**changes** [2] - 12:11, 49:6
**Channel** [1] - 29:14
**charge** [2] - 67:22, 73:16
**charging** [1] - 98:22
**charted** [1] - 44:19
**charter** [17] - 4:17, 9:18, 17:14, 18:2, 18:14, 19:14, 19:15, 24:5, 25:25, 26:23, 31:12, 44:21, 44:25, 45:15, 48:14, 54:14, 54:20
**Charter** [1] - 55:10
**chartered** [9] - 17:10, 17:11, 18:9, 26:25, 44:24, 45:1, 55:2, 55:20, 56:7
**chartering** [2] - 25:24, 45:4
**charters** [2] - 54:16, 54:17
**check** [6] - 14:21, 50:22, 64:8, 65:20, 90:24, 91:3
**checks** [1] - 17:17
**chief** [1] - 74:7
**chip** [1] - 74:18
**circumstances** [1] - 57:25
**City** [1] - 23:20
**CIVIL** [2] - 1:13
**Claim** [1] - 92:24
**claim** [7] - 51:11, 92:2, 92:5, 92:7, 92:21, 98:13, 98:19
**claimant** [1] - 82:13
**claiming** [1] - 44:10
**claims** [1] - 21:12
**clarification** [1] - 57:17
**clarify** [2] - 22:15, 98:2
**class** [2] - 74:11, 74:12
**classifications** [1] - 17:2
**clean** [2] - 32:1, 77:19
**cleaned** [1] - 77:1
**clear** [1] - 90:3
**clearly** [2] - 30:13, 30:17
**cleat** [1] - 58:1
**cleats** [3] - 49:20, 88:3, 88:4
**client** [7] - 53:2, 53:16, 83:15, 83:25, 84:12, 84:14, 84:17
**client's** [2] - 82:16, 83:8
**close** [4] - 24:1, 60:7, 60:9, 78:21
**closed** [1] - 99:8
**closest** [1] - 94:5
**Co** [1] - 75:12
**Coast** [5] - 32:10, 32:13, 34:16, 75:15, 75:17, 75:20
**coat** [1] - 41:15
**coated** [1] - 35:16

**College** [2] - 16:7, 17:4
**color** [3] - 23:11, 41:8
**Columbus** [2] - 21:3, 28:21
**combination** [1] - 94:8
**coming** [4] - 37:11, 38:14, 52:4, 53:16
**comment** [1] - 77:9
**common** [1] - 7:20
**common-known** [1] - 7:20
**commonly** [1] - 7:18
**company** [12] - 12:19, 22:16, 22:17, 26:11, 27:22, 28:24, 33:19, 47:10, 47:17, 51:5, 56:14, 60:15
**competitive** [1] - 22:22
**complete** [1] - 19:24
**completed** [1] - 56:2
**completely** [2] - 35:20, 78:8
**complexity** [1] - 12:11
**comply** [1] - 53:13
**components** [1] - 95:23
**Computer** [1] - 1:25
**Computer-aided** [1] - 1:25
**computerized** [1] - 1:25
**concerned** [7] - 30:18, 30:20, 31:1, 31:10, 60:20, 71:15
**concerns** [3] - 31:15, 86:15, 86:18
**conclusion** [1] - 30:12
**concrete** [3] - 91:23, 92:11, 92:13
**condition** [15] - 10:17, 11:16, 13:11, 19:5, 31:6, 31:10, 31:15, 34:1, 35:22, 49:10, 53:8, 53:10, 60:21, 64:18, 75:25
**conductivity** [2] - 72:3, 98:10
**conductor** [1] - 96:2
**conducts** [1] - 7:14
**configuration** [1] - 23:24
**connected** [10] - 4:11, 11:11, 11:14, 11:22, 87:18, 87:21, 87:24, 91:21, 95:18, 96:8
**connecting** [3] - 79:13, 95:6, 95:17
**connection** [1] - 40:10
**consider** [1] - 24:14
**considered** [1] - 24:17
**consistently** [1] - 40:12
**consists** [1] - 27:11
**constantly** [3] - 8:8, 11:9, 36:18
**construction** [4] - 12:18, 16:24, 16:25, 32:19
**Construction** [3] - 55:2, 55:17, 55:24
**consultant** [1] - 70:21
**consulting** [2] - 16:16, 70:16
**contact** [11] - 5:7, 9:1, 17:21, 17:24, 20:12, 37:11, 51:7, 90:24, 91:3, 98:11, 99:16
**contacted** [6] - 4:19, 5:7, 5:8, 30:25, 72:17, 97:6
**continue** [3] - 41:14, 62:20, 74:25
**continued** [1] - 17:15
**Continued** [7] - 64:1, 65:15, 75:2, 91:25, 100:11, 100:12, 100:19
**contract** [3] - 49:8, 57:21, 73:22
**contractor** [4] - 17:13, 18:22, 19:25, 26:21
**contractors** [5] - 16:24, 19:24, 22:18, 26:12, 26:14
**contracts** [1] - 54:11
**contributor** [1] - 77:4

**control** [1] - 61:23
**controlled** [1] - 85:12
**convenience** [1] - 5:17
**conversation** [4] - 20:21, 21:14, 22:12, 66:22
**converted** [1] - 18:12
**copies** [1] - 23:11
**copy** [4] - 23:7, 23:10, 26:6, 71:7
**Corps** [5] - 31:20, 31:23, 32:3, 32:7, 32:12
**correct** [70] - 3:4, 11:12, 11:14, 12:3, 15:2, 22:5, 23:22, 25:19, 30:2, 30:3, 33:1, 36:23, 46:13, 46:16, 47:2, 47:11, 47:12, 47:14, 47:15, 47:20, 47:23, 48:1, 48:19, 48:21, 50:13, 50:17, 51:2, 51:18, 51:22, 52:1, 52:3, 54:5, 54:13, 54:24, 56:7, 56:8, 57:2, 57:6, 58:23, 59:11, 60:1, 60:4, 60:6, 60:12, 61:17, 61:20, 61:24, 63:8, 73:10, 73:14, 73:15, 74:6, 76:6, 76:21, 77:14, 77:22, 80:5, 80:8, 80:10, 80:13, 81:2, 83:17, 86:1, 87:19, 89:16, 92:22, 93:21, 95:18, 97:16, 97:20
**Correct** [4] - 3:5, 63:9, 67:9, 87:9
**corrode** [2] - 7:16, 7:17
**corroded** [5] - 35:20, 36:10, 36:11, 40:12, 40:13
**Corrosion** [2] - 77:25, 78:5
**corrosion** [61] - 7:15, 13:13, 13:24, 14:8, 14:16, 14:19, 14:21, 14:25, 36:12, 36:16, 36:22, 37:5, 37:7, 38:9, 38:11, 39:18, 40:8, 42:11, 42:19, 43:20, 44:1, 44:6, 59:15, 59:17, 61:10, 64:10, 71:21, 72:4, 72:6, 72:23, 75:8, 77:24, 78:2, 78:4, 78:6, 78:7, 78:11, 79:3, 79:19, 80:3, 80:4, 80:6, 80:9, 80:12, 80:15, 80:18, 80:22, 80:25, 81:6, 81:10, 81:17, 90:18, 91:7, 91:11, 91:14, 91:17, 91:20, 97:16, 97:19, 97:22, 98:7
**cost** [7] - 9:19, 12:3, 12:18, 30:9, 33:22, 49:12, 67:6
**Cost** [1] - 9:21
**costs** [3] - 9:13, 33:23, 44:5
**Counsel** [6] - 65:25, 66:7, 68:14, 82:17, 96:24, 99:9
**Counsels** [1] - 2:3
**counter** [1] - 82:13
**counter-claimant** [1] - 82:13
**Counterclaim** [6] - 25:9, 25:11, 25:13, 25:15, 101:3, 101:5
**country** [1] - 90:12
**couple** [8] - 28:6, 29:12, 31:13, 48:10, 65:24, 67:20, 81:18, 96:23
**course** [7] - 4:13, 6:25, 26:8, 31:5, 32:18, 65:25, 96:24
**COURT** [140] - 1:1, 2:3, 2:10, 2:18, 2:21, 2:24, 3:3, 3:6, 3:20, 5:2, 8:21, 8:24, 9:8, 10:5, 10:8, 13:7, 14:12, 14:14, 14:16, 15:8, 15:10, 15:14, 23:2, 23:13, 24:14, 24:23, 25:2, 25:8, 25:13, 27:9, 39:21, 39:25, 40:3, 41:4, 42:15, 46:5, 46:9, 48:25, 51:15, 52:13, 52:20, 53:20, 57:8, 57:16, 58:4, 58:9, 58:14, 58:18, 58:20, 59:8, 62:5, 62:14, 62:17, 62:20, 62:23, 62:25, 63:2, 63:7, 63:10, 63:12, 63:16, 63:21, 63:23, 65:6, 65:8, 65:11, 65:14, 65:24, 66:4, 66:7, 66:12, 66:16, 66:19, 

66:21, 67:1, 67:5, 67:9, 67:13, 67:18, 67:22, 67:25, 68:6, 68:8, 68:12, 68:14, 68:21, 68:25, 69:4, 69:18, 70:7, 73:3, 73:6, 74:24, 76:9, 76:16, 82:7, 82:9, 82:12, 82:14, 82:18, 82:20, 82:23, 83:1, 83:6, 83:11, 83:14, 83:18, 83:21, 84:1, 84:3, 84:6, 84:9, 84:11, 84:17, 85:8, 92:17, 94:18, 94:25, 95:4, 96:21, 96:23, 97:5, 97:8, 97:12, 97:15, 97:18, 98:1, 98:6, 98:11, 98:13, 98:19, 98:24, 99:2, 99:4, 99:6, 99:8, 99:14, 99:17, 99:22, 100:14
**Court** [9] - 1:22, 1:23, 3:25, 27:5, 41:10, 65:4, 65:5, 70:1, 70:18
**court** [5] - 2:1, 28:14, 69:3, 70:9, 99:16
**Court's** [1] - 84:4
**Courthouse** [1] - 1:6
**courtroom** [1] - 65:1
**COURTROOM** [15] - 2:2, 3:12, 3:17, 3:21, 15:18, 15:23, 16:1, 69:8, 69:13, 69:17, 69:22, 84:22, 85:2, 85:5, 85:7
**cover** [2] - 26:8, 26:9
**covered** [1] - 10:20
**covering** [1] - 74:20
**craft** [1] - 4:14
**crane** [61] - 8:7, 8:16, 9:10, 10:1, 11:9, 13:2, 16:13, 16:23, 18:12, 18:24, 19:7, 19:10, 19:12, 19:21, 19:23, 20:3, 20:4, 20:8, 20:17, 23:21, 23:24, 24:9, 28:3, 28:7, 29:18, 30:23, 44:22, 46:13, 46:16, 46:18, 46:21, 46:24, 47:1, 47:4, 47:6, 47:10, 47:14, 47:19, 48:8, 48:11, 50:3, 50:4, 50:5, 50:7, 50:20, 50:25, 56:15, 56:16, 56:17, 56:18, 57:2, 57:3, 58:22, 59:3, 59:4, 61:19, 62:1, 62:11, 92:8, 92:11
**cranes** [1] - 48:17
**create** [1] - 7:12
**creates** [1] - 97:22
**credit** [1] - 50:16
**creditor** [2] - 93:5, 93:7
**cross** [13] - 14:11, 14:12, 14:13, 15:8, 63:4, 63:6, 63:17, 63:20, 63:24, 63:25, 65:9, 65:12, 83:15
**Cross** [1] - 76:9
**CROSS** [10] - 10:10, 46:10, 65:15, 76:10, 92:18, 100:5, 100:10, 100:12, 100:20, 100:24
**cross-examination** [4] - 63:25, 65:9, 65:12, 83:15
**CROSS-EXAMINATION** [10] - 10:10, 46:10, 65:15, 76:10, 92:18, 100:5, 100:10, 100:12, 100:20, 100:24
**CRR** [1] - 1:22
**cruised** [1] - 29:4
**current** [3] - 7:13, 38:25, 64:15
**currents** [1] - 61:7
**customers** [1] - 34:25
**cut** [2] - 31:22, 91:23

