**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
GOWANUS INDUSTRIAL PARK, INC.,
                       Plaintiff,

                               **REPORT AND**
                               **RECOMMENDATION**
     - against -

                               06-CV-0105 (KAM) (JO)

ARTHUR H. SULZER ASSOCIATES, INC.,
                       Defendant.
-----------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

      Plaintiff Gowanus Industrial Park, Inc. ("Gowanus") commenced this action in New York State court in November 2005 against Defendant and Counter-Claimant Arthur H. Sulzer Associates, Incorporated ("AHS") seeking damages associated with expenses incurred in retaining AHS's barge on its property. Docket Entry ("DE") 1 (Notice of Removal and Complaint). AHS removed the case to this court, *id.*, and asserted counterclaims arising from Gowanus's refusal to return the barge upon AHS's demand. DE 3 (Answer). AHS moved for summary judgment dismissing Gowanus's claims and for partial summary judgment as to liability on its counterclaims. The Honorable Sterling Johnson, Jr., United States District Judge, granted the motion and referred the matter to me for a report and recommendation on damages. I held an inquest on May 20, 2008, and now make my report. For the reasons set forth below, I respectfully recommend that the court award AHS damages in the amount of $208,200, consisting of $93,000 in lost rental income on AHS's first counterclaim, $100,200 in lost rental income on the second counterclaim, $15,000 in repair costs on the third counterclaim, and nothing on the fourth counterclaim. I further respectfully recommend that the court deny AHS's request for punitive damages, litigation costs, and attorneys' fees.

I.  Background

AHS is the owner of the barge ADA. In 2000, AHS leased the ADA to CDS Marine Construction, LLC ("CDS") pursuant to a demise charter. DE 64 (Transcript of Damages Inquest held May 20, 2008) ("Tr.")) 17. CDS subsequently entered into a contract with Gowanus to perform work on Gowanus's facility and, in order to perform the work, transported three barges to the work site, including the ADA. Tr. 85. At some point during this time, CDS installed a crane on the ADA. Tr. 18.

In October 2003, CDS filed for bankruptcy and abandoned the ADA on Gowanus's property. DE 54 (Memorandum and Order ("M&O")) at 3. In early 2004, AHS learned of the CDS bankruptcy, discovered that the barge had been abandoned, and sought to recover it from Gowanus. Tr. 28. Gowanus refused AHS's requests and instead informed AHS that Gowanus had incurred substantial expense in maintaining, repairing, and storing the barge after CDS abandoned it at the work site. M&O at 4. Over a year later, in late October 2005, AHS resorted to self-help by securing a tugboat, entering the waters surrounding Gowanus's dock, and recovering the ADA. *Id.* at 5.

Soon thereafter, Gowanus initiated this action against AHS seeking damages for the expense of storing and maintaining the ADA. AHS removed the case to this court and counterclaimed for damages caused by Gowanus's refusal to relinquish possession of the barge. In April 2008, the court granted AHS's motion for summary judgment dismissing Gowanus's claims against it and granted partial summary judgment on its counterclaims. M&O at 18. Specifically, the court found that CDS and AHS had executed a valid demise charter that relieved AHS of liability for any injuries caused by the use or operation of the vessel by CDS,

and concluded that Gowanus had "presented no legal justification for withholding [AHS's] property[.]" *Id*. at 11. The court referred the matter to me for a report and recommendation with respect to an appropriate damages award for AHS's counterclaims. I held a damages inquest on May 20, 2008 to determine the extent of AHS's damages.

II. Discussion

    A. Compensatory Damages

Before it can properly assess the amount of damages Gowanus owes AHS on the counterclaims, the court must first decide whether AHS owns the crane that CDS installed on the ADA before abandoning the barge at the Gowanus work site, as the determination of that question will affect the value of the ADA and AHS's recovery. *See* Tr. 18-19. The crane, along with other tangible property, was officially abandoned by the trustee in the CDS bankruptcy proceedings. *In re CDS Marine Constr. LLC*, case no. 03-44170 (JHW) (Bankr. D.N.J. 2003); *see also* DE 66 (AHS's Post-Inquest Memorandum ("AHS Br.")) at 4-5. According to the unchallenged testimony of AHS's owner and manager, Arthur H. Sulzer ("Sulzer"), it is standard industry practice that equipment installed on a barge by a charterer and not removed before it is returned to the owner becomes the property of the barge owner. Tr. 18. Moreover, any adjustment to the price of the charter rate – based on the additional value of the added equipment or the additional expense of removing it – is negotiated between the owner and charterer. Tr. 18, 49-50. Because CDS abandoned all rights to the crane by failing to remove it, the crane belongs to AHS.