**D**

**daily** [5] - 8:16, 9:10, 19:13, 19:15, 55:23
**damage** [9] - 24:7, 24:9, 64:4, 64:6,

71:11, 71:13, 72:23, 86:15, 86:24
**damages** [2] - 44:10, 78:3
**dangerous** [1] - 79:2
**date** [4] - 6:1, 6:3, 22:23, 90:3
**dated** [3] - 22:3, 52:3, 71:3
**days** [10] - 9:12, 22:10, 46:4, 54:2, 54:22, 55:3, 55:4, 55:5, 55:11
**de** [1] - 57:14
**deal** [3] - 18:19, 19:18, 51:4
**dealt** [1] - 75:17
**debtor** [2] - 93:11, 93:12
**December** [1] - 35:1
**decide** [1] - 65:5
**decision** [2] - 2:19, 32:22
**deck** [6] - 4:2, 8:7, 18:9, 49:20, 51:10, 87:25
**declared** [1] - 73:1
**deemed** [3] - 25:5, 25:14, 80:4
**Defendant** [2] - 1:10, 1:19
**Defendant's** [4] - 22:3, 25:9, 25:15, 101:5
**Defendants** [1] - 25:13
**Defense** [1] - 84:24
**definitely** [2] - 72:7, 77:8
**defunct** [1] - 57:12
**degree** [3] - 12:15, 73:25, 78:8
**Delaware** [2] - 31:3, 59:10
**delay** [3] - 33:3, 33:15, 35:1
**delivered** [1] - 27:1
**demand** [1] - 21:20
**demonstrative** [1] - 65:4
**department** [2] - 70:14, 75:16
**deposition** [3] - 39:17, 39:23, 83:9
**DEPUTY** [15] - 2:2, 3:12, 3:17, 3:21, 15:18, 15:23, 16:1, 69:8, 69:13, 69:17, 69:22, 84:22, 85:2, 85:5, 85:7
**Describe** [1] - 90:8
**describe** [2] - 5:23, 90:7
**described** [5] - 29:15, 29:19, 29:21, 33:11, 65:18
**designated** [1] - 22:2
**deteriorate** [1] - 61:13
**deteriorated** [2] - 77:12, 77:17
**deterioration** [1] - 77:5
**determined** [1] - 2:7
**devices** [1] - 96:17
**Diesel** [1] - 95:14
**difference** [2] - 37:1, 59:15
**different** [17] - 9:2, 9:5, 11:21, 12:17, 20:2, 26:14, 26:15, 37:2, 47:18, 53:22, 61:2, 61:3, 61:12, 61:14, 64:10, 77:21, 78:1
**differently** [1] - 63:20
**difficult** [2] - 7:9, 13:15
**dilemma** [1] - 56:20
**dimensions** [1] - 32:19
**dire** [1] - 73:4
**DIRE** [2] - 73:7, 100:18
**DIRECT** [12] - 3:22, 16:2, 64:1, 69:24, 75:2, 85:9, 100:4, 100:9, 100:11, 100:17, 100:19, 100:23
**direct** [4] - 21:7, 38:25, 62:22, 63:11
**directly** [1] - 28:22
**disadvantage** [1] - 49:17
**disagreement** [1] - 2:11

**disappeared** [3] - 27:24, 58:25, 85:25
**disconnected** [1] - 91:24
**discrepancies** [2] - 82:24, 83:7
**discretionary** [1] - 83:24
**discuss** [1] - 62:17
**discussed** [2] - 24:19, 64:3
**Discussion** [2] - 52:11, 68:23
**disposed** [1] - 48:11
**dispute** [2] - 2:23, 70:25
**disregarded** [1] - 89:12
**dissimilar** [2] - 36:24, 42:10
**distances** [1] - 71:19
**DISTRICT** [2] - 1:1, 1:1
**divers** [1] - 13:17
**diving** [1] - 4:12
**dock** [33] - 9:2, 14:19, 14:20, 15:2, 15:3, 19:25, 20:18, 21:4, 24:10, 27:14, 31:4, 34:19, 35:22, 39:12, 39:15, 43:15, 59:21, 59:23, 61:2, 72:18, 73:18, 78:22, 80:20, 81:4, 87:14, 87:25, 88:7, 88:11, 94:5, 94:14, 94:15, 95:9, 95:12
**docked** [19] - 11:2, 11:3, 34:24, 35:6, 35:7, 35:9, 35:12, 42:18, 60:1, 60:3, 60:12, 61:8, 76:25, 77:3, 77:8, 85:12, 85:16, 85:17, 85:21
**docking** [2] - 13:17, 44:12
**document** [6] - 23:3, 23:4, 23:18, 26:10, 31:20, 43:11
**documentation** [1] - 21:24
**dollars** [9] - 9:13, 12:3, 12:5, 12:24, 19:6, 19:13, 50:4, 50:19, 50:23
**done** [21] - 7:21, 12:8, 12:10, 17:1, 34:10, 40:17, 43:23, 44:13, 49:4, 57:23, 57:24, 59:13, 64:16, 64:21, 71:13, 81:11, 81:14, 81:18, 90:10, 90:18, 93:9
**Donna** [1] - 22:4
**down** [12] - 9:16, 9:17, 26:16, 28:4, 40:18, 49:5, 49:22, 53:25, 67:11, 71:4, 72:18, 84:11
**downward** [1] - 48:21
**drive** [1] - 28:9
**driven** [1] - 88:7
**driving** [1] - 29:8
**drove** [3] - 21:6, 28:7, 28:8
**dry** [31] - 11:2, 11:3, 13:17, 14:19, 14:20, 15:2, 15:3, 20:18, 24:10, 31:4, 34:19, 34:24, 35:6, 35:7, 35:9, 35:12, 42:18, 43:15, 44:12, 59:21, 59:23, 60:1, 60:3, 60:12, 60:15, 61:2, 73:18, 76:25, 77:3, 77:8, 81:4
**dry-dock** [14] - 14:19, 14:20, 15:2, 15:3, 20:18, 24:10, 31:4, 34:19, 43:15, 59:21, 59:23, 61:2, 73:18, 81:4
**dry-docked** [14] - 11:2, 11:3, 34:24, 35:6, 35:7, 35:9, 35:12, 42:18, 60:1, 60:3, 60:12, 76:25, 77:3, 77:8
**dry-docking** [2] - 13:17, 44:12
**duly** [4] - 3:15, 15:21, 69:11, 84:25
**during** [2] - 45:14, 82:17
**duty** [4] - 17:18, 29:3, 35:5, 60:15

## E

**E-mail** [1] - 1:24
**earliest** [1] - 55:18

**early** [2] - 81:19, 91:22
**earth** [1] - 79:12
**easiest** [1] - 32:20
**East** [1] - 9:21
**EASTERN** [1] - 1:1
**eaten** [1] - 36:21
**ECF** [2] - 23:12, 24:16
**Edelsberger** [1] - 22:4
**education** [2] - 16:6, 70:2
**Eerie** [1] - 29:5
**effect** [1] - 14:16
**efforts** [1] - 20:22
**eight** [3] - 31:4, 45:2, 55:24
**Eight** [1] - 25:2
**either** [8] - 12:10, 13:16, 18:16, 18:17, 57:22, 62:8, 97:24, 98:9
**elect** [1] - 49:11
**electric** [1] - 91:7
**electrical** [7] - 7:13, 14:23, 61:6, 61:7, 64:13, 95:15, 95:22
**electricity** [8] - 7:11, 7:17, 38:13, 38:18, 38:20, 39:13, 96:2, 97:24
**Electro** [1] - 64:9
**Electro-Meter** [1] - 64:9
**electrolysis** [9] - 7:13, 36:16, 36:20, 36:24, 64:4, 64:5, 90:25, 97:23, 98:3
**electrolytic** [1] - 38:9
**Electrons** [1] - 79:7
**electrons** [10] - 36:17, 37:4, 37:14, 37:15, 38:13, 38:14, 71:21, 77:18, 77:25, 79:7
**emergency** [1] - 39:8
**encompass** [1] - 74:15
**encourage** [1] - 98:22
**end** [5] - 6:3, 54:15, 55:4, 57:22, 79:4
**ends** [1] - 11:8
**engineer** [2] - 16:8, 17:3, 73:22
**engineering** [1] - 74:2
**Engineers** [4] - 31:20, 31:23, 32:3, 32:7
**enquire** [2] - 69:19, 85:8
**enter** [1] - 54:17
**entered** [1] - 68:4
**enters** [3] - 3:10, 15:16, 69:6
**entire** [1] - 40:12
**entitled** [1] - 30:13
**environment** [1] - 11:6
**environmental** [1] - 75:24
**environments** [1] - 60:11
**equipment** [37] - 16:24, 17:2, 18:13, 18:15, 18:17, 18:18, 19:7, 20:1, 22:18, 22:20, 31:25, 32:20, 47:22, 48:1, 48:3, 48:5, 49:7, 49:9, 50:11, 50:21, 51:1, 51:5, 51:9, 51:16, 57:4, 57:5, 57:10, 57:14, 57:18, 59:5, 64:7, 85:20, 92:5, 92:7, 92:8, 98:13, 98:16
**Especially** [1] - 11:8
**ESQ** [2] - 1:18, 1:21
**essentially** [2] - 43:7, 44:15
**established** [2] - 2:12, 27:8
**estimate** [4] - 45:13, 67:14, 67:18, 75:9
**estimation** [1] - 79:18, 86:24
**events** [2] - 5:23, 40:10
**eventually** [5] - 27:6, 28:4, 28:16, 28:25, 29:11
**evidence** [7] - 24:20, 25:12, 25:16,

All Word // Gowanus v. Sulzer

6

26:4, 61:10, 68:4, 99:8

**exact** [4] - 28:19, 38:1, 78:20, 81:4
**Exactly** [1] - 9:16
**exactly** [6] - 5:25, 18:23, 28:25, 67:12, 85:15, 93:1
**examination** [4] - 63:25, 65:9, 65:12, 83:15
**EXAMINATION** [26] - 3:22, 10:10, 13:8, 16:2, 46:10, 64:1, 65:15, 66:2, 69:24, 75:2, 76:10, 85:9, 92:18, 100:4, 100:5, 100:6, 100:9, 100:10, 100:11, 100:12, 100:13, 100:17, 100:19, 100:20, 100:23, 100:24
**examined** [4] - 3:15, 15:21, 69:11, 84:25
**example** [2] - 24:19, 55:16
**exceeding** [2] - 83:21, 83:23
**excluded** [1] - 84:15
**Excuse** [3] - 56:5, 58:14, 63:16
**excused** [7] - 15:11, 15:13, 68:9, 68:13, 82:10, 82:11, 99:2
**Exhibit** [12] - 23:5, 23:17, 25:15, 26:4, 41:3, 43:12, 44:19, 52:13, 65:4, 66:10, 71:6, 101:5
**exhibits** [1] - 24:18
**Exhibits** [10] - 22:3, 23:10, 25:1, 25:8, 25:9, 25:11, 68:3, 68:16, 69:21, 101:3
**expensive** [1] - 67:17
**experience** [13] - 4:1, 4:12, 7:5, 13:12, 16:6, 34:8, 70:2, 70:22, 72:21, 90:5, 90:9, 90:13, 91:6
**expert** [4] - 59:17, 73:1, 74:22, 79:24
**expertise** [1] - 34:2
**explain** [1] - 62:24
**explained** [1] - 60:13
**explored** [2] - 2:9, 30:6
**exploring** [1] - 67:1
**extend** [1] - 17:15
**extended** [2] - 17:14, 48:14
**extent** [5] - 3:25, 16:5, 42:24, 55:9, 70:2
**extra** [3] - 18:15, 20:5, 49:14
**extreme** [4] - 39:18, 40:8, 44:6, 75:8
**extremely** [1] - 7:9
**eye** [1] - 67:11
**eyes** [2] - 40:14, 94:25

## F

**facility** [9] - 21:5, 21:7, 85:12, 85:16, 85:20, 85:22, 89:19, 92:15, 98:18
**facing** [2] - 61:9, 61:11
**Facsimile** [1] - 1:24
**fact** [10] - 2:22, 3:4, 31:11, 35:7, 39:19, 42:8, 50:5, 52:8, 76:1, 91:21
**facto** [1] - 57:14
**facts** [2] - 2:7, 2:12
**fair** [4] - 44:21, 45:13, 72:24, 75:9
**fall** [1] - 4:24
**familiar** [4] - 8:2, 8:13, 33:18, 74:8
**family** [5] - 16:12, 16:17, 16:18, 16:23, 17:5
**far** [1] - 14:25
**fast** [1] - 88:17
**fastened** [2] - 87:7, 87:11
**fasteners** [5] - 88:4, 88:10, 96:5, 96:6,
96:7