Gowanus has no valid competing claim to the crane. Though Gowanus purports to have a claim against CDS that could be partially satisfied by the crane, DE 65 (Gowanus's Post-

Inquest Memorandum ("Gowanus Br.")) at 3-4, Gowanus never filed a Proof of Claim as required by 11 U.S.C. § 501 and Federal Rule of Bankruptcy Procedure 3002(a) in the CDS bankruptcy proceedings. Those proceedings concluded on July 7, 2005. *See* AHS Br. at 6 & Ex. 4 (Gowanus's Response to Request for Production of Documents). By contrast, AHS did file such a Proof of Claim in the amount of $65,777 for unpaid rent on the barge. *Id.* at 8 & Ex. 6 (Copy of AHS's Proof of Claim in CDS Bankruptcy). Accordingly, for purposes of calculating of AHS's damages, I conclude that AHS owns the crane that CDS installed on the ADA and subsequently abandoned.

1. First Counterclaim

AHS's first counterclaim seeks damages for lost rental income for a period of 311 days, from April 23, 2003 to February 27, 2004, representing the time during which the abandoned ADA remained on Gowanus's property but before AHS sought the return of the barge. Answer ¶¶ 36, 39. This claim is based on the theory that once CDS abandoned the barge on its property, Gowanus had the ability and an affirmative duty to determine the identity of the ADA's owner and inform it of the barge's location. Tr. 32. I recognize that Gowanus has asserted it affirmatively believed the barge to be the property of CDS until it was contacted by AHS, and that it therefore could not have intentionally withheld the ADA until AHS requested its return. *See* DE 44 (Gowanus's Memorandum of Law in Opposition to Motions for Summary Judgment and for Sanctions) at 5. Nevertheless, as a result of the court's grant of summary judgment on AHS's first counterclaim, it is the law of the case that Gowanus could and should have identified the barge as belonging to AHS and by failing to do so it unlawfully withheld the ADA from AHS. Accordingly, I must calculate the rental income that AHS lost during this period.

AHS seeks damages equivalent to the daily charter rate the ADA would have commanded, multiplied by the days it would have likely put the ADA in service, during this time period. To establish an estimated charter rate for the ADA, AHS presented evidence of the rates it charged for the use of another barge it owns, the Betsy, which Sulzer described as being comparable to the ADA in size and similarly equipped with a crane. *See* Tr. 23-24. The evidence provided by AHS establishes that the Betsy has previously rented for $450-$700 per day, *see* Tr. 26; DE 58 (AHS's Pre-Inquest Memorandum) ("AHS Pre-Inquest Memo.")), Ex. 5 (Copies of Invoices for Betsy Rental), and that the Betsy commanded daily rates between $500-$1,000 as of the date of the inquest. Tr. 19. AHS also presented the testimony of Captain Robert Henry ("Henry") to the effect that in 2004 and 2005, the daily rate in the New York area for the short-term hire of a barge equivalent to the ADA would be approximately $1,000. Tr. 9. Sulzer testified that during the relevant time period, the ADA would have been rented for an average of $600 a day in the Philadelphia area (where AHS would have chartered the barge, *see* AHS Br. at 11), and that he would have been able to charter the ADA for at least half of the days at issue. Tr. 44-46. I credit the testimony of AHS's witnesses and therefore conclude that AHS would have earned $600 per day for half of the days at issue. Dividing the 311 days in the period covered by the first counterclaim by two, and multiplying that quotient by a daily rate of $600 produces a damages calculation of $93,000 on the first counterclaim, and I respectfully recommend that the court award that amount.

    2.    Second Counterclaim

In its second counterclaim, AHS seeks damages for the 607 days between February 28, 2004, when Sulzer asserts he called Gowanus's principal, John Quadrozzi, Jr. ("Quadrozzi"), to

discuss recovering the ADA, and October 27, 2005, when AHS recovered physical possession of the barge.[1]  Answer ¶ 42.  I use the same method described above to calculate AHS's damages during this period, with one important limitation:  AHS's acquisition of the Betsy during this period effectively mitigated the loss of the ADA.

From the date the Betsy was chartered, on January 28, 2005, any revenue AHS earned from the ADA was essentially replaced by revenue earned from the Betsy, and AHS therefore has no further cognizable damages from January 28, 2005 forward.  *See* Tr. 26.  To award damages for lost rental income after that point – for the 272 days during which AHS covered its losses – would be to award it a windfall.  I therefore calculate that AHS was deprived of rental income of $600 per day for half of the 335 days during the period from February 28, 2004 (when Gowanus first refused to allow AHS to recover the ADA) until January 28, 2005 (the first day the Betsy was operational), for a total of $100,200.  I respectfully recommend that the court award that amount on AHS's second counterclaim.