**father** [7] - 16:20, 17:11, 18:11, 47:6, 48:9, 60:14, 90:11
**February** [13] - 21:16, 21:19, 22:3, 22:24, 45:7, 51:21, 52:4, 52:13, 52:14, 55:3, 59:2, 66:14, 66:15
**fee** [1] - 67:7
**feet** [4] - 12:25, 13:1, 36:10, 42:24
**fenders** [1] - 88:13
**few** [6] - 10:15, 11:21, 33:2, 76:12, 80:20, 87:1
**field** [1] - 17:14
**fifty** [1] - 26:19
**figuring** [1] - 28:14
**file** [2] - 28:13, 92:24
**filed** [1] - 28:14
**final** [1] - 68:14
**finally** [2] - 21:23, 60:3
**fine** [3] - 25:6, 36:10, 49:16
**Fine** [1] - 25:7
**finished** [2] - 6:4, 65:7
**firm** [1] - 17:5, 17:23, 67:16
**first** [22] - 3:15, 4:4, 15:21, 16:21, 25:25, 27:16, 37:9, 37:16, 41:7, 41:15, 41:20, 42:18, 42:20, 55:1, 55:7, 57:10, 69:11, 81:11, 81:18, 84:25, 91:22, 99:15
**fishing** [2] - 4:2, 29:14
**five** [10] - 11:21, 26:9, 34:15, 59:23, 60:6, 60:24, 68:25, 70:11, 72:6, 72:9
**fixed** [1] - 42:12
**float** [1] - 88:14
**floating** [3] - 4:16, 11:18, 81:16
**Floor** [1] - 1:17
**flow** [3] - 7:13, 14:23, 79:7
**flowing** [1] - 36:18
**flows** [2] - 39:2, 39:4
**folks** [3] - 25:4, 68:22, 98:24
**follow** [7] - 66:1, 68:1, 68:6, 96:23, 96:25, 99:10, 99:13
**follow-up** [5] - 68:1, 68:6, 96:23, 99:10, 99:13
**following** [4] - 29:12, 33:16, 53:13, 91:25
**follows** [4] - 3:16, 15:22, 69:12, 85:1
**foot** [4] - 24:2, 24:4, 86:13, 90:15
**FOR** [1] - 1:13
**forced** [1] - 86:10
**foreseeable** [1] - 20:8
**formal** [1] - 74:6
**formally** [1] - 24:13
**formula** [1] - 38:2
**formulated** [1] - 63:20
**forth** [1] - 86:19
**forthcoming** [1] - 17:17
**forward** [2] - 47:20, 50:10
**Four** [2] - 11:21, 72:7
**four** [8] - 17:13, 25:2, 26:19, 48:14, 54:5, 54:18, 54:22, 72:7
**four-fifty** [1] - 26:19
**four-month** [2] - 17:13, 48:14
**fourth** [3] - 16:13, 30:21, 55:16
**frame** [8] - 8:15, 8:23, 9:9, 20:10, 21:14, 30:9, 40:16, 85:15
**frames** [1] - 54:22
**frankly** [2] - 17:25, 30:5

**frayed** [1] - 38:19
**free** [3] - 70:16, 71:20, 93:23
**fresh** [6] - 31:3, 31:5, 31:14, 35:15, 59:10, 59:16
**friend** [3] - 29:3, 29:13, 33:4
**full** [1] - 47:18
**future** [1] - 20:8

## G

**gallery** [1] - 84:14
**galvanic** [6] - 7:12, 13:24, 14:8, 14:15, 14:24, 36:12
**gasoline** [1] - 95:14
**gauge** [2] - 13:16, 14:20
**general** [1] - 4:11
**Generally** [2] - 10:19, 20:3
**generally** [3] - 11:1, 19:19, 36:6
**gentleman** [2] - 4:20, 29:25
**gentlemen** [1] - 67:25
**given** [1] - 35:22
**gong** [1] - 67:17
**GOWANUS** [1] - 1:4
**Gowanus** [15] - 5:11, 10:14, 21:1, 27:10, 28:17, 29:14, 39:15, 51:11, 51:21, 65:17, 65:20, 88:21, 88:22, 89:8, 93:6
**grade** [2] - 16:13, 30:21
**graduate** [2] - 16:7, 17:3
**graduated** [1] - 70:3
**grandfather** [1] - 90:12
**gray** [1] - 13:23
**great** [1] - 77:4
**greater** [1] - 37:14
**ground** [3] - 38:17, 38:18, 38:20
**grounds** [2] - 8:21, 83:6
**grows** [1] - 35:14
**growth** [8] - 35:14, 35:18, 40:9, 42:19, 43:4, 76:4, 77:2, 81:21
**guard** [1] - 97:2
**Guard** [6] - 32:10, 32:13, 34:16, 75:15, 75:17, 75:20
**guess** [8] - 9:23, 16:21, 27:19, 28:13, 28:23, 67:7, 67:10, 72:23

## H

**half** [2] - 45:16, 56:11
**hand** [6] - 3:12, 4:2, 15:18, 42:1, 69:8, 84:22
**Handing** [6] - 23:6, 23:14, 26:5, 41:5, 43:13, 52:21
**handling** [2] - 93:1, 97:14
**hang** [1] - 49:14
**happy** [2] - 53:4, 53:13
**Harbor** [3] - 31:9, 33:17, 75:14
**harbor** [1] - 32:1
**hauled** [1] - 31:11
**hazard** [1] - 49:21
**hear** [1] - 57:8
**hearing** [2] - 3:4, 62:21
**HEARING** [1] - 1:13
**heavy** [2] - 11:9, 39:11
**held** [3] - 52:11, 78:15, 87:15
**help** [2] - 13:23, 83:15

**helpful** [1] - 23:9
**helps** [2] - 20:5, 22:17
**Henry** [16] - 3:9, 3:19, 3:20, 3:24, 10:12, 18:6, 30:1, 32:23, 34:4, 34:8, 39:15, 40:6, 67:22, 72:1, 76:1, 79:22
**higher** [3] - 9:20, 9:22
**hire** [17] - 8:3, 8:9, 8:10, 8:16, 9:10, 9:12, 9:14, 18:3, 19:10, 19:15, 30:9, 45:19, 55:9, 55:10, 58:2, 87:6
**hired** [4] - 8:22, 27:22, 29:25, 85:19
**hiring** [1] - 9:7
**hmm** [1] - 93:18
**hold** [2] - 28:12, 88:17
**holding** [1] - 94:4
**holdings** [1] - 6:9
**hole** [1] - 50:7
**holes** [4] - 41:17, 41:18, 41:25, 81:7
**honest** [1] - 59:19
**Honor** [14] - 2:6, 3:8, 13:6, 15:9, 23:9, 24:12, 25:6, 57:23, 58:12, 68:20, 69:20, 96:22, 99:5, 99:7
**HONORABLE** [1] - 1:14
**horizontal** [1] - 36:6
**house** [2] - 29:18, 73:21
**housekeeping** [3] - 10:21, 68:15
**hull** [12] - 15:4, 17:2, 32:9, 35:11, 35:21, 35:25, 36:2, 43:5, 43:25, 76:5, 76:6, 77:2
**humongous** [1] - 75:23
**hundred** [14] - 12:23, 12:25, 19:6, 26:18, 26:19, 26:20, 46:4, 50:19, 50:23, 54:9, 86:13, 91:12
**hundred-foot** [1] - 86:13
**hung** [1] - 88:15
**hurt** [1] - 49:24
**hypothetical** [1] - 79:24
**Hypothetically** [1] - 79:25

## I

**ID** [1] - 89:12
**idea** [2] - 12:19, 19:3
**identical** [1] - 37:1
**identified** [1] - 2:15
**identify** [1] - 32:17
**immediately** [2] - 62:2, 64:22
**impact** [1] - 90:18
**improper** [1] - 83:10
**improperly** [2] - 81:11, 90:18
**improvement** [1] - 49:17
**improvements** [4] - 18:20, 49:16, 50:8, 50:19
**in-house** [1] - 73:21
**inappropriate** [1] - 89:21
**INC** [2] - 1:4, 1:9
**incident** [2] - 30:24, 97:1
**inclement** [1] - 86:19
**Incorporated** [2] - 2:14, 16:19
**incorrect** [1] - 47:18
**incorrectly** [1] - 81:19
**increased** [2] - 19:2, 19:3
**indicate** [3] - 54:23, 55:9, 65:3
**indicated** [15] - 8:22, 11:1, 11:11, 12:2, 46:25, 54:4, 56:9, 59:9, 73:9, 73:12, 73:24, 74:14, 74:20, 75:22, 80:3
**indicates** [1] - 52:16

**indicating** [2] - 4:21, 5:3
**indicating)** [1] - 69:22
**indication** [2] - 32:18, 42:22, 55:22
**individual** [1] - 20:11
**INDUSTRIAL** [1] - 1:4
**Industrial** [11] - 10:14, 21:1, 39:15, 51:11, 51:21, 65:17, 65:20, 88:21, 88:22, 89:8, 93:6
**industries** [1] - 47:18
**industry** [2] - 12:17, 72:21
**information** [2] - 8:24, 28:15
**initial** [1] - 18:2
**inner** [1] - 95:17
**inquest** [3] - 23:5, 23:17, 62:16
**inside** [4] - 6:15, 6:16, 92:12, 94:13
**inspect** [17] - 21:7, 21:25, 51:22, 51:24, 52:9, 52:10, 52:17, 52:24, 53:6, 53:17, 58:2, 65:5, 75:16, 81:14, 89:4, 89:8, 90:21
**inspected** [5] - 34:17, 49:5, 75:15, 77:9, 96:15
**inspection** [5] - 13:16, 15:1, 15:3, 70:24, 71:2
**inspections** [4] - 75:17, 75:20, 78:23, 81:5
**install** [1] - 64:24
**instance** [6] - 32:10, 43:24, 55:1, 55:15, 61:9, 77:21
**instead** [2] - 22:20, 37:19
**instruct** [1] - 34:12
**instructed** [1] - 94:22
**instruction** [1] - 95:1
**instructions** [1] - 5:14
**instruments** [1] - 14:22
**insulate** [1] - 97:16
**insulator** [4] - 91:10, 91:14, 91:17, 91:20
**insurance** [2] - 53:2, 53:12
**intent** [2] - 56:1, 56:17
**interrupt** [2] - 41:19, 57:16
**introduce** [1] - 61:6
**introduced** [2] - 24:13, 26:4
**investigator** [1] - 27:22
**invoice** [4] - 27:21, 54:24, 55:6, 55:12
**invoices** [10] - 26:11, 54:11, 54:14, 54:21, 55:8, 55:18, 55:21, 55:23, 93:8, 93:15
**Invoices** [1] - 54:15
**involved** [3] - 16:12, 33:23, 97:14
**Island** [1] - 5:11
**issue** [2] - 2:17, 13:17
**issues** [2] - 5:18, 68:15
**item** [2] - 44:3, 64:23
**items** [1] - 72:5
**itself** [1] - 91:19

## J

**JAMES** [3] - 1:14, 1:19, 1:21
**January** [3] - 20:12, 26:1, 28:16
**job** [8] - 6:4, 12:17, 22:19, 33:19, 34:6, 34:10, 70:5, 94:21
**jobs** [1] - 12:15
**Joe** [1] - 10:14
**John** [2] - 82:15, 85:4

**John's** [1] - 83:9
**Johnson's** [1] - 2:16
**Joseph** [4] - 68:20, 69:5, 69:15, 71:7
**JOSEPH** [1] - 1:18
**Judge** [1] - 2:16
**JUDGE** [1] - 1:14
**Judge's** [1] - 2:7
**judgment** [1] - 2:8
**judicial** [1] - 46:7
**July** [1] - 29:2
**June** [3] - 26:13, 55:20
**Junior** [1] - 82:15

## K

**KC** [2] - 70:21, 75:18
**Keane** [1] - 67:16
**keel** [1] - 78:10
**keep** [5] - 11:18, 56:24, 67:11, 88:15, 93:24
**keeping** [1] - 43:7, 98:22
**keeps** [1] - 32:4
**kept** [2] - 35:23, 48:14
**kind** [13] - 7:18, 20:7, 26:16, 27:25, 28:1, 30:9, 33:19, 37:7, 38:23, 40:14, 64:23, 70:18, 72:6
**kinds** [1] - 6:7
**knowing** [1] - 53:8
**knowledge** [8] - 9:15, 60:10, 85:18, 89:7, 90:17, 91:10, 91:13, 91:16
**known** [5] - 5:5, 7:18, 7:20, 60:23, 94:20
**KRIEG** [1] - 1:16