3. Third Counterclaim

In its third counterclaim, AHS seeks compensation for expenses related to repairing damage on the ADA that occurred while on Gowanus's property.  Answer ¶ 45; AHS Pre-Inquest Memo. at 8.  The testimony of Sulzer and Captain Joseph Ahlstrom ("Ahlstrom"), a professor at

---

[1] There is a factual dispute as to whether this telephone conversation actually took place.  *See* AHS Br. at 22-23.  To the extent that the February 28, 2004 date represents a close approximation of the date on which Gowanus knew or should have known of AHS's interest in repossessing the ADA – Sulzer also testified that his attorney sent a letter to Gowanus on February 17, 2004 demanding the release of the ADA – I rely on it for the purpose of calculating damages on the second counterclaim.  In any event, if Gowanus had an affirmative duty to return the barge to AHS even before Sulzer's telephone call – as the court's determination of liability on the first counterclaim establishes it did – then the date on which AHS first identified itself to Gowanus as the ADA's owner is of no moment.

SUNY Maritime College and AHS's witness, established that the damage sustained by the ADA is consistent with a phenomenon known as "electrolysis," whereby electrons move through the metal of a vessel into water, especially conductive saltwater, eventually corroding the metal. *See* Tr. 36, 40, 78-81. The damage is exacerbated when a vessel is connected to the shore by metal cables, because the cables connect the earth to the vessel, effectively forming a circuit which allows the electricity in the ground to flow through the vessel. Tr. 7, 38.

Henry testified that the ADA was positioned as the outermost of three barges tied parallel to one another and to Gowanus's dock. The ADA was tied to the barge next to it with steel cables, which likely caused the electrolysis-related damage. Tr. 6, 11. Finally, AHS's witnesses explained that the damage to the ADA could have been minimized by simple protective measures including using rope rather than steel cables, Tr. 79, and installing zinc anodes, a common anti-corrosion device, on the barge. Tr. 37, 71, 80-81.[2] There were two anodes on the ADA when it was recovered, but according to Ahlstrom, there should have been between twelve and twenty to sufficiently protect the barge from corrosion. Tr. 78.

Gowanus argues that there is no way to know whether the damage occurred before the ADA was brought to its shipyard or during its time docked there. Gowanus Br. at 3, 5-6. In light of the testimony at the inquest, the argument is specious. AHS demonstrated that the barge was so damaged as to be nearly unseaworthy at the time of recovery. Specifically, Sulzer and Ahlstrom testified that the barge's seams were almost completely corroded, leaving the hull of

---

[2] Quadrozzi testified on behalf of Gowanus that only non-conductive rope was used to secure the ADA to the neighboring barge. Tr. 87. That testimony was at odds with Henry's account that he removed steel cables from the ADA. Based on my assessment of each witness's demeanor, I credit Henry's testimony in that regard and disbelieve Quadrozzi's.

7

the barge riddled with holes. Tr. 35-36. Indeed, it is possible that the only thing keeping the barge from sinking was the marine growth that had attached to the hull and blocked the holes. Tr. 35. The barge was incapable of traveling back to Philadelphia in this condition and had to be repaired in New York. Tr. 75-76. I reject as unsupportable the proposition that the barge was in such a state of disrepair before it came into Gowanus's control.

The cost to repair the ADA is established by an invoice from May Ship Repair Contracting Corporation on Staten Island. AHS Pre-Inquest Memo. Ex. 4. Sulzer testified that the items in this invoice attributable to corrosion damage are the welding, the installation of hull plates, and miscellaneous work including the removal of "skegs." Tr. 43-44. The additional expenses, including dry-docking the barge and sandblasting the hull, were part of routine maintenance and not related to any damage suffered by the ADA. Tr. 44. Sulzer estimated that approximately $15,000 or $16,000 of the invoice is attributable to the repair costs associated with corrosion. Tr. 44. The invoice supports that estimate. *See* AHS Pre-Inquest Memo. Ex. 4. I therefore respectfully recommend that the court award $15,000 to compensate AHS for the repair expenses necessitated by the damage to the ADA while it was in the care of Gowanus.