## L

**lack** [1] - 81:1
**Land** [1] - 30:9
**land** [4] - 91:21, 91:23, 91:24, 97:25
**landed** [1] - 7:24
**large** [1] - 89:19
**last** [10] - 9:23, 21:16, 22:24, 31:11, 48:10, 48:11, 59:25, 70:11, 85:5, 90:16
**late** [4] - 4:24, 29:24, 35:1, 45:9
**LAW** [1] - 1:19
**lawsuit** [1] - 44:11
**lawyer** [2] - 93:1, 94:19
**laying** [3] - 6:8, 7:1, 32:11
**lead** [1] - 74:19
**learn** [1] - 27:20
**learned** [1] - 28:17
**lease** [7] - 12:2, 12:8, 12:13, 12:16, 54:4, 54:8, 59:9
**leased** [2] - 12:5, 47:13
**leasing** [3] - 54:11, 60:10, 61:22
**least** [2] - 11:3, 45:16
**Leave** [1] - 68:12
**leave** [9] - 18:18, 48:5, 49:12, 49:15, 49:24, 50:2, 57:21, 65:4, 98:22
**leaves** [1] - 99:3
**leaving** [2] - 30:18, 92:2
**left** [7] - 42:1, 48:17, 57:14, 78:13, 86:1, 86:9, 86:10
**left-hand** [1] - 42:1

**All Word // Gowanus v. Sulzer**

**legal** [7] - 22:6, 30:11, 31:19, 31:22, 62:7, 68:15, 83:3
**length** [2] - 19:14, 86:13
**less** [4] - 9:17, 18:16, 18:8, 49:8
**letter** [21] - 9:2, 21:4, 21:22, 22:2, 22:3, 22:6, 28:18, 51:21, 52:3, 52:6, 52:7, 52:13, 52:15, 53:15, 53:21, 89:24, 90:1, 90:2, 90:3, 99:17
**letters** [2] - 17:22, 27:21
**liability** [2] - 31:17, 75:23
**liable** [1] - 31:1
**license** [1] - 4:4
**licensed** [1] - 16:8
**lien** [1] - 28:14
**life** [5] - 16:9, 78:19, 90:11, 90:14, 90:15
**lights** [1] - 7:12
**limit** [3] - 79:10, 79:21, 81:6
**limited** [3] - 71:18, 80:2, 80:18
**line** [5] - 13:13, 13:14, 14:5, 15:5, 42:25
**Lines** [1] - 23:20
**lines** [1] - 87:5
**listed** [3] - 93:5, 93:6, 93:12
**lists** [1] - 31:21
**litigate** [1] - 2:24
**LLP** [1] - 1:16
**local** [1] - 40:18
**locally** [1] - 24:8
**locate** [2] - 18:1, 27:23
**location** [4] - 28:19, 28:20, 59:3, 66:17
**locations** [1] - 28:6
**long-term** [6] - 12:8, 12:13, 12:16, 38:22, 54:4, 54:8
**look** [18] - 15:3, 21:11, 23:4, 23:16, 26:3, 28:11, 29:15, 32:25, 35:11, 38:3, 41:6, 53:3, 55:1, 55:13, 71:4, 71:17, 89:16, 96:14
**looked** [10] - 10:18, 10:19, 20:15, 29:5, 29:6, 40:15, 40:24, 44:19, 71:24, 72:16
**looking** [4] - 28:7, 29:4, 55:10, 78:14
**looks** [1] - 26:13
**loose** [4] - 86:20, 86:23, 87:1, 87:2
**loosen** [1] - 93:24
**loosened** [1] - 87:17
**louder** [1] - 70:8
**lower** [3] - 9:20, 37:17, 42:21
**lying** [1] - 10:19

## M

**MacAlister** [1] - 33:20
**machine** [1] - 61:5
**Madison** [1] - 1:17
**MAGISTRATE** [1] - 1:14
**MAHON** [1] - 1:16
**Mahoney** [1] - 67:16
**mail** [1] - 1:24
**maintained** [1] - 10:25
**major** [4] - 12:10, 40:11, 44:2, 72:7
**MALONEY** [77] - 1:19, 1:21, 2:5, 2:13, 3:8, 3:23, 10:4, 13:6, 13:9, 14:6, 14:13, 15:7, 15:15, 16:3, 23:1, 23:3, 23:7, 23:9, 23:15, 24:12, 24:15, 24:24, 25:7, 25:17, 26:2, 26:6, 26:8, 39:24, 40:4, 41:2, 41:6, 43:11, 46:1, 46:6, 48:2, 51:13, 53:18, 57:7, 58:12, 58:16, 58:19, 62:6, 62:15,

62:19, 62:22, 62:24, 63:5, 64:2, 65:3, 65:7, 66:9, 68:2, 68:19, 69:5, 69:20, 69:23, 69:25, 73:2, 75:1, 75:3, 76:8, 82:8, 82:13, 82:16, 83:13, 92:19, 96:20, 99:1, 99:7, 99:21, 100:5, 100:7, 100:10, 100:12, 100:17, 100:19, 100:24
**Maloney** [3] - 74:25, 83:14, 92:17
**man** [1] - 9:3
**managing** [2] - 17:7, 17:19
**March** [13] - 22:24, 26:13, 35:5, 35:6, 35:7, 55:3, 56:3, 56:4, 56:5, 56:6, 66:14, 71:3, 72:17
**marine** [14] - 16:15, 16:25, 17:3, 17:14, 22:20, 31:25, 33:17, 35:14, 35:17, 38:23, 40:9, 42:19, 43:4, 76:4
**Marine** [16] - 17:10, 17:12, 47:14, 51:12, 51:17, 55:17, 55:24, 57:5, 70:21, 74:1, 75:18, 85:17, 85:24, 86:21, 92:2, 97:11
**Marine's** [1] - 92:6
**maritime** [5] - 4:1, 16:6, 70:2, 70:6, 72:21
**Maritime** [8] - 16:7, 17:4, 70:3, 70:5, 70:13, 70:21, 73:10, 73:25
**marked** [3] - 23:16, 26:4, 43:12
**market** [1] - 22:17
**marshal** [2] - 30:9, 67:11
**marshals** [1] - 67:2
**mate** [1] - 74:7
**material** [4] - 77:11, 77:16, 93:22, 98:21
**matter** [5] - 21:13, 31:11, 34:3, 34:10, 57:17
**matting** [1] - 42:19
**mean** [11] - 32:5, 35:24, 38:1, 41:11, 41:23, 50:18, 53:9, 74:15, 81:12, 81:24, 87:8
**meaning** [1] - 9:12
**means** [4] - 37:4, 58:2, 76:17, 98:3
**meant** [1] - 93:11
**measure** [1] - 14:23
**mechanical** [1] - 4:12
**mechanism** [1] - 27:20
**meets** [1] - 36:6
**memoranda** [2] - 99:10, 99:13
**mentioned** [5] - 7:4, 8:2, 14:7, 19:20, 32:3
**metal** [24] - 13:22, 36:19, 37:2, 37:13, 38:20, 38:23, 39:2, 42:10, 64:13, 77:17, 77:18, 78:1, 78:22, 79:1, 79:12, 79:18, 88:3, 88:9, 95:20, 95:22, 96:6, 96:10, 96:11, 97:22
**metals** [2] - 36:24, 77:21
**Meter** [1] - 64:9
**meter** [6] - 64:10, 64:17, 64:19, 64:23, 65:18, 96:18
**method** [1] - 30:4
**methods** [1] - 76:20
**middle** [1] - 36:3
**might** [8] - 20:2, 49:11, 49:23, 50:2, 50:3, 63:19, 64:6, 67:20
**million** [1] - 12:24
**mine** [3] - 29:3, 29:13, 30:17
**minutes** [2] - 68:25, 76:12
**miscellaneous** [1] - 43:24
**miss** [1] - 61:22
**missing** [2] - 18:25, 20:5

**mistakenly** [1] - 62:10
**misunderstanding** [1] - 97:18
**money** [9] - 33:24, 49:12, 57:11, 92:22, 93:3, 93:4, 98:14, 98:17, 98:19
**monitor** [3] - 31:5, 64:5, 73:23
**month** [14] - 17:13, 18:5, 20:15, 22:13, 29:23, 46:4, 48:14, 51:10, 51:18, 54:12, 54:15, 54:25, 55:1
**monthly** [4] - 51:17, 54:24, 55:12, 55:13
**months** [26] - 19:15, 20:18, 24:9, 32:24, 33:2, 33:15, 33:16, 35:3, 45:2, 45:3, 45:11, 45:14, 45:17, 45:18, 46:4, 54:5, 54:6, 54:7, 54:19, 55:19, 55:25, 56:10, 56:11, 62:3, 67:21
**moor** [1] - 93:21
**moored** [7] - 7:4, 7:6, 64:6, 86:20, 93:19, 93:25, 94:2
**mooring** [6] - 38:10, 38:12, 43:21, 71:11, 79:2
**morning** [6] - 3:24, 6:10, 6:11, 10:12, 10:13, 16:4
**most** [5] - 16:9, 28:10, 71:15, 93:25, 95:17
**Most** [1] - 12:9
**mostly** [3] - 13:13, 13:14, 70:12
**mother** [1] - 17:19
**motor** [1] - 95:14
**motors** [2] - 71:20, 78:9
**move** [3] - 49:19, 59:8, 75:25
**moved** [2] - 75:17, 76:1
**moving** [2] - 11:9, 80:12
**mud** [1] - 88:8
**multiple** [3] - 22:21, 26:22, 27:11

## N

**name** [15] - 3:17, 5:3, 5:12, 10:5, 10:7, 10:14, 15:23, 32:17, 32:18, 34:4, 46:22, 69:14, 71:6, 85:2, 85:5
**names** [2] - 46:23, 64:10
**naturally** [1] - 80:9
**nature** [4] - 3:25, 16:5, 16:18, 70:2
**naval** [1] - 16:9
**Navy** [6] - 16:10, 29:3, 29:13, 35:2, 35:5, 70:17
**near** [1] - 79:10
**necessarily** [3] - 21:3, 24:19, 89:11
**need** [15] - 2:8, 8:7, 22:20, 23:7, 26:6, 28:13, 31:7, 36:23, 53:12, 56:17, 57:23, 68:16, 75:16, 78:8
**needed** [7] - 6:10, 8:8, 8:9, 11:5, 24:9, 61:19, 62:2
**needs** [5] - 56:22, 76:25, 77:1, 77:8
**Negative** [1] - 74:12
**negotiation** [2] - 19:17, 26:21
**neighbor's** [1] - 86:22
**neighborhood** [1] - 19:16
**nested** [1] - 87:13
**never** [8] - 11:8, 38:22, 40:11, 51:7, 56:17, 81:7, 84:13, 93:9
**NEW** [1] - 1:1
**New** [26] - 1:6, 1:18, 1:20, 8:3, 9:20, 9:22, 16:17, 16:24, 26:23, 26:24, 28:18, 30:6, 31:8, 33:17, 45:21, 45:22, 45:24, 51:10, 56:14, 56:21, 59:22, 60:19, 60:21,

64:16, 75:14

**next** [6] - 15:15, 61:8, 72:11, 79:25, 93:25, 99:17

**night** [2] - 6:5, 9:25

**nine** [2] - 43:22, 44:3

**nobody** [3] - 57:13, 59:1, 59:6

**None** [1] - 54:12

**none** [1] - 68:2

**nonjury** [1] - 2:5

**normally** [8] - 7:7, 7:21, 8:8, 9:16, 9:22, 12:11, 13:21, 98:4

**Normally** [1] - 11:3, 14:20

**note** [1] - 2:7

**nothing** [5] - 10:4, 15:7, 46:8, 76:8, 96:20

**Notice** [1] - 92:24

**notice** [3] - 10:23, 77:11, 77:16

**notified** [1] - 20:11

**number** [9] - 21:2, 26:11, 26:14, 32:9, 32:12, 32:15, 38:1, 38:6, 43:22

**numbered** [1] - 72:5

**numbers** [1] - 32:8

---

## O

**object** [1] - 14:10

**objecting** [2] - 83:4, 83:5

**Objection** [8] - 8:20, 27:7, 39:20, 48:2, 51:13, 53:18, 57:7, 72:25

**objection** [14] - 9:8, 24:21, 24:22, 24:25, 40:1, 49:13, 58:15, 58:16, 63:1, 82:18, 82:21, 83:3, 94:20, 94:21

**objects** [1] - 11:10

**observation** [1] - 13:10

**observe** [3] - 13:19, 14:1, 14:17

**observed** [1] - 40:7

**obviously** [4] - 35:13, 37:2, 39:13, 40:20

**Obviously** [2] - 38:14, 39:14

**occasion** [4] - 4:17, 4:18, 8:6, 8:11

**occur** [2] - 13:13, 37:6

**occurred** [6] - 15:1, 43:1, 43:20, 75:8, 78:11, 80:6

**occurring** [2] - 37:7, 64:6

**occurs** [4] - 36:14, 38:17, 42:11, 80:9

**October** [6] - 6:2, 6:3, 33:12, 45:9

**odd** [1] - 90:15

**OF** [3] - 1:1, 1:13, 1:19

**off-hire** [1] - 58:2

**offer** [4] - 19:24, 23:3, 24:20, 25:4

**office** [4] - 27:23, 88:21, 88:23, 88:24

**OFFICE** [1] - 1:19

**officer** [1] - 16:9

**Official** [1] - 1:23

**offset** [1] - 50:8

**often** [9] - 11:2, 11:4, 11:5, 18:13, 18:21, 49:13, 59:21, 61:2, 76:23

**Oftentimes** [1] - 18:14

**oil** [2] - 30:22, 30:23

**old** [4] - 38:16, 75:7, 93:23

**once** [6] - 11:3, 34:12, 40:8, 61:22, 68:16, 76:4, 78:15, 81:21

**Once** [3] - 31:8, 61:25, 76:25

**One** [4] - 13:6, 36:23, 69:20, 76:20

**one** [53] - 2:13, 9:3, 14:6, 15:14, 17:9,

19:14, 19:18, 20:4, 21:6, 22:2, 24:16, 24:23, 29:20, 32:18, 33:21, 34:9, 36:4, 36:8, 38:22, 40:13, 41:16, 41:20, 41:23, 41:24, 44:17, 44:24, 49:2, 49:18, 55:2, 55:7, 55:8, 55:14, 55:15, 55:17, 55:18, 55:21, 61:19, 62:7, 62:22, 65:1, 71:15, 72:5, 72:19, 79:15, 79:17, 87:5, 87:13, 87:14, 88:17, 88:18, 95:7, 96:17

**one's** [2] - 26:18, 26:19

**ones** [4] - 37:24, 41:9, 71:16, 78:5

**open** [4] - 2:1, 41:16, 41:24, 69:3

**opening** [2] - 2:6, 35:24

**openings** [2] - 36:2, 76:5

**operate** [4] - 4:5, 4:7, 31:2, 56:14

**operated** [3] - 48:6, 59:22, 87:15

**operating** [2] - 17:7, 59:4

**operation** [1] - 5:15

**operational** [1] - 88:2

**operator** [1] - 59:22

**operators** [3] - 28:9, 33:18, 33:25

**opinion** [4] - 2:16, 73:3, 79:2, 79:9

**opportunities** [1] - 61:23

**opportunity** [6] - 20:16, 62:15, 63:5, 63:17, 65:25, 83:9

**opposed** [1] - 98:4

**option** [1] - 48:3

**options** [1] - 48:22

**order** [1] - 2:8

**ORENSTEIN** [1] - 1:14

**originally** [3] - 17:12, 18:9, 25:20

**otherwise** [1] - 94:22

**oust** [1] - 56:11

**outboard** [4] - 29:20, 33:11, 71:19, 78:9

**outer** [3] - 93:25, 94:16, 95:7

**outermost** [1] - 6:18

**outfitted** [2] - 19:9, 30:22

**outside** [6] - 6:14, 15:4, 73:20, 73:22, 75:14, 87:13

**outstanding** [1] - 21:12

**overdue** [1] - 60:12

**Overruled** [4] - 14:12, 27:9, 51:15, 57:8

**overruled** [1] - 9:8

**oversaw** [1] - 73:18

**owe** [3] - 50:5, 50:8, 93:4

**owed** [3] - 57:10, 92:22, 93:3

**own** [4] - 30:10, 30:13, 30:16, 31:17

**owned** [4] - 17:10, 32:6, 44:22, 89:15

**owner** [9] - 2:15, 20:13, 21:4, 21:25, 22:6, 30:25, 31:19, 31:22, 71:3

**owners** [1] - 21:24, 61:2

**ownership** [1] - 32:2

**owns** [1] - 32:13

**oxidation** [19] - 36:14, 71:14, 74:5, 74:8, 74:9, 74:11, 74:14, 74:16, 74:21, 76:13, 76:15, 77:5, 77:10, 77:20, 77:22, 77:24, 78:4, 97:19

**Oxidation** [3] - 78:1, 78:2, 97:21

---

## P

**package** [2] - 19:18, 19:25

**page** [7] - 41:21, 42:6, 42:7, 42:16, 42:17, 71:6, 91:25

**PAGE** [1] - 100:2

**pages** [4] - 26:9, 41:7, 72:11

**paid** [2] - 17:15, 50:15

**paint** [13] - 11:8, 11:10, 20:18, 31:12, 37:9, 41:13, 41:15, 61:14, 74:19, 74:20, 76:20, 78:7

**paint's** [1] - 37:10

**painted** [5] - 11:4, 76:24, 77:2, 77:3, 77:9

**painting** [1] - 11:8, 38:8

**paperwork** [1] - 89:3

**PARK** [1] - 1:4

**Park** [11] - 10:15, 21:2, 39:15, 51:11, 51:21, 65:17, 65:20, 88:21, 88:22, 89:8, 93:6

**part** [4] - 19:23, 22:24, 39:24, 44:2

**partially** [1] - 34:1

**particular** [4] - 12:22, 55:8, 70:19, 98:20

**particularly** [6] - 13:21, 22:19, 30:22, 31:10, 38:16, 75:7

**parties** [2] - 54:14, 54:20

**parts** [1] - 71:10

**pass** [2] - 64:15, 79:7

**passed** [3] - 17:6, 60:14, 98:21

**pathway** [2] - 39:12, 95:22

**Pause** [4] - 8:1, 52:12, 61:15, 68:24

**pay** [2] - 43:17, 67:10

**Paykin** [9] - 2:18, 10:9, 10:14, 23:7, 46:9, 82:14, 83:1, 84:13, 99:4

**PAYKIN** [33] - 1:16, 1:18, 2:19, 2:23, 3:1, 3:5, 8:20, 8:22, 10:11, 13:5, 14:10, 15:9, 23:8, 24:22, 25:6, 26:7, 27:7, 39:20, 39:22, 40:2, 46:11, 52:14, 52:19, 62:4, 63:1, 63:3, 63:9, 63:11, 63:14, 63:19, 63:22, 65:10, 65:13, 65:16, 65:23, 68:3, 68:7, 72:25, 73:5, 73:8, 73:9, 73:12, 73:16, 73:20, 73:24, 74:2, 74:5, 74:11, 74:14, 74:22, 76:11, 76:19, 82:6, 82:15, 82:19, 82:22, 82:24, 83:5, 83:7, 83:17, 83:20, 83:23, 84:2, 84:4, 84:7, 84:10, 84:16, 85:10, 92:1, 92:16, 95:5, 96:22, 98:25, 99:5, 99:12, 99:15, 99:20, 100:6, 100:11, 100:13, 100:18, 100:20, 100:23

**pending** [1] - 98:15

**people** [17] - 5:18, 9:5, 12:17, 16:24, 18:14, 29:7, 29:8, 49:22, 55:19, 57:25, 89:2, 89:9, 89:10, 89:19, 93:19, 97:13

**percent** [2] - 4:15, 91:12

**percentage** [1] - 44:23

**perimeter** [1] - 15:5

**period** [8] - 17:13, 26:12, 39:8, 54:12, 55:9, 55:11, 57:22, 59:20

**periodically** [1] - 37:10

**periods** [1] - 29:13

**permission** [2] - 18:16, 89:25

**person** [3] - 5:3, 40:24, 89:23

**person's** [1] - 30:15

**personnel** [2] - 89:2, 89:14

**petition** [1] - 93:6, 93:12

**phase** [1] - 82:17

**Philadelphia** [20] - 16:14, 17:12, 18:10, 19:11, 24:10, 26:17, 27:1, 27:23, 28:3, 33:22, 34:16, 45:23, 46:2, 46:3, 48:9, 56:14, 56:16, 59:24, 60:17

**Philly** [1] - 75:21

**phone** [3] - 21:2, 21:10, 53:5

**photo** [1] - 43:3
**photographs** [4] - 42:16, 72:12, 72:13, 72:15
**photos** [5] - 23:11, 41:8, 41:10, 41:21, 42:18
**phrase** [1] - 10:21
**physically** [5] - 6:22, 27:12, 33:7, 87:8, 88:22
**pick** [8] - 5:10, 52:4, 52:8, 52:17, 52:22, 53:7, 53:16, 75:21
**picked** [6] - 7:22, 9:25, 10:16, 13:20, 34:9, 59:2
**picture** [3] - 41:16, 41:20, 72:15
**pictures** [7] - 40:23, 40:25, 42:2, 42:4, 42:20, 42:21, 72:20
**piece** [2] - 39:11, 64:7
**pieces** [5] - 10:20, 11:15, 11:18, 11:20, 22:18
**pier** [20] - 5:19, 6:12, 6:17, 6:22, 19:25, 38:23, 61:8, 61:9, 61:11, 79:1, 79:11, 79:12, 79:13, 79:17, 88:2, 91:19, 91:20, 91:24
**piers** [6] - 27:11, 27:13, 29:6, 38:16, 38:18, 39:1
**piles** [4] - 88:5, 88:6, 88:7, 88:9
**pilings** [2] - 95:18, 95:23
**pipes** [1] - 38:20
**place** [3] - 13:23, 49:24, 81:11
**places** [2] - 13:15, 28:10
**Plaintiff** [5] - 1:5, 1:16, 3:14, 15:20, 69:10
**plaintiff** [1] - 25:3
**Plaintiff's** [3] - 25:8, 25:11, 101:3
**Plaintiffs** [1] - 25:10
**plate** [5] - 36:5, 36:7, 37:21, 42:23, 43:1
**plates** [6] - 36:3, 36:10, 36:20, 37:3, 42:11, 43:25
**pleasure** [2] - 29:4, 33:5
**plus** [1] - 9:13
**point** [11] - 17:22, 18:10, 20:23, 27:24, 28:12, 49:7, 62:7, 62:12, 85:25, 91:19, 98:20
**policy** [2] - 31:4, 84:4
**pollute** [1] - 31:18
**pollution** [1] - 30:24
**poor** [1] - 11:16
**port** [1] - 36:8
**Port** [2] - 1:20, 16:14
**portable** [2] - 64:23, 64:25
**portion** [2] - 14:2, 44:23
**portions** [1] - 13:19
**ports** [1] - 9:21
**possession** [1] - 47:1
**possibilities** [1] - 30:6
**possibility** [2] - 67:2, 81:12
**possible** [1] - 52:23
**possibly** [2] - 44:1, 81:12
**post** [1] - 62:16
**post-inquest** [1] - 62:16
**potential** [1] - 96:17
**powered** [2] - 95:13, 95:14
**practice** [2] - 57:20, 58:6
**pre** [2] - 22:2, 23:16
**pre-designated** [1] - 22:2
**pre-marked** [1] - 23:16

**precluding** [1] - 83:18
**prefer** [1] - 99:10
**preferences** [1] - 82:20
**prejudiced** [2] - 63:13, 63:18
**premises** [1] - 51:25
**prepare** [1] - 83:15
**presence** [1] - 82:17
**present** [2] - 35:9, 72:13
**presently** [1] - 51:9
**pressure** [1] - 7:10
**pretty** [4] - 9:6, 24:1, 29:21
**prevent** [1] - 13:24, 37:7, 38:11, 38:14, 64:4, 74:9, 74:17, 74:21, 76:13, 76:14, 98:6
**prevented** [3] - 74:8, 77:10, 78:7
**preventing** [1] - 38:9
**prevents** [1] - 89:21
**previously** [3] - 24:15, 47:7, 74:20
**Price** [1] - 12:22
**price** [3] - 9:16, 12:20, 18:20, 66:5, 66:11
**priced** [1] - 12:15
**Primarily** [1] - 4:15
**primary** [1] - 2:13
**prime** [1] - 74:19
**primed** [1] - 77:2
**principle** [1] - 43:22
**private** [2] - 27:22, 28:10
**probe** [1] - 64:12
**problem** [7] - 7:15, 38:16, 56:13, 63:10, 63:12, 81:9, 93:17
**problems** [5] - 34:11, 36:13, 64:20, 81:25, 82:1
**procedure** [1] - 93:2
**procedures** [1] - 14:21
**proceed** [1] - 99:11
**proceeding** [2] - 2:5, 92:25
**proceedings** [5] - 8:1, 52:12, 61:15, 68:24, 99:23
**Proceedings** [1] - 1:25
**process** [5] - 3:2, 18:1, 37:22, 67:6, 78:1
**processes** [1] - 78:2
**produced** [1] - 1:25
**professor** [5] - 70:6, 70:13, 70:20, 73:9
**progress** [1] - 73:23
**project** [1] - 12:11
**prolonged** [1] - 43:21
**promote** [1] - 79:19
**proof** [3] - 89:12, 89:15, 89:18
**properly** [3] - 64:8, 81:15, 86:21
**property** [15] - 22:9, 28:17, 28:19, 30:5, 30:13, 30:14, 30:15, 30:16, 53:3, 62:10, 86:22, 89:20, 92:3
**proposing** [1] - 99:17
**protect** [1] - 37:11
**protected** [1] - 45:8
**protection** [1] - 64:9
**prove** [1] - 21:24
**provide** [5] - 47:18, 53:2, 53:12, 54:16, 55:22
**provided** [2] - 54:10, 54:21
**pull** [1] - 37:20
**pulled** [2] - 60:24, 87:16
**pumping** [2] - 92:11, 92:13

**pumps** [1] - 7:12
**purchase** [6] - 20:10, 20:17, 22:11, 22:14, 66:5, 66:11
**purchased** [8] - 19:7, 20:6, 20:8, 22:23, 47:9, 58:13, 58:21, 61:16
**purchasing** [1] - 12:20
**purpose** [1] - 53:9
**purposes** [1] - 3:3
**pursue** [1] - 62:12
**put** [37] - 18:12, 18:15, 18:17, 19:8, 19:18, 20:17, 20:19, 24:5, 25:23, 28:2, 37:12, 37:19, 38:7, 39:10, 41:15, 44:9, 49:9, 49:19, 50:11, 51:17, 53:25, 54:20, 55:25, 57:25, 61:25, 62:1, 64:12, 64:19, 71:18, 74:19, 79:11, 80:21, 81:25, 92:7, 93:20
**putting** [1] - 6:25

### Q

**Q-U-A-D-R-O-Z-Z-I** [1] - 85:6
**Quadrozzi** [14] - 21:9, 21:15, 21:21, 22:8, 32:24, 39:17, 39:22, 45:6, 66:13, 82:15, 85:4, 85:11, 90:5, 94:19
**qualifications** [1] - 73:4
**qualified** [1] - 72:25
**questions** [12] - 10:15, 13:5, 40:4, 62:4, 63:3, 65:13, 65:23, 65:24, 82:6, 92:16, 94:21, 96:24
**quite** [4] - 18:21, 33:2, 49:13, 78:21
**Quite** [1] - 11:21

### R

**raise** [6] - 3:12, 15:18, 62:7, 63:4, 69:8, 84:22
**raised** [2] - 50:12, 51:17
**ran** [1] - 34:11
**range** [4] - 19:9, 19:19, 45:3, 50:21
**rank** [2] - 70:4, 70:13
**rapid** [1] - 98:3
**rapidly** [1] - 7:17
**rate** [8] - 8:16, 9:4, 9:6, 9:10, 18:3, 19:10, 26:22, 45:19, 48:5, 48:18, 48:21, 51:8, 54:8, 59:15, 59:21
**rates** [10] - 8:3, 8:25, 9:20, 9:21, 19:12, 26:15, 26:16, 44:19, 51:17, 55:23
**rather** [4] - 29:9, 49:12, 82:19, 83:2
**rationale** [1] - 89:18
**re** [5] - 14:12, 14:13, 15:8, 42:1, 93:19
**re-cross** [3] - 14:12, 14:13, 15:8
**re-moored** [1] - 93:19
**re-welded** [1] - 42:1
**reach** [1] - 51:4
**reaction** [2] - 77:20, 97:22
**reactions** [3] - 74:5, 91:2, 91:8
**reactivity** [1] - 37:14
**read** [1] - 52:6
**reading** [1] - 64:14
**real** [2] - 2:6, 89:18
**reality** [1] - 50:25
**realized** [1] - 44:15
**really** [17] - 19:14, 20:25, 21:3, 27:11, 27:13, 27:16, 28:22, 32:6, 33:7, 44:10,

45:24, 46:22, 47:7, 48:10, 50:3, 80:25, 86:20

**Really** [1] - 66:23

**reason** [9] - 33:3, 56:21, 57:1, 57:5, 57:9, 57:10, 78:10, 90:23, 94:18

**reasonable** [1] - 53:15

**reasons** [1] - 34:9

**rebuttal** [1] - 99:6

**receipt** [1] - 60:15

**received** [2] - 25:12, 25:16

**receiving** [1] - 73:3

**recently** [4] - 16:10, 19:15, 45:2, 49:18

**receptionist** [1] - 89:1

**Recess** [1] - 69:2

**recognize** [2] - 23:18, 60:22

**recommend** [1] - 76:23

**record** [12] - 3:17, 5:2, 15:23, 46:7, 52:11, 58:17, 66:4, 66:8, 68:23, 69:14, 85:2, 95:1

**recorded** [1] - 1:25

**records** [1] - 48:7

**recover** [1] - 20:22

**red** [1] - 74:19

**redirect** [9] - 13:6, 62:5, 62:6, 62:18, 62:19, 62:20, 82:7, 82:8, 96:21

**REDIRECT** [2] - 13:8, 100:6

**reengaged** [1] - 17:6

**refasten** [1] - 87:5

**refastening** [1] - 93:24

**reference** [1] - 20:21

**referred** [2] - 52:15, 88:13

**referring** [3] - 55:6, 97:3, 97:23

**reflects** [1] - 66:11

**refused** [1] - 51:25

**regarding** [1] - 74:5

**regiment** [1] - 32:2

**register** [1] - 31:19

**registered** [1] - 32:9

**regular** [2] - 17:16, 31:3, 56:15

**regularly** [4] - 20:19, 29:13, 64:7, 96:15

**relate** [2] - 71:10, 72:6

**related** [3] - 9:18, 28:22, 44:8

**release** [5] - 6:7, 7:3, 7:9, 20:7, 20:14

**released** [1] - 6:8

**Relevance** [1] - 27:7

**relevant** [1] - 58:17

**remaining** [2] - 37:24, 41:13

**remember** [10] - 6:1, 10:5, 18:3, 46:22, 46:23, 47:7, 55:13, 57:24, 66:25, 90:3

**remove** [4] - 18:17, 50:1, 57:23, 98:21

**removing** [1] - 43:25

**renamed** [2] - 25:20, 44:17

**rent** [9] - 12:12, 16:24, 45:24, 50:6, 51:8, 54:18, 56:9, 56:15, 59:19

**rental** [2] - 26:12, 98:18

**rentals** [1] - 16:14

**rented** [2] - 54:2, 54:3

**renting** [1] - 59:18

**repair** [15] - 4:3, 24:8, 43:15, 44:5, 56:2, 62:3, 73:16, 73:18, 73:21, 74:23, 75:5, 80:7, 91:20, 92:14

**repaired** [1] - 43:9

**repairs** [3] - 24:11, 34:20, 80:4

**repeat** [1] - 40:2

**replace** [4] - 31:6, 44:15, 56:19, 56:25

**replaced** [1] - 38:5

**replacement** [1] - 22:11

**replacing** [1] - 75:7

**report** [5] - 71:2, 71:3, 71:8, 71:10, 72:5

**Reporter** [2] - 1:22, 1:23

**reporter** [2] - 70:9, 99:16

**represent** [2] - 10:14, 72:15

**representing** [2] - 97:9, 97:10

**request** [5] - 62:15, 65:17, 65:20, 82:16, 89:4

**requested** [2] - 7:25, 53:5

**requesting** [2] - 89:11, 89:25

**required** [1] - 12:16

**requirement** [1] - 34:17

**reserve** [3] - 16:9, 17:18, 60:15

**Reserve** [2] - 16:10, 70:17

**resort** [1] - 30:4

**resources** [1] - 33:17

**respect** [1] - 85:23

**respecting** [1] - 30:15

**rest** [2] - 14:13, 44:9

**restate** [1] - 76:14

**rested** [1] - 21:13

**rests** [1] - 82:13

**result** [5] - 36:15, 36:16, 44:5, 80:4, 81:10

**retired** [1] - 16:10

**retrieve** [9] - 30:1, 32:23, 33:14, 34:6, 56:20, 86:3, 86:5, 86:21, 89:25

**retrieved** [5] - 33:9, 33:10, 33:12, 34:13, 54:1

**retrieving** [1] - 4:21

**return** [4] - 18:16, 21:21, 49:4, 49:8

**returned** [9] - 17:23, 27:21, 29:2, 47:25, 48:18, 55:4, 57:1, 58:22, 58:24

**revenue** [1] - 22:16

**review** [1] - 52:16

**rewelded** [1] - 82:3

**Richmond** [2] - 28:6, 28:8

**rightful** [1] - 21:23

**rise** [1] - 2:2

**River** [2] - 31:3, 59:10

**river** [1] - 32:11

**Riverside** [1] - 55:2

**road** [1] - 27:12

**Robert** [3] - 3:9, 3:19, 30:1

**roll** [1] - 94:25

**rolled** [1] - 36:7

**room** [1] - 84:8

**ROONEY** [1] - 1:16

**rope** [19] - 10:20, 11:15, 39:5, 39:11, 39:13, 78:24, 78:25, 79:6, 79:8, 79:10, 79:20, 91:10, 94:1, 94:2, 94:8, 96:1, 96:3

**roped** [3] - 79:16, 79:17, 79:25

**ropes** [7] - 11:14, 11:16, 87:14, 93:20, 93:23, 94:10, 98:9

**Ropes** [1] - 87:10

**rose** [1] - 70:13

**rot** [1] - 13:25

**roughly** [1] - 12:25

**round** [1] - 44:22

**rubber** [5] - 88:14, 88:15, 91:16, 97:15, 98:6

**rule** [1] - 94:20

**run** [1] - 90:15

**running** [3] - 18:11, 38:25, 48:16

**Rust** [1] - 74:17

**rust** [7] - 10:23, 11:7, 13:25, 36:14, 41:14, 74:16, 77:18

**rusting** [1] - 74:17

**rusty** [1] - 10:24

## S

**sacrificial** [1] - 37:13

**safely** [2] - 75:13, 81:16

**sake** [2] - 49:3, 70:8

**sale** [3] - 23:19, 66:10, 66:11

**salt** [16] - 11:5, 31:9, 35:13, 35:15, 59:13, 59:16, 59:18, 59:19, 60:11, 60:24, 72:3, 76:23, 80:12, 80:21, 90:19, 91:7

**salvage** [4] - 4:11, 8:6, 12:9, 34:8

**sand** [4] - 35:17, 44:12, 75:13, 81:21

**sand-blasted** [3] - 35:17, 75:13, 81:21

**sand-blasting** [1] - 44:12

**saw** [5] - 6:6, 17:20, 40:17, 80:19, 81:7

**scene** [1] - 27:24

**schedule** [1] - 99:18

**science** [1] - 81:4

**scrap** [1] - 31:22

**scrape** [1] - 74:18

**scraping** [1] - 11:10

**sea** [8] - 7:14, 16:8, 29:12, 35:2, 70:4, 70:11, 73:13, 73:17

**seam** [3] - 41:16, 41:24, 42:9

**seamanship** [3] - 74:13, 75:21, 76:2

**seams** [11] - 35:19, 36:4, 42:22, 42:23, 72:9, 75:7, 77:13, 77:14, 80:7, 81:8, 82:1

**seat** [2] - 3:20, 69:18

**seated** [3] - 16:1, 85:3, 85:7

**seaweed** [4] - 35:14, 35:16, 35:23, 41:13

**second** [6] - 37:12, 40:14, 42:16, 42:17, 69:20, 71:6

**Secondly** [1] - 57:12

**sections** [1] - 11:21

**secure** [3] - 87:2, 87:4, 96:16

**secured** [4] - 7:1, 79:1, 79:14, 88:1

**security** [5] - 89:2, 89:14, 89:21, 97:2

**see** [33] - 3:3, 13:21, 14:19, 22:8, 27:11, 29:17, 32:25, 34:17, 35:18, 35:20, 35:24, 39:14, 41:17, 41:24, 42:1, 42:15, 42:17, 42:18, 42:21, 42:24, 43:4, 49:1, 64:8, 71:17, 71:19, 76:5, 78:9, 81:13, 81:14, 89:17, 89:20, 97:12, 98:1

**seeing** [1] - 14:25

**seek** [1] - 98:14

**seeking** [2] - 98:15, 98:17

**seem** [1] - 54:23

**sell** [2] - 31:22, 56:22

**send** [1] - 54:15

**Send** [1] - 99:17

**sends** [1] - 31:20

**sense** [1] - 2:11

**sent** [7] - 21:4, 21:22, 22:5, 51:20, 89:24, 90:2, 90:4

**series** [1] - 55:21

**serious** [2] - 17:20, 75:25

**Seriously** [1] - 63:23

**Service** [1] - 16:10

All Word // Gowanus v. Sulzer
12

**service** [9] - 19:24, 20:18, 20:20, 24:5, 25:23, 47:18, 61:25, 62:2, 81:25
**serviced** [2] - 78:18, 81:1
**services** [3] - 67:23, 73:20, 73:23
**set** [2] - 40:14, 69:23
**seven** [4] - 26:19, 45:3, 55:24
**Several** [1] - 93:22
**several** [11] - 9:2, 9:12, 12:15, 17:15, 20:18, 22:17, 24:9, 24:24, 30:19, 62:3, 86:20
**shape** [1] - 13:4
**shaved** [1] - 77:1
**sheet** [2] - 26:8, 26:9
**Ship** [5] - 34:19, 34:21, 34:22, 43:15, 75:5
**ship** [4] - 70:14, 74:17, 90:17
**ship's** [1] - 16:8
**ships** [4] - 77:7, 78:9, 90:13, 91:6
**shipyard** [7] - 5:11, 5:12, 5:16, 5:20, 6:10, 24:8, 38:6
**Shipyard** [8] - 5:13, 6:9, 7:24, 34:14, 42:13, 43:9, 71:5, 76:1
**shocked** [1] - 66:25
**shop** [1] - 4:3
**short** [6] - 8:16, 9:12, 12:2, 39:8, 40:16, 76:18
**short-term** [3] - 8:16, 9:12, 12:2
**shorter** [1] - 40:5
**shortly** [2] - 20:6, 21:22
**show** [1] - 43:11
**showed** [2] - 89:15, 89:17
**showing** [2] - 89:11, 89:23
**shown** [1] - 89:9
**shows** [1] - 41:16
**side** [17] - 16:16, 29:20, 31:6, 32:11, 36:6, 36:9, 42:1, 61:9, 61:10, 62:8, 70:16, 83:15, 83:25, 84:1, 84:3, 84:18, 96:10
**sides** [4] - 13:21, 65:25, 68:14, 71:18
**significance** [2] - 42:8, 92:12
**significant** [2] - 42:5, 59:17
**Signs** [1] - 10:22
**similar** [3] - 19:12, 20:8, 23:24
**simple** [2] - 44:9, 83:1
**sink** [3] - 30:21, 31:18, 35:22
**sinking** [1] - 43:7
**sit** [1] - 67:11
**Sit** [1] - 84:11
**site** [1] - 89:10
**sitting** [8] - 4:20, 10:22, 13:12, 14:18, 80:11, 80:14, 80:16, 87:23
**situation** [1] - 75:23
**Six** [2] - 46:4, 54:7
**six** [19] - 19:15, 26:9, 26:18, 26:19, 34:15, 45:3, 54:6, 54:9, 54:12, 54:19, 55:19, 56:11, 60:8, 70:5, 80:11, 80:14, 80:16, 80:21, 81:2
**six-month** [1] - 54:12
**size** [8] - 8:19, 9:10, 19:5, 23:24, 50:20, 78:17, 86:12, 86:23
**sizes** [1] - 20:2
**SJ)(JO** [1] - 1:4
**skegs** [1] - 43:25
**slight** [1] - 81:12
**slower** [1] - 70:8

**slowly** [1] - 70:18
**small** [2] - 33:22, 33:24
**smirk** [1] - 94:25
**snotter** [1] - 39:11
**societies** [1] - 17:3
**sold** [1] - 47:6
**some-odd-foot** [1] - 90:15
**someone** [2] - 12:19, 32:5
**sometimes** [4] - 7:11, 7:13, 26:21, 39:9
**Sometimes** [1] - 88:25
**somewhere** [5] - 29:15, 45:3, 84:14, 90:4, 98:15
**Somewhere** [1] - 21:17
**Son** [1] - 23:20
**soon** [5] - 5:16, 41:12, 52:22, 99:14, 99:15
**sorry** [4] - 14:6, 25:9, 40:22, 68:22
**sort** [2] - 66:25, 75:24
**sound** [1] - 18:6
**source** [1] - 22:16
**sources** [2] - 22:21, 38:14
**space** [1] - 38:2
**specific** [3] - 5:14, 9:18, 54:21
**specifically** [2] - 2:16, 27:13
**Spell** [1] - 85:5
**spend** [2] - 12:23, 13:3
**spot** [1] - 81:8
**spots** [1] - 36:3
**stand** [4] - 3:10, 15:16, 69:6, 99:3
**standard** [3] - 9:6, 57:20, 58:6
**starboard** [1] - 36:8
**start** [7] - 12:23, 25:23, 40:3, 40:4, 63:25, 69:1, 95:16
**started** [5] - 14:7, 16:20, 49:10, 59:4, 98:21
**Started** [1] - 4:2
**state** [6] - 20:13, 22:19, 52:24, 69:13, 73:25
**State** [3] - 3:17, 15:23, 85:2
**statement** [2] - 2:6, 47:17
**statements** [2] - 2:4, 48:15
**Staten** [1] - 5:11
**states** [2] - 49:8, 72:1
**STATES** [2] - 1:1, 1:14
**States** [1] - 1:6
**stating** [1] - 22:6
**steel** [40] - 4:14, 6:7, 7:1, 7:4, 10:20, 11:5, 11:6, 11:15, 11:18, 11:20, 11:22, 13:25, 36:15, 36:17, 36:21, 36:25, 37:3, 37:11, 37:15, 37:16, 37:17, 39:9, 39:12, 39:16, 39:19, 40:7, 43:21, 61:9, 61:11, 71:11, 77:21, 79:6, 79:17, 80:5, 87:18, 87:21, 87:23, 90:10
**stenography** [1] - 1:25
**stepped** [1] - 7:2
**steps** [1] - 87:2
**stern** [1] - 36:9
**stick** [1] - 59:5
**still** [3] - 31:21, 33:3, 56:21
**stipulated** [1] - 9:3
**stop** [1] - 86:21
**stopped** [1] - 63:11
**store** [1] - 35:4
**stored** [1] - 21:1
**stern** [1] - 87:6

**straight** [1] - 79:12
**stray** [1] - 61:7
**street** [2] - 21:2, 28:21
**strike** [1] - 63:24
**Strike** [1] - 46:1
**structure** [2] - 38:23, 79:19
**stuff** [5] - 28:11, 49:12, 50:22, 50:23, 98:22
**subject** [2] - 26:20, 70:24
**submissions** [1] - 54:10
**submit** [1] - 99:10
**submitted** [5] - 23:5, 24:16, 24:18, 93:8, 93:15
**subsequent** [1] - 29:25
**substantial** [1] - 86:24
**successful** [1] - 29:9
**Sulzer** [20] - 2:14, 2:15, 5:4, 5:5, 15:15, 15:25, 16:19, 23:17, 71:14, 72:18, 72:22, 75:5, 75:22, 76:3, 78:16, 79:5, 81:7, 88:19, 89:4, 89:7
**SULZER** [1] - 1:9
**Sulzer's** [2] - 9:11, 89:24
**summary** [1] - 2:8
**summer** [2] - 4:24, 33:4
**sunk** [3] - 4:16, 30:23, 34:2
**sunlight** [1] - 71:17
**SUNY** [4] - 70:3, 70:5, 70:13, 73:10
**superfluous** [1] - 56:22
**supposed** [5] - 3:4, 26:25, 37:25, 42:15, 48:1
**supposedly** [1] - 48:13
**survey** [2] - 40:19, 72:17
**surveying** [2] - 16:15, 17:1
**surveyor** [1] - 40:14
**suspicious** [1] - 29:8
**sustain** [1] - 56:18
**Sustained** [1] - 53:20
**switch** [1] - 38:25
**sworn** [4] - 3:15, 15:21, 69:11, 84:25
**system** [4] - 30:8, 30:11, 92:11, 92:13

**T**

**table** [2] - 65:2, 82:17
**tanks** [1] - 30:23
**teach** [5] - 70:20, 74:9, 74:11, 74:12, 74:14
**teaching** [2] - 70:6, 70:17
**techniques** [1] - 38:10
**Telephone** [1] - 1:23
**Ten** [2] - 45:17, 45:18
**ten** [9] - 22:10, 24:2, 31:4, 46:4, 56:10, 59:24, 61:2, 61:3, 67:6
**ten-foot** [1] - 24:2
**tend** [4] - 30:21, 37:4, 61:9, 89:3
**tends** [3] - 22:21, 35:13, 61:6
**term** [10] - 8:16, 9:12, 9:14, 12:2, 12:8, 12:13, 12:16, 38:22, 54:4, 54:8
**terms** [1] - 44:10
**Terrace** [2] - 28:6, 28:8
**terrible** [1] - 10:22
**test** [1] - 65:17
**testified** [23] - 3:15, 14:15, 15:21, 30:1, 40:6, 46:12, 46:15, 47:13, 47:25, 48:3, 50:11, 51:20, 51:24, 60:1, 60:25, 61:19,

69:11, 75:6, 76:3, 76:12, 84:25, 92:21,
93:16

**testifying** [3] - 51:16, 56:24, 80:23
**testimony** [8] - 2:4, 63:25, 68:4, 73:3,
81:20, 82:25, 83:8
**Texas** [1] - 4:4
**THE** [188] - 1:14, 2:3, 2:10, 2:18, 2:21,
2:24, 3:3, 3:6, 3:19, 3:20, 5:2, 5:4, 8:21,
8:24, 9:1, 9:8, 10:5, 10:6, 10:8, 13:7,
14:12, 14:14, 15:8, 15:10, 15:12, 15:14,
15:25, 23:2, 23:13, 24:14, 24:23, 25:2,
25:8, 25:13, 27:9, 39:21, 39:25, 40:3,
41:4, 42:15, 42:17, 46:5, 46:9, 48:25,
51:15, 52:13, 52:20, 53:20, 57:8, 57:16,
57:20, 58:4, 58:7, 58:9, 58:10, 58:14,
58:18, 58:20, 59:8, 62:5, 62:14, 62:17,
62:20, 62:23, 62:25, 63:2, 63:7, 63:10,
63:12, 63:16, 63:21, 63:23, 65:6, 65:8,
65:11, 65:14, 65:24, 66:3, 66:4, 66:6,
66:7, 66:12, 66:15, 66:16, 66:18, 66:19,
66:20, 66:21, 66:23, 67:1, 67:4, 67:5,
67:7, 67:9, 67:10, 67:13, 67:15, 67:18,
67:20, 67:22, 67:24, 67:25, 68:6, 68:8,
68:10, 68:12, 68:14, 68:21, 68:25, 69:4,
69:15, 69:18, 70:7, 70:10, 73:3, 73:6,
73:11, 73:15, 73:18, 73:22, 74:1, 74:4,
74:7, 74:12, 74:16, 74:24, 76:9, 76:16,
82:7, 82:9, 82:12, 82:14, 82:18, 82:20,
82:23, 83:1, 83:6, 83:11, 83:14, 83:18,
83:21, 84:1, 84:3, 84:6, 84:9, 84:11,
84:17, 85:4, 85:6, 85:8, 92:17, 94:18,
94:24, 94:25, 95:3, 95:4, 96:21, 96:23,
97:4, 97:5, 97:7, 97:8, 97:10, 97:12,
97:13, 97:15, 97:17, 97:18, 97:21, 98:1,
98:2, 98:6, 98:8, 98:11, 98:12, 98:13,
98:17, 98:19, 98:20, 98:24, 99:2, 99:4,
99:6, 99:8, 99:14, 99:17, 99:22, 100:14
**themselves** [3] - 2:15, 11:16, 36:21
**thereafter** [1] - 90:4
**Therefore** [1] - 62:11
**thin** [1] - 64:11
**thinking** [1] - 77:7
**third** [3] - 6:2, 55:16, 68:19
**thousand** [9] - 9:13, 12:3, 12:5, 12:23,
19:6, 19:13, 50:19, 50:23, 61:12
**three** [9] - 4:6, 4:7, 6:21, 29:19, 36:10,
42:24, 70:14, 79:14, 87:12
**throwing** [1] - 38:24
**thrust** [1] - 72:8
**tie** [2] - 38:23, 39:5
**tied** [12] - 29:17, 39:14, 39:16, 39:19,
40:7, 53:8, 72:2, 78:24, 78:25, 88:4,
96:1, 98:8
**Tied** [1] - 6:9
**tighten** [1] - 88:16
**time..** [1] - 61:18
**timing** [1] - 97:1
**tires** [6] - 49:14, 88:15, 91:16, 97:16,
98:6, 98:9
**title** [2] - 51:4, 98:15
**today** [4] - 11:6, 24:19, 99:9, 99:19
**today's** [1] - 3:3
**together** [5] - 6:20, 19:18, 36:7, 88:16,
94:2
**tomorrow** [1] - 11:7
**took** [17] - 19:8, 24:9, 26:22, 29:3,

---

30:16, 33:5, 42:2, 42:3, 42:4, 47:4,
49:23, 51:1, 62:3, 70:5, 71:4, 72:20,
87:17
**top** [2] - 13:18, 71:7
**Torres** [1] - 1:22
**total** [1] - 72:23
**totally** [1] - 33:25
**touch** [1] - 96:13
**touching** [3] - 79:21, 88:17, 96:11
**tour** [1] - 33:5
**tow** [4] - 34:16, 34:18, 53:23, 75:21
**towards** [2] - 4:24, 6:3
**Towed** [2] - 6:6, 7:24
**towed** [2] - 75:14, 79:6
**towing** [1] - 4:11
**track** [1] - 32:4
**trailer** [2] - 88:23, 88:24
**training** [2] - 70:14, 74:6
**transcript** [2] - 99:13, 99:16
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:13
**Transcription** [1] - 1:25
**transferred** [1] - 51:4
**transportation** [1] - 74:1
**travel** [2] - 37:15, 37:21
**traveling** [1] - 36:17
**travels** [2] - 38:21, 97:24
**tribute** [1] - 76:2
**tried** [1] - 28:9
**tripping** [1] - 49:21
**trouble** [1] - 75:25
**truck** [1] - 90:11
**true** [2] - 71:7, 72:1
**trustee** [1] - 62:9
**try** [1] - 28:7
**trying** [7] - 15:3, 18:1, 40:21, 48:25,
56:21, 89:20, 98:2
**Tuesday** [1] - 1:8
**tug** [8] - 4:4, 4:7, 4:10, 16:13, 16:23,
33:18, 33:23, 87:6
**tugs** [1] - 79:6
**turn** [2] - 36:5, 58:18
**Turning** [1] - 72:11
**turning** [1] - 97:2
**Two** [5] - 33:15, 55:10, 65:13, 78:13
**two** [31] - 4:5, 21:22, 24:4, 33:16, 35:3,
36:13, 36:24, 37:24, 38:13, 40:10, 41:7,
41:21, 42:17, 42:20, 42:21, 42:24, 48:22,
56:16, 56:17, 56:20, 62:1, 71:24, 72:11,
77:20, 78:2, 78:12, 79:15, 79:16
**two-foot** [1] - 24:4
**type** [4] - 37:2, 61:13, 80:19, 81:17
**types** [1] - 36:13
**typical** [1] - 55:23
**Typically** [2] - 36:13, 38:5
**typically** [11] - 19:5, 31:4, 37:3, 37:5,
41:15, 45:3, 48:8, 56:9, 57:21, 59:9,
78:19

## U

**un-inspected** [1] - 75:15
**unauthorized** [1] - 89:22
**unclear** [1] - 97:1
**under** [7] - 7:9, 13:16, 35:18, 38:3,

---

57:17, 86:9, 91:20
**underground** [1] - 51:6
**underwater** [2] - 13:19, 14:1
**Unfortunately** [1] - 62:1
**unidentified** [1] - 32:5
**uniform** [1] - 9:6
**UNITED** [2] - 1:1, 1:14
**United** [1] - 1:6
**unless** [1] - 94:22
**unusual** [1] - 10:23
**up** [73] - 4:4, 4:5, 5:10, 6:4, 6:9, 7:14,
7:23, 9:7, 9:25, 10:16, 11:17, 12:23,
13:20, 14:19, 17:18, 19:9, 21:4, 21:6,
21:8, 21:25, 22:6, 28:5, 28:8, 28:18,
29:14, 29:17, 29:19, 31:8, 31:22, 32:1,
32:6, 33:18, 34:5, 38:4, 39:5, 39:14,
39:16, 39:19, 40:7, 40:20, 42:1, 49:4,
52:4, 52:8, 52:17, 52:22, 53:7, 53:8,
53:16, 59:2, 60:16, 60:21, 64:16, 65:4,
66:1, 68:1, 68:6, 68:15, 68:16, 68:18,
70:8, 72:2, 72:16, 75:21, 87:17, 89:9,
89:15, 89:17, 89:23, 96:23, 96:25, 99:10,
99:13
**upper** [1] - 42:20
**upset** [1] - 64:18

## V

**value** [5] - 19:2, 19:3, 37:17, 50:12,
92:13
**Vanished** [1] - 58:25
**vanished** [2] - 27:24, 57:13
**variable** [2] - 44:24, 79:20
**variables** [3] - 61:12, 78:22, 80:20
**variations** [1] - 61:14
**various** [3] - 17:2, 26:12, 26:20
**VBButlerRPR@aol.com** [1] - 1:24
**verbally** [1] - 53:14
**verify** [1] - 40:19
**versus** [1] - 81:1
**vertical** [1] - 36:6
**vessel** [2] - 66:17, 67:3
**vessels** [1] - 73:17
**Victoria** [1] - 1:22
**virtue** [1] - 95:22
**visit** [2] - 53:9, 66:24
**voir** [1] - 73:4
**VOIR** [2] - 73:7, 100:18
**voyages** [1] - 81:18

## W

**wants** [1] - 65:5
**war** [1] - 17:18
**Warwick** [1] - 70:21
**Washington** [1] - 1:20
**waste** [2] - 68:16, 78:1
**water** [62] - 4:14, 6:8, 7:14, 11:6, 13:13,
13:14, 13:16, 14:5, 14:18, 14:22, 15:5,
31:3, 31:5, 31:7, 31:9, 31:14, 35:13,
35:15, 35:23, 36:15, 36:17, 36:18, 37:11,
37:15, 37:21, 38:3, 38:15, 39:3, 40:21,
42:25, 59:10, 59:13, 59:16, 59:18, 59:20,
60:11, 60:24, 64:12, 71:20, 72:3, 72:16,

76:23, 79:10, 79:13, 80:11, 80:12, 80:21, 88:14, 90:14, 90:19, 91:7, 97:19, 97:24, 98:5

**waterfront** [1] - 27:25
**ways** [4] - 32:21, 64:3, 76:12, 76:14
**wearing** [1] - 37:22
**weather** [1] - 86:19
**week** [8] - 6:2, 12:9, 12:10, 12:12, 21:16, 21:17, 33:16, 99:17
**weeks** [1] - 21:22
**weld** [8] - 36:9, 36:21, 37:2, 37:20, 40:13, 42:10, 42:24, 43:22
**welded** [8] - 15:4, 32:8, 36:4, 36:7, 42:1, 42:9, 72:9, 75:7
**welder** [3] - 90:5, 90:9, 90:11
**welding** [9] - 4:3, 40:20, 61:5, 81:11, 81:14, 90:8, 90:10, 90:17, 90:21
**welds** [16] - 36:11, 36:20, 37:3, 37:5, 37:8, 40:8, 40:20, 42:11, 43:23, 44:2, 44:3, 71:16, 75:8, 77:5, 77:12, 82:1
**WHEREUPON** [1] - 99:23
**white** [1] - 29:18
**whoever's** [1] - 54:18
**whole** [9] - 12:11, 18:1, 43:2, 44:25, 55:21, 58:4, 90:10, 90:14, 90:15
**WHS-350** [1] - 25:21
**wide** [1] - 24:4
**winch** [8] - 87:15, 87:18, 87:23, 94:4, 95:9, 95:11, 95:13
**winches** [2] - 13:2
**wind** [2] - 7:14, 9:7
**wire** [3] - 96:3, 96:7, 98:4
**wires** [2] - 38:19, 95:17
**wish** [5] - 2:3, 73:4, 84:1, 99:9, 99:10
**withdraw** [1] - 39:24
**withdrawn** [1] - 39:25
**withheld** [2] - 2:14, 45:5
**witness** [7] - 3:7, 15:15, 23:1, 41:2, 62:23, 68:19, 99:3
**Witness** [7] - 3:10, 15:13, 15:16, 68:13, 69:6, 82:11, 99:3
**WITNESS** [49] - 3:19, 5:4, 9:1, 10:6, 15:12, 15:25, 42:17, 57:20, 58:7, 58:10, 66:6, 66:15, 66:18, 66:20, 66:23, 67:4, 67:7, 67:10, 67:15, 67:20, 67:24, 68:10, 69:15, 70:10, 73:11, 73:15, 73:18, 73:22, 74:1, 74:4, 74:7, 74:12, 74:16, 85:4, 85:6, 94:24, 95:3, 97:4, 97:7, 97:10, 97:13, 97:17, 97:21, 98:2, 98:8, 98:12, 98:17, 98:20, 100:2
**witnesses** [5] - 68:17, 82:12, 84:7, 84:15, 99:4
**wood** [3] - 96:1, 96:8, 96:11
**Wood** [1] - 96:2
**wooden** [7] - 79:1, 88:4, 88:6, 88:7, 88:9, 88:10, 95:18
**word** [3] - 28:2, 28:14, 89:10
**words** [3] - 52:7, 53:22, 53:24
**world** [2] - 27:17, 32:20
**worn** [1] - 71:16
**worried** [1] - 31:17
**worth** [1] - 19:6
**wrapper** [1] - 36:5
**write** [4] - 50:22, 52:7, 53:21, 71:2
**writing** [2] - 21:21, 53:14

**written** [4] - 41:7, 53:21, 53:23, 54:17
**wrongfully** [1] - 2:14
**wrote** [1] - 28:18

## Y

**yards** [1] - 28:10
**year** [16] - 11:3, 20:20, 21:18, 27:19, 29:12, 29:23, 31:20, 44:22, 44:23, 44:25, 45:1, 45:2, 45:4, 54:19, 56:11, 76:25
**year-round** [1] - 44:22
**years** [33] - 12:18, 16:22, 17:15, 28:1, 30:19, 31:5, 31:13, 31:14, 34:15, 40:12, 46:23, 46:24, 48:6, 48:7, 48:10, 57:24, 59:24, 60:6, 60:8, 60:25, 70:5, 70:11, 70:15, 73:13, 80:11, 80:14, 80:16, 80:22, 81:2, 81:17, 90:16
**YORK** [1] - 1:1
**York** [26] - 1:6, 1:18, 1:20, 8:3, 9:20, 9:22, 16:7, 17:4, 26:23, 26:24, 28:18, 30:6, 31:8, 33:17, 45:21, 45:22, 45:24, 53:10, 56:14, 56:21, 59:22, 60:19, 60:21, 64:16, 75:14
**yourself** [2] - 8:10, 96:15

## Z

**zinc** [7] - 37:19, 37:20, 37:21, 38:2, 71:18, 71:23, 78:9
**Zincs** [1] - 13:23
**zincs** [5] - 15:4, 31:6, 37:23, 38:5, 38:8

## Ö

**Ö** [2] - 69:9, 100:16