### 4. Fourth Counterclaim

In its Answer, AHS seeks damages for expenses incurred in the performance of a physical inspection of the hull of the barge. Answer ¶ 47. In its Pre-Inquest Memorandum, however, AHS appears to abandon this claim for damages, explaining that the fee paid to Ahlstrom for the inspection is being treated as a litigation cost and is therefore not an element of the counterclaim damages. AHS Pre-Inquest Memo. at 8. I therefore recommend that the court award no damages on the fourth counterclaim.

5. Total Compensatory Damages

As set forth above, I respectfully recommend that the court award AHS a total of $208,200 in compensatory damages. This amount includes $93,000 in lost rental income for the period from CDS's abandonment of the barge until AHS's demand for its return; $100,200 in lost rental income for the period from AHS's demand until its recovery of the barge (excluding the period when AHS mitigated its losses); and $15,000 in repair costs.

B. Punitive Damages

The purpose of punitive damages is not to compensate the victim, but rather to "punish the wrongdoer and deter him and others from duplicating his misconduct." *Williams v. City of New York*, 508 F.2d 356, 360 (2d Cir. 1974). Under maritime law, such damages may be available for "intentional or wanton and reckless conduct [that] amount[s] to a conscious disregard of the rights of others." *In re Horizon Cruises Litig.*, 101 F. Supp. 2d 204, 211 (S.D.N.Y. 2000) (quoting *CEH, Inc. v. F/V SEAFARER (ON 675048)*, 70 F.3d 694, 699 (1st Cir. 1995)); *see also Atl. Sounding Co., Inc. v. Townsend,* 557 U.S. ----, 129 S. Ct. 2561, 2575 (2009).[3] Gowanus's conduct does not rise to this level. Although Gowanus was not justified in

---

[3] AHS removed this action on the basis of both maritime and diversity jurisdiction. Although the court's prior decision made explicit reference only to diversity jurisdiction, *see* M&O at 5, I conclude that the court also has maritime jurisdiction because AHS's counterclaims arose from activities that occurred on the navigable waters of the United States and bears "a significant relationship to traditional maritime activity." *E. River Steamship Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 864 (1986). However, the precise source of the court's jurisdiction is of little significance to the question of punitive damages. If jurisdiction here were based exclusively on diversity, the substantive law of New York would apply. That law makes punitive damages available "where the wrongdoing is intentional or deliberate, has circumstances of aggravation or outrage, has a fraudulent or evil motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton." *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 321 (S.D.N.Y. 2008) (quoting *Swersky v. Dreyer & Traub*, 643 N.Y.S.2d 33, 38 (N.Y. App. Div. 1996)). Applying the latter standard would not alter my analysis.

withholding the barge, AHS has not demonstrated that Gowanus acted in a manner that evinces a conscious disregard for AHS's rights. Indeed, the court has already determined, in denying AHS's request for sanctions, that Gowanus earnestly believed that it was entitled to the expenses it attempted to recover from AHS. M&O at 14. Moreover, AHS acknowledges that a grant of its request for damages during the period covered by the first counterclaim vitiates, at least to some extent, its claim for punitive damages. AHS Br. at 12. I therefore respectfully recommend that the court decline to exercise its discretion to award punitive damages.

  C. Costs And Attorneys' Fees

An award of fees and expenses in a maritime action is discretionary "upon a finding of bad faith." *Am. Nat'l Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 270 (2d Cir. 1995) (citing *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 309 (2d Cir. 1987)). Such an award requires "clear evidence" that the losing party acted "for reasons of harassment or delay or for other improper purposes." *Puritan Ins. Co. v. Eagle S.S. Co.*, 779 F.2d 866, 873 (2d Cir. 1985) (citation omitted). The court has already concluded that Gowanus did not act in bad faith. M&O at 13-16 (denying AHS's request to impose sanctions on Gowanus under Federal Rule of Civil Procedure 11(b)(1) and 11(b)(2)). I therefore respectfully recommend that the court decline to award costs and attorneys' fees.

III. Recommendation

For the reasons set forth above, I respectfully recommend that the court enter judgment in favor of defendant Arthur H. Sulzer Associates, Incorporated and award it damages in the total amount of $208,200 (consisting of $93,000 in lost rental income on the first counterclaim; $100,200 in lost rental income on the second counterclaim; $15,000 in repair costs on the third

counterclaim; and nothing on the fourth counterclaim). I further respectfully recommend that the court deny the defendant's request for punitive damages, litigation costs, and attorneys' fees.

IV.     Objections

Any objections to this Report and Recommendation must be filed no later than April 7, 2010. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, --- F.3d ----, 2010 WL 547526, at *7 (2d Cir. Feb. 18, 2010).

**SO ORDERED.**

Dated: Brooklyn, New York
       March 24, 2010

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge