UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

GOWANUS INDUSTRIAL PARK, INC.,

Plaintiff,

vs.

ARTHUR H. SULZER ASSOCIATES, INC.,

Defendant.

---------------------------------------------------------------X

Civil Action No.:
06-CV-0105 (KAM)(JO)

**AFFIDAVIT OF JOHN QUADORZZI JR. IN OPPOSITION TO DEFENDANT'S POST-REMAND MOTION FOR SUMMARY JUDGMENT**

State of New York )
) ss.:
County of New York )

John Quadrozzi, Jr., being duly sworn deposes and says as follows:

1. I am the president of plaintiff Gowanus Industrial Park, Inc. ("GIP") and am submitting this affidavit in good faith and based upon my own personal knowledge in opposition to defendant-counter-claimant Arthur H. Sulzer Associates, Inc. ("Sulzer")'s Post-Remand Motion for Summary Judgment.

2. On or about May 30, 2000, Arthur Sulzer Associates, Inc. ("Sulzer") leased the barge known as the ADA (the "ADA") to CDS Marine Construction, LLC ("CDS"), pursuant to a demise charter party agreement, at a rate of $3,100 per month. See *Transcript of Damages Inquest*, at 17-18, dated May 20, 2008, a copy of which is annexed hereto as **Exhibit 1**; see also *Defendant / Counter-claimant's Memorandum of Law in Support of Post-Remand Motion for Summary Judgment*, dated March 26, 2012.

3.     In April 2003, CDS entered into a contract with GIP to repair its dock and bulkhead facilities located at the Henry Street Basin.  In order to carry out its work, CDS transported the ADA to the worksite.  At time time GIP entered into a contract with CDS, the ADA had a crane installed on it.  CDS began working at GIP's facilities shortly thereafter.  However, CDS failed to complete the work, and in August 2003, ceased operations at the site and left the ADA on GIP's property.

4.     In October, 2003, CDS filed for bankruptcy in the District of New Jersey and in July 2005, was discharged in bankruptcy.  GIP was unaware that CDS had filed for bankruptcy until well after the proceeding had been commenced.  A copy of the docket sheet on PACER for CDS's bankruptcy file is attached herewith as **Exhibit 2**.

5.     On February 17, 2004, Sulzer contacted GIP and requested permission to retrieve the ADA.  On February 28, 2004, GIP responded to Sulzer stating that it had permission to retrieve the ADA as long as Sulzer paid GIP its outstanding dockage fees for the ADA.  Sulzer refused to pay GIP's outstanding dockage fees.  The ADA took up valuable dockage which GIP rents for approximately ten thousand dollars per month. In addition, GIP was burdened with the ongoing task of ensuring the ADA was secured and that it did not harm GIP or any neighboring property.

6.     On October 27, 2005, Sulzer resorted to self-help by securing a tugboat, entering the waters surrounding GIP's dock, and removing the ADA. An action that clearly could have been done at anytime -- before or after contacting GIP.

7.     Thereafter, on November 2005, GIP commenced the herein proceeding in the Supreme Court of the State of New York, Kings County.  Subsequently, in January 2006, Sulzer removed the case to the United States District for the Eastern District of

New York ("E.D.N.Y.), asserting for counterclaims for damages and moved for summary judgment to dismiss GIP's complaint and for partial summary judgment on GIP's liability for the counterclaims.

8. On April 1, 2008, the E.D.N.Y. issued an order granting partial summary judgment in favor of Sulzer on its counterclaims and dismissing GIP's claims against Sulzer. A copy of the Order is annexed hereto as **Exhibit 3**.

9. On May 20, 2008, an inquest was held before Magistrate Judge Orenstein, and he issued a report and recommendation on March 24, 2010 ("Report"). A copy of the Report is annexed hereto as **Exhibit 4**. The District Court adopted the Report in its entirety. Thereafter, GIP filed an appeal to the United States Court of Appeals for the Second Circuit.

10. On October 7, 2011, the Second Circuit issued a mandate ("Mandate") vacating the Order. A copy of the Mandate is annexed hereto as **Exhibit 5**.

WHEREFORE, I respectfully request that Sulzer's motion for summary judgment be denied in its entirety.

John Quadrozzi, Jr.

Sworn to before me this
3rd day of April, 2012

NOTARY PUBLIC

JOSEPH N. PAYKIN
Notary Public, State of New York
No. 02PA5018218
Residing In West
Commission Expires 12/30/2013

# EXHIBIT 1

And then, along with that, we've done surveying on barges and equipment for various hull and classifications societies. He was a marine engineer and a graduate of New York Maritime College also, as was my brother. And that's what the family firm does.

He passed away in 2001. And I got reengaged in the business at that time and have been managing it and operating it since that time.

Q Did there come a time when one of the barges that was owned by the business was chartered out to CDS Marine?

A Yes. In 2000, my father chartered the barge ADA to CDS Marine in Philadelphia for, it was originally for a four-month period with the ability for the contractor or the charter as we call it in the marine field, to be extended. And they continued to extend it for several years and paid us on a regular basis.

In 2003, the checks were not forthcoming. I had been called up for the war and was away on reserve duty. My mother was managing the business at the time. When I got back, I saw they were in serious arrears and I attempted to contact them and find out what was going on with the barge.

And at that point, basically the letters and everything were returned from their firm and they went out of business and I had no way -- I didn't know how to contact them and I didn't know where the barge was, frankly. And that's

when this whole process and trying to locate it began.

Q Okay. Let's go back to the initial charter.

Do you remember the what the rate of hire was for that barge?

A I think it was like $3,100 a month at the time.

Q Okay. That's sound a bit less than what Captain Henry was talking about.

Why was it so much less?

A The barge was originally chartered to them as a deck barge in Philadelphia. And at some point in time and I'm not, I don't know when this happened because my father was running the business, they converted it to a crane barge. They put a lot of equipment on it. And that happens often.

Oftentimes people will charter a barge and they'll put extra equipment on and it says you can do that with our permission, but when you return the barge you either have to -- you can either remove all the equipment and put it back the way it was, or you can say okay, we'll leave the equipment there, or you work out a deal with us saying we made some improvements, what can we work out with the price of the barge. So, that's happened quite often that that's what a contractor does.

Q You said you weren't sure exactly when they did that.

Were you aware that it was a crane barge by the time it went missing?

# EXHIBIT 2

**03-44170-JHW** CDS Marine Construction, LLC
**Case type:** bk **Chapter:** 7 **Asset:** No **Vol:** v **Chief Judge:** Judith H. Wizmur
**Date filed:** 10/16/2003 **Date of last filing:** 07/07/2005
**Date terminated:** 07/07/2005

# History

| Doc. No. | Dates | Description |
|---|---|---|
| 1 | *Filed & Entered:* 10/16/2003<br>*Terminated:* 07/07/2005 | Voluntary Petition (Chapter 7) |
| | *Filed & Entered:* 10/17/2003<br>*Terminated:* 07/07/2005 | Receipt of Case Filing Fee |
| 2 | *Filed & Entered:* 10/17/2003<br>*Terminated:* 07/07/2005 | Document |
| 3 | *Filed & Entered:* 10/17/2003<br>*Terminated:* 07/07/2005 | Meeting of Creditors Chapter 7 No Asset |
| 4 | *Filed:* 10/19/2003<br>*Entered:* 10/20/2003<br>*Terminated:* 07/07/2005 | BNC Certificate of Mailing - Meeting of Creditors |
| 5 | *Filed & Entered:* 10/22/2003<br>*Terminated:* 07/07/2005 | Notice of Assets |
| 6 | *Filed & Entered:* 10/22/2003<br>*Terminated:* 10/30/2003 | Application for Retention |
| 7 | *Filed & Entered:* 10/24/2003<br>*Terminated:* 07/07/2005 | Notice of Appearance and Request |
| 8 | *Filed:* 10/25/2003<br>*Entered:* 10/26/2003<br>*Terminated:* 07/07/2005 | BNC Cert - Notice of Assets |
| 9 | *Filed:* 10/29/2003<br>*Entered:* 10/30/2003<br>*Terminated:* 07/07/2005 | Certification of Non Compliance |
| 10 | *Filed:* 10/30/2003<br>*Entered:* 11/03/2003<br>*Terminated:* 07/07/2005 | Order on Application to Employ |
| 11 | *Filed:* 11/13/2003<br>*Entered:* 11/14/2003<br>*Terminated:* 07/07/2005 | Notice of Appearance and Request |
| | *Filed & Entered:* 11/14/2003<br>*Terminated:* 07/07/2005 | First Meeting Minutes |
| 12 | *Filed:* 01/21/2004<br>*Entered:* 01/22/2004<br>*Terminated:* 07/07/2005 | Certification of Non Compliance |

| | | |
|---|---|---|
| 13 | *Filed & Entered:* 02/05/2004<br>*Terminated:* 02/26/2004 | Notice of Information |
| 14 | *Filed & Entered:* 02/05/2004<br>*Terminated:* 02/26/2004 | Notice of Information |
| 15 | *Filed:* 02/08/2004<br>*Entered:* 02/09/2004<br>*Terminated:* 07/07/2005 | BNC Notice of Sale or Auction or Abandonment |
| 16 | *Filed:* 02/08/2004<br>*Entered:* 02/09/2004<br>*Terminated:* 07/07/2005 | BNC Notice of Sale or Auction or Abandonment |
| 17 | *Filed & Entered:* 02/26/2004<br>*Terminated:* 07/07/2005 | Certification of No Objection |
| 18 | *Filed & Entered:* 02/26/2004<br>*Terminated:* 07/07/2005 | Certification of No Objection |
| 19 | *Filed & Entered:* 06/17/2005<br>*Terminated:* 07/07/2005 | Notice of Hearing -(Generic) |
| | *Filed & Entered:* 07/06/2005<br>*Terminated:* 07/07/2005 | Chapter 7 Trustee's Report of No Distribution |
| | *Filed & Entered:* 07/07/2005 | Close Bankruptcy Case |
| 20 | *Filed & Entered:* 07/07/2005<br>*Terminated:* 07/07/2005 | Final Decree |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/11/2012 10:38:23 | | | |
| **PACER Login:** | hh0085 | **Client Code:** | GIP |
| **Description:** | History/Documents | **Search Criteria:** | 03-44170-JHW Type: History |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

# EXHIBIT 3

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 01 2008 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
GOWANUS INDUSTRIAL PARK, INC.,

Plaintiff,

-against-

ARTHUR H.SULZER ASSOCIATES, INC.,

Defendant.
-----------------------------------------------------X

06 CV 105 (SJ)

**MEMORANDUM AND ORDER**

A P P E A R A N C E S:

PAYKIN GREENBLATT LESSER & KRIEG
185 Madison Avenue
New York, New York 10016
By: James Klatsky, Esq.
Attorneys for Plaintiffs

JAMES M. MALONEY
33 Bayview Avenue
New York, NY 10165
Attorney for Defendants

JOHNSON, Senior District Judge:

Gowanus Industrial Park, Inc. ("Plaintiff"), a corporation organized under the laws of the state of New York, brings this action against Arthur H. Sulzer, Inc. ("Defendant"), a Pennsylvania corporation, alleging that Defendant is liable for expenses incurred as a result of services rendered by the Plaintiff from August 2003 to October 2005, in connection with the storage and maintenance of a barge (the

P-049

"Barge ADA") owned by Defendant and located on the Plaintiff's property during the relevant timeframe. Defendant now moves for summary judgment dismissing the Plaintiff's claim and for partial summary judgment, with respect to the issue of liability only, as it relates to the Defendant's counterclaims against Plaintiff for allegedly withholding the Barge ADA to the Defendant's detriment. In addition, the Defendant moves for sanctions against the Plaintiff, pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"). For the reasons stated herein, the Defendant's motions for summary judgment, partial summary judgment, and for Rule 11 sanctions are hereby GRANTED.

**BACKGROUND**

The parties agree that on or about May 30, 2000, the Defendant leased the Barge ADA to CDS Marine Construction, LLC ("CDS"), pursuant to a demise charter party, at a rate of $3,100 per month. Ex. 1 to Def. Rule 56.1 Statement.[1] In April 2003, unbeknownst to the Defendant, CDS entered into a contract with the Plaintiff to repair the Plaintiff's dock and bulkhead facilities located at the Henry Street Basin. In order to carry out its work, CDS transported three barges to the work site, including the Barge ADA, which was still in the possession of CDS

[1] The terms of the charter party suggest that, while the vessel was under charter, the Barge ADA was to be staffed and maintained exclusively by CDS. In addition, the charter party appears to include no restrictions with respect to where and for what purpose CDS used the Barge ADA during the term of the lease. In fact, there is no indication that CDS was under any obligation to keep the Defendant informed as to the usage or whereabouts of the Barge ADA while the vessel was in its possession.

under the aforementioned demise charter party. Though CDS began work at the Plaintiff's facilities shortly thereafter, CDS failed to complete the job and abandoned the work site in August 2003, leaving all three barges unattended on the Plaintiff's property at the Henry Street Basin. Compl., p. 2.

Meanwhile, the Defendant commenced an action against CDS in the Eastern District of Pennsylvania in July 2003 on the grounds that, as of November 2002, the Defendant had stopped receiving monthly hire payments from CDS, as required under the demise charter party. Mem. in Supp. Def.'s Rule 56 Mot., p. 4. Specifically, the Defendant filed suit in order to recover the barge, the location of which was unknown to the Defendant at the time the action was commenced, and to recover the hire payments that should have been made by CDS between November 2002 and July 2003. Id.

On or about October 16, 2003, CDS filed for bankruptcy in the District of New Jersey and was subsequently discharged in bankruptcy in July 2004. Compl., p. 3; Mem. in Supp. Def.'s Rule 56 Mot., p. 5. Neither the Plaintiff nor the Defendant in this matter was aware that CDS had filed for bankruptcy until well after those proceedings had begun. In or about January 2004, the Plaintiff was contacted by representatives from CDS and informed that the company had filed for bankruptcy. Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 4. Plaintiff was further informed at that time that CDS intended to abandon all three barges left at the job site, including the Barge ADA. Id.

Also in January 2004, Defendant learned of the bankruptcy proceedings and that the Barge ADA was left unattended at the Plaintiff's dock. Tr. 45; Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 5. By all accounts, this was the Defendant's first indication that CDS had entered into a contract with the Plaintiff and subsequently abandoned the job prior to completing its work.

In a letter dated February 17, 2004, the Defendant informed the Plaintiff that it was the registered owner of the Barge ADA and that it was seeking to make arrangements to recover said barge from the Plaintiff's dock. Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 5. This letter constituted the first communication between the Plaintiff and the Defendant. Id.

On or about March 3, 2004, counsel for the Plaintiff responded to the February 17 letter by denying the Defendant's request to enter the Plaintiff's property to recover the barge, and noting that the Plaintiff had substantial and ongoing claims for the maintenance, repair, and storage of the Barge ADA dating back to the point at which CDS abandoned the job site. Id. at 6.

There is some dispute between the parties as to the timing and nature of their communications immediately following the Defendant's receipt of the Plaintiff's March 3 letter. However, the parties agree that, on or about May 14, 2004, Plaintiff's counsel sent another letter to the Defendant, indicating that the Plaintiff would consider the Barge ADA abandoned if Defendant did not advise the Plaintiff as to its intentions with respect to recovering the vessel and paying for the

Plaintiff's maintenance, repair, and storage of the barge. Id. The Defendant responded in a May 19, 2004 letter stating unequivocally that it was not abandoning the Barge ADA and had only failed to recover the vessel because the Plaintiff had denied Defendant's previous requests for access to the dock. Ex. 9 Def. Rule 56.1 Statement as to Countercl.

More than a year later, on or about October 27, 2005, the Defendant resorted to self-help by securing a tugboat, entering the waters surrounding the Plaintiff's dock, and recovering the Barge ADA. Mem. in Supp. Def.'s Rule 56 Mot., p. 9. The Plaintiff then filed this suit in the Supreme Court of the State of New York, after which the Defendant removed the case to this Court. Id.

**JURISDICTION AND APPLICABLE LAW**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), as the case involves complete diversity and an amount in controversy in excess of $75,000.

**STANDARD OF REVIEW**

It is well-settled that a party moving for summary judgment has the burden of establishing that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir.2003). Material facts are those that may affect the outcome of the case. See Anderson, 477 U.S. at 248. An issue of fact is considered

"genuine" when a reasonable finder of fact could render a verdict in favor of the non-moving party. Id. When considering a motion for summary judgment, the Court must view the evidence, as well as any inferences that may be drawn from such evidence, in the light most favorable to the non-moving party. See Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).

If the moving party discharges its burden of proof under Rule 56(c), the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading." Anderson, 477 U.S. at 256. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. Id. at 248.

In considering a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir.1986) (citing Anderson, 477 U.S. at 248). If the Court recognizes any material issues of fact, summary judgment is improper, and the motion must be denied. See Eastway Const. Corp. v. City of N.Y., 762 F.2d 243, 249 (2d Cir.1985).

**DISCUSSION**

*A) Motion for Summary Judgment Dismissing Plaintiff's Claims*

Although the Defendant has presented a number of arguments in support of its Motion for Summary Judgment, this Court need only address the issue of whether or not a valid demise charter party existed between Defendant and CDS in order to determine whether summary judgment is appropriate in this case. For, as noted below, the case law makes clear that where a demise charter party does indeed exist, the registered owner of the vessel in question cannot be held liable for injuries caused by the use or operation of said vessel by the charterer.

In addressing the issue of whether or not a demise charter exists in a given situation, the U.S. Supreme Court has noted that the evidence indicating that such an agreement was in place must be unmistakable, particularly where the owner is seeking to avoid *in personam* liability. See Guzman v. Pichirilo, 369 U.S. 698 (1962) (party seeking to be isolated from liability based on a demise charter has the heavy burden of proving the existence of such charter; the owner in this case was not able to do so because there was no formal charter in place). To facilitate the inquiry as to whether or not a demise charter existed under the particular facts in Guzman, the Court stated that "[t]o create a demise the owner of the vessel must completely and exclusively relinquish 'possession, command, and navigation' thereof to the demise." Guzman, at 699-700. The Court added that such an

arrangement "is therefore tantamount to, though just short of, an outright transfer of ownership." Id.

Lower courts have held that, where employees of the registered owner of a vessel continue to occupy and operate the vessel, a demise charter will not shield the owner from liability. See Walker v. Braus, 995 F.2d 77, 81 (5th Cir. 1993) ("Because the charter's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability.")

Consistent with the U.S. Supreme Court's ruling in Guzman, federal district courts have gone to great lengths to ensure that a demise charter actually existed, even where the parties' written agreement expresses an intent to create a demise charter. See Federal Barge Lines, Inc. v. SCNO Barge Lines, Inc., 711 F.2d 110, 112 (8th Cir. 1983) ("…the clear intent of the charter agreement was to create a 'demise charter' and to shift liability for the negligence of the M/V FT. PIERRE from SCNO to United…. Having found that the parties intended to create a 'demise charter' by their agreement, the district court then looked to their actions for evidence of inconsistency, and further found that 'there is no extrinsic evidence of *conduct* by the parties inconsistent with the expressed intent to create a demise.'")

The court's decision in Kerr-McGee v. Law, 479 F.2d 61 (4th Cir. 1973), provides further support for the notion that the owner's liability is limited where a valid demise charter exists. Citing a number of prior cases, including two from the

Second Circuit[2], the court noted that "...the owner of a vessel under a demise charter is liable only for unseaworthiness or negligence that pre-exists the charter" (citations omitted). Kerr-McGee, 479 F.2d at 63. The court went on to explain that:

> ...when the owner of the vessel enters into a demise charter, he surrenders all possession and control of the vessel to the charterer. Since he no longer has the right to control the use of the vessel, he is no longer charged with the duties and liabilities that arise out of its ownership. Conversely, the demise charterer "becomes subject to the duties and responsibilities of ownership." (citing Leary v. United States, 81 U.S. (14 Wall.) 607, 610, 20 L. Ed. 756 (1872)) Id.

Given the facts of the case at bar, it is abundantly clear that a demise charter did, in fact, exist between the Defendant and CDS prior to the point at which the Plaintiff contracted with CDS to repair its dock. First, it should be pointed out that the Plaintiff has never questioned the validity of the agreement between the Defendant and CDS. Hence, the Plaintiff has failed to raise any issue of material fact with respect to whether or not a valid demise charter existed between the Defendant and CDS at the time of Plaintiff's alleged injuries.

Second, the supporting documentation filed by the Defendant, including a copy of the written contract entered into by the Defendant and CDS indicate a clear intent by the parties to create a demise charter party. Ex. 1 to Def.'s Rule 56.1 Statement as to Countercl. Moreover, the subsequent actions of the parties are not inconsistent with their expressed intent to create a demise charter. The evidence

[2] See In re New York Dock Co., 61 F.2d 777 (2d Cir. 1932); In re Marine Sulphur Queen, 460 F.2d 89, 100 (2d Cir. 1972) (dictum).

suggests that, as of May 2000, the Barge ADA was in the exclusive possession of CDS. The Defendant was in no way involved in the maintenance or operation of the vessel, and was not a party to CDS's contract with the Plaintiff. Indeed, the Plaintiff seems to concede that the Defendant was not even aware of the location of the Barge until after the CDS bankruptcy proceedings were well under way. Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 5.

Third, the demise charter was never formally terminated by Defendant or CDS, as required by the contract. Ex. 1 to Rule 56.1 Statement. Therefore, despite the fact that CDS stopped making its hire payments in November 2002, thereby prompting the initiation of a lawsuit by the Defendant, the charter—and by extension, the rights and obligations arising out of the charter—was still in effect during much of the time period for which the Plaintiff now seeks compensation. In addition, even if the charter was rendered void following the close of the CDS bankruptcy proceedings in July 2005, from that point forward it was the Plaintiff who refused to allow the Defendant to remove the barge from its dock without payment. Dep. of John Quadrozzi, Jr., p. 51.

Given all of these circumstances, this Court finds that there exists no genuine issue of material fact with respect to whether or not CDS was in possession of the Barge ADA pursuant to a valid demise charter party during the timeframe in question. Hence, the Plaintiff's *in personam* claims would be cognizable solely

against CDS, in its role as charterer of the Barge ADA, and not against the Defendant.

*B) Partial Motion for Summary Judgment*

According to the pleadings currently before this Court, there appear to be no genuine issues of material fact regarding whether or not the Defendant was the registered owner of the Barge ADA. Indeed, the Plaintiff's claims against the Defendant are based in large part on its assertion that the Defendant owned the Barge and is therefore liable for the services rendered to the Barge while it was in the Plaintiff's possession. It is also undisputed that, after learning that Defendant was the registered owner of the Barge ADA sometime in early 2004, the Plaintiff refused to allow the Defendant to recover or even inspect the barge unless or until the Defendant paid the Plaintiff for the services rendered. Dep. of John Quadrozzi, Jr., pages 48-52. Particularly in light of the fact that the Plaintiff and Defendant never entered into any kind of contractual agreement, the Plaintiff has presented no legal justification for withholding the Defendant's property.

However, the extent to which the Defendant was harmed as a result of the Plaintiff's withholding of the Barge ADA involves numerous issues of fact that must be resolved in further proceedings.[3]

[3] Such proceedings will also provide an opportunity to address the Defendant's act of "self-help" in recovering the Barge ADA, and the extent to which that act should impact the damages award, if at all.

*C) Motion for Rule 11 Sanctions*

The Defendant also argues that the Plaintiff's claims in the instant case are frivolous and were filed in an effort to retaliate against the Defendant. Moreover, the Defendant argues that the Plaintiff made certain false representations to the Court in its Memorandum of Law in Opposition to Motions for Summary Judgment and For Sanctions. Hence, the Defendant has asked the Court to impose sanctions on the Plaintiff pursuant to Rule 11 of the Federal Rules of Civil Procedure ("Rule 11"). For the reasons stated below, the Court finds that, with respect to the false representations apparently made by the Plaintiff, Rule 11 sanctions are appropriate in this case.

Fed. R. Civ. P. 11(b) states that whenever a signed pleading or "other paper" is submitted to the court, an attorney certifies that:

> (1) [the paper] is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
>
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if

specifically so identified, are reasonably based on a lack of information or belief. Fed. R. Civ. P. 11(b).

It should be noted that "only conduct explicitly referred to in the instrument providing notice is sanctionable." Schlaifer Nance & Co. v. Estate of Warhol, 194 F.3d 323, 334 (2d Cir. 1999). In its motion for sanctions, the Defendant does not indicate which specific section of Rule 11 was allegedly violated by the Plaintiff. However, the Defendant's allegations suggest that the Plaintiff has run afoul of Fed. R. Civ. P. 11(b)(1), (2), and (3). In particular, the Defendant suggests that the Plaintiff 1) filed this lawsuit in an effort to retaliate against the Defendant for retrieving the Barge ADA from the Plaintiff's dock, thus presenting its claims to the court for an improper purpose, thereby violating Rule 11(b)(1); 2) filed frivolous claims, in violation of Rule 11(b)(2); and 3) made a number of false statements in its pleadings, particularly regarding the nature and content of certain correspondence between the parties prior to the commencement of these proceedings.

1) Rule 11(b)(1) – Improper Purpose

First, with respect to the Defendant's claim that the Plaintiff filed this lawsuit for an improper purpose (i.e. as a retaliatory tactic), there is nothing in the record to support such a contention. Although the Plaintiff clearly was not happy with what it characterized as the Defendant's engagement in "illegal self-help" in

Case 1:06-cv-00105-KAM-JO Document 54 Filed 04/01/08 Page 14 of 19 PageID #: 432

connection with the retrieval of the Barge ADA, it does not necessarily follow that this action was commenced in retaliation. Indeed, the prior correspondence between the parties suggests that the Plaintiff filed this suit in an earnest attempt to recover the expenses to which it believed it was entitled. Although this Court has found the Plaintiff's arguments unpersuasive, there is simply no evidence in the record that would lead the Court to believe that retaliation was the Plaintiff's motivation for filing suit.

2) Rule 11(b)(2) – Frivolous Claims

The Defendant also argues that the Plaintiff's claims for damages from the Defendant, as opposed to CDS, are frivolous, given that the parties to this lawsuit never entered into any contract whatsoever. The Plaintiff's only cognizable claims, the Defendant contends, were against CDS. The Defendant goes on to note that, despite the fact that CDS ultimately went into bankruptcy, the Plaintiff could have pursued an *in rem* action against the vessel itself, but failed to do so. Mem. in Supp. Def.'s Rule 56 Mot., p. 8. In addition, the Defendant points out that all of the Plaintiff's claims for services against Defendant were based either on events that occurred while the barge was in the custody and control of CDS, pursuant to a valid demise charter party, or after Plaintiff was made aware that the barge was owned by the Defendant, at which point the Plaintiff prevented the Defendant from

inspecting and/or recovering the barge. The Defendant argues that these facts further demonstrate the frivolous nature of the Plaintiff's lawsuit.

When determining whether or not Rule 11(b)(2) has been violated, the court must decide whether the claims or legal arguments being advanced are "so untenable as a matter of law as to necessitate sanction." Mareno v. Rowe, 910 F.2d 1043, 1047 (2d Cir. 1990). More specifically, "it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." Id. It also should be noted that, even if the court finds that a party's claims are frivolous, Rule 11(c)(2) specifically prohibits monetary sanctions for such a violation. Fed. R. Civ. P. 11(c)(2).

While the Plaintiff clearly made some strategic mistakes in its efforts to recover expenses for the services it provided in connection with the Barge ADA, such mistakes do not render the current suit frivolous, though perhaps ill-advised. Moreover, while this Court has granted the Defendant's Motion for Summary Judgment based on the fact that the Defendant had relinquished control of the Barge ADA to CDS under a valid demise charter party, it is at least arguable (though erroneous in the Court's view) that the Defendant, as the registered owner of the vessel, bears some responsibility for the costs incurred by the Plaintiff after the Defendant learned of the CDS bankruptcy, as well as the location and status of the Barge ADA. For "[a] distinction must be drawn between a position which is

'merely losing' and one which is both 'losing and sanctionable.'" Securities Industry Association v. Clarke, 898 F.2d 318, 321 (2d Cir. 1990) (reversed on other grounds). Moreover, the Second Circuit has held that "[w]hen divining the point at which an argument turns from merely losing to losing *and* sanctionable, . . .we have instructed district courts to resolve all doubts in favor of the signer" of the pleading. Rodick v. City of Schenectady, 1 F.3d 1341, 1350 (2d Cir. 1993).

The Court finds that the Plaintiff's legal arguments, while unconvincing and poorly crafted, can not be considered frivolous as that term is understood in the context of Rule 11(b)(2).

3) False Statements

Finally, and perhaps most troubling, the Defendant maintains, and the documentary evidence confirms, that the Plaintiff included false statements in its pleadings with respect to the content of the correspondence between the parties prior to the commencement of this action. Mem. of Law in Reply, p. 2-3. In particular, the Defendant points out that the Plaintiff made "several serious misstatements of fact" in its response to the Defendant's motion for summary judgment and sanctions, which could amount to a violation of Rule 11(b)(3). Id. at 2. However, the Court has identified only one of the cited statements as warranting sanctions. Specifically, the Plaintiff states that "[o]n May 19, 2004, Donna

Adelsberger responded on behalf of the defendant in a letter instructing the plaintiff to continue to hold the Barge ADA." Mem. in Opp'n to Mot. for Summ. J. and Sanctions, p. 6. However, the letter, which the Defendant filed with the Court along with its Rule 56.1 Statement as to Counterclaims, says no such thing. In fact, Ms. Adelberger's letter makes it clear that the Defendant was requesting that the Plaintiff release the vessel as soon as possible. Ex. 9 to Def.'s Rule 56.1 Statement as to Countercl. Among other things, Ms. Adelberger's letter states that she considered the barge "as good as stolen by your client." Id. She goes on to state unequivocally, "UNDER NO CIRCUMSTANCES ARE YOU TO CONSIDER THE BARGE ADA ABANDONED." Id. Finally, Ms. Adelberger informed the Plaintiff that the Defendant had "retained a local attorney in New York who will be filing the appropriate papers, not only to retrieve the barge, but also for damages for the time that [the Defendant] has been deprived of the use of his barge." Id. It is difficult to imagine language more clearly at odds with the Plaintiff's claim that Ms. Adelberger asked the Plaintiff to remain in possession of the barge.

Given these facts, the Court finds that, by making factual contentions to the Court that are completely unsupported by the evidence, the Plaintiff did indeed violate Rule 11(b)(3) and should be sanctioned accordingly. Specifically, the Court hereby directs Plaintiff's counsel to pay a fine to the Court in the amount of $1,000.00, to be paid in full within 30 days of this order. In addition, pursuant to

Rule 11(c)(1)(A), the law firm with whom Plaintiff's counsel is employed shall be held jointly responsible for the violation described above.

Finally, the Court notes that, in addition to violating Rule 11, Plaintiff's misrepresentation also runs afoul of the American Bar Association's Model Rules of Professional Conduct ("Model Rules"). In particular, counsel's conduct flies in the face of Model Rule 3.3, which states, *inter alia*, that an attorney shall not knowingly "make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Model Rule of Prof. Conduct 3.3(a)(1). This Court takes such violations quite seriously and hereby admonishes Plaintiff's counsel for what amounts to unsavory and unethical conduct in the practice of law.

**CONCLUSION**

For these reasons, the Defendant's motion for summary judgment is hereby GRANTED. The Defendant's motion for partial summary judgment with respect to its counterclaims is also GRANTED. In addition, the Defendant's Motion for Rule 11 Sanctions is GRANTED. The Court refers this matter to Magistrate Judge James Orenstein to recommend a damages award with respect to the Defendant's counterclaims, and to conduct an inquest or make any findings of fact relevant thereto.

SO ORDERED.

Dated: March 31, 2008
Brooklyn, New York

Senior U.S.D.J.

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
GOWANUS INDUSTRIAL PARK, INC.,
Plaintiff,

- against -

ARTHUR H. SULZER ASSOCIATES, INC.,
Defendant.
---------------------------------------------------------X

**REPORT AND RECOMMENDATION**

06-CV-0105 (KAM) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

Plaintiff Gowanus Industrial Park, Inc. ("Gowanus") commenced this action in New York State court in November 2005 against Defendant and Counter-Claimant Arthur H. Sulzer Associates, Incorporated ("AHS") seeking damages associated with expenses incurred in retaining AHS's barge on its property. Docket Entry ("DE") 1 (Notice of Removal and Complaint). AHS removed the case to this court, *id.*, and asserted counterclaims arising from Gowanus's refusal to return the barge upon AHS's demand. DE 3 (Answer). AHS moved for summary judgment dismissing Gowanus's claims and for partial summary judgment as to liability on its counterclaims. The Honorable Sterling Johnson, Jr., United States District Judge, granted the motion and referred the matter to me for a report and recommendation on damages. I held an inquest on May 20, 2008, and now make my report. For the reasons set forth below, I respectfully recommend that the court award AHS damages in the amount of $208,200, consisting of $93,000 in lost rental income on AHS's first counterclaim, $100,200 in lost rental income on the second counterclaim, $15,000 in repair costs on the third counterclaim, and nothing on the fourth counterclaim. I further respectfully recommend that the court deny AHS's request for punitive damages, litigation costs, and attorneys' fees.

I.      Background

AHS is the owner of the barge ADA.  In 2000, AHS leased the ADA to CDS Marine

Construction, LLC ("CDS") pursuant to a demise charter.  DE 64 (Transcript of Damages

Inquest held May 20, 2008) ("Tr."))  17.  CDS subsequently entered into a contract with

Gowanus to perform work on Gowanus's facility and, in order to perform the work, transported

three barges to the work site, including the ADA.  Tr. 85.  At some point during this time, CDS

installed a crane on the ADA.  Tr. 18.

In October 2003, CDS filed for bankruptcy and abandoned the ADA on Gowanus's

property.  DE 54 (Memorandum and Order ("M&O")) at 3.  In early 2004, AHS learned of the

CDS bankruptcy, discovered that the barge had been abandoned, and sought to recover it from

Gowanus.  Tr. 28.  Gowanus refused AHS's requests and instead informed AHS that Gowanus

had incurred substantial expense in maintaining, repairing, and storing the barge after CDS

abandoned it at the work site.  M&O at 4.  Over a year later, in late October 2005, AHS resorted

to self-help by securing a tugboat, entering the waters surrounding Gowanus's dock, and

recovering the ADA.  *Id.* at 5.

Soon thereafter, Gowanus initiated this action against AHS seeking damages for the

expense of storing and maintaining the ADA.  AHS removed the case to this court and

counterclaimed for damages caused by Gowanus's refusal to relinquish possession of the barge.

In April 2008, the court granted AHS's motion for summary judgment dismissing Gowanus's

claims against it and granted partial summary judgment on its counterclaims.  M&O at 18.

Specifically, the court found that CDS and AHS had executed a valid demise charter that

relieved AHS of liability for any injuries caused by the use or operation of the vessel by CDS,

and concluded that Gowanus had "presented no legal justification for withholding [AHS's] property[.]" *Id.* at 11.  The court referred the matter to me for a report and recommendation with respect to an appropriate damages award for AHS's counterclaims.  I held a damages inquest on May 20, 2008 to determine the extent of AHS's damages.

II.    Discussion

     A.    Compensatory Damages

Before it can properly assess the amount of damages Gowanus owes AHS on the counterclaims, the court must first decide whether AHS owns the crane that CDS installed on the ADA before abandoning the barge at the Gowanus work site, as the determination of that question will affect the value of the ADA and AHS's recovery.  *See* Tr. 18-19.  The crane, along with other tangible property, was officially abandoned by the trustee in the CDS bankruptcy proceedings.  *In re CDS Marine Constr. LLC*, case no. 03-44170 (JHW) (Bankr. D.N.J. 2003); *see also* DE 66 (AHS's Post-Inquest Memorandum ("AHS Br.")) at 4-5.  According to the unchallenged testimony of AHS's owner and manager, Arthur H. Sulzer ("Sulzer"), it is standard industry practice that equipment installed on a barge by a charterer and not removed before it is returned to the owner becomes the property of the barge owner.  Tr. 18.  Moreover, any adjustment to the price of the charter rate – based on the additional value of the added equipment or the additional expense of removing it – is negotiated between the owner and charterer.  Tr. 18, 49-50.  Because CDS abandoned all rights to the crane by failing to remove it, the crane belongs to AHS.

Gowanus has no valid competing claim to the crane.  Though Gowanus purports to have a claim against CDS that could be partially satisfied by the crane, DE 65 (Gowanus's Post-

Inquest Memorandum ("Gowanus Br.")) at 3-4, Gowanus never filed a Proof of Claim as required by 11 U.S.C. § 501 and Federal Rule of Bankruptcy Procedure 3002(a) in the CDS bankruptcy proceedings. Those proceedings concluded on July 7, 2005. *See* AHS Br. at 6 & Ex. 4 (Gowanus's Response to Request for Production of Documents). By contrast, AHS did file such a Proof of Claim in the amount of $65,777 for unpaid rent on the barge. *Id.* at 8 & Ex. 6 (Copy of AHS's Proof of Claim in CDS Bankruptcy). Accordingly, for purposes of calculating of AHS's damages, I conclude that AHS owns the crane that CDS installed on the ADA and subsequently abandoned.

1. First Counterclaim

AHS's first counterclaim seeks damages for lost rental income for a period of 311 days, from April 23, 2003 to February 27, 2004, representing the time during which the abandoned ADA remained on Gowanus's property but before AHS sought the return of the barge. Answer ¶¶ 36, 39. This claim is based on the theory that once CDS abandoned the barge on its property, Gowanus had the ability and an affirmative duty to determine the identity of the ADA's owner and inform it of the barge's location. Tr. 32. I recognize that Gowanus has asserted it affirmatively believed the barge to be the property of CDS until it was contacted by AHS, and that it therefore could not have intentionally withheld the ADA until AHS requested its return. *See* DE 44 (Gowanus's Memorandum of Law in Opposition to Motions for Summary Judgment and for Sanctions) at 5. Nevertheless, as a result of the court's grant of summary judgment on AHS's first counterclaim, it is the law of the case that Gowanus could and should have identified the barge as belonging to AHS and by failing to do so it unlawfully withheld the ADA from AHS. Accordingly, I must calculate the rental income that AHS lost during this period.

AHS seeks damages equivalent to the daily charter rate the ADA would have commanded, multiplied by the days it would have likely put the ADA in service, during this time period. To establish an estimated charter rate for the ADA, AHS presented evidence of the rates it charged for the use of another barge it owns, the Betsy, which Sulzer described as being comparable to the ADA in size and similarly equipped with a crane. *See* Tr. 23-24. The evidence provided by AHS establishes that the Betsy has previously rented for $450-$700 per day, *see* Tr. 26; DE 58 (AHS's Pre-Inquest Memorandum) ("AHS Pre-Inquest Memo.")), Ex. 5 (Copies of Invoices for Betsy Rental), and that the Betsy commanded daily rates between $500-$1,000 as of the date of the inquest. Tr. 19. AHS also presented the testimony of Captain Robert Henry ("Henry") to the effect that in 2004 and 2005, the daily rate in the New York area for the short-term hire of a barge equivalent to the ADA would be approximately $1,000. Tr. 9. Sulzer testified that during the relevant time period, the ADA would have been rented for an average of $600 a day in the Philadelphia area (where AHS would have chartered the barge, *see* AHS Br. at 11), and that he would have been able to charter the ADA for at least half of the days at issue. Tr. 44-46. I credit the testimony of AHS's witnesses and therefore conclude that AHS would have earned $600 per day for half of the days at issue. Dividing the 311 days in the period covered by the first counterclaim by two, and multiplying that quotient by a daily rate of $600 produces a damages calculation of $93,000 on the first counterclaim, and I respectfully recommend that the court award that amount.

2. Second Counterclaim

In its second counterclaim, AHS seeks damages for the 607 days between February 28, 2004, when Sulzer asserts he called Gowanus's principal, John Quadrozzi, Jr. ("Quadrozzi"), to

discuss recovering the ADA, and October 27, 2005, when AHS recovered physical possession of the barge.[1] Answer ¶ 42. I use the same method described above to calculate AHS's damages during this period, with one important limitation: AHS's acquisition of the Betsy during this period effectively mitigated the loss of the ADA.

From the date the Betsy was chartered, on January 28, 2005, any revenue AHS earned from the ADA was essentially replaced by revenue earned from the Betsy, and AHS therefore has no further cognizable damages from January 28, 2005 forward. *See* Tr. 26. To award damages for lost rental income after that point -- for the 272 days during which AHS covered its losses -- would be to award it a windfall. I therefore calculate that AHS was deprived of rental income of $600 per day for half of the 335 days during the period from February 28, 2004 (when Gowanus first refused to allow AHS to recover the ADA) until January 28, 2005 (the first day the Betsy was operational), for a total of $100,200. I respectfully recommend that the court award that amount on AHS's second counterclaim.

3. Third Counterclaim

In its third counterclaim, AHS seeks compensation for expenses related to repairing damage on the ADA that occurred while on Gowanus's property. Answer ¶ 45; AHS Pre-Inquest Memo. at 8. The testimony of Sulzer and Captain Joseph Ahlstrom ("Ahlstrom"), a professor at

[1] There is a factual dispute as to whether this telephone conversation actually took place. *See* AHS Br. at 22-23. To the extent that the February 28, 2004 date represents a close approximation of the date on which Gowanus knew or should have known of AHS's interest in repossessing the ADA -- Sulzer also testified that his attorney sent a letter to Gowanus on February 17, 2004 demanding the release of the ADA -- I rely on it for the purpose of calculating damages on the second counterclaim. In any event, if Gowanus had an affirmative duty to return the barge to AHS even before Sulzer's telephone call -- as the court's determination of liability on the first counterclaim establishes it did -- then the date on which AHS first identified itself to Gowanus as the ADA's owner is of no moment.

SUNY Maritime College and AHS's witness, established that the damage sustained by the ADA is consistent with a phenomenon known as "electrolysis," whereby electrons move through the metal of a vessel into water, especially conductive saltwater, eventually corroding the metal. *See* Tr. 36, 40, 78-81. The damage is exacerbated when a vessel is connected to the shore by metal cables, because the cables connect the earth to the vessel, effectively forming a circuit which allows the electricity in the ground to flow through the vessel. Tr. 7, 38.

Henry testified that the ADA was positioned as the outermost of three barges tied parallel to one another and to Gowanus's dock. The ADA was tied to the barge next to it with steel cables, which likely caused the electrolysis-related damage. Tr. 6, 11. Finally, AHS's witnesses explained that the damage to the ADA could have been minimized by simple protective measures including using rope rather than steel cables, Tr. 79, and installing zinc anodes, a common anti-corrosion device, on the barge. Tr. 37, 71, 80-81.[2] There were two anodes on the ADA when it was recovered, but according to Ahlstrom, there should have been between twelve and twenty to sufficiently protect the barge from corrosion. Tr. 78.

Gowanus argues that there is no way to know whether the damage occurred before the ADA was brought to its shipyard or during its time docked there. Gowanus Br. at 3, 5-6. In light of the testimony at the inquest, the argument is specious. AHS demonstrated that the barge was so damaged as to be nearly unseaworthy at the time of recovery. Specifically, Sulzer and Ahlstrom testified that the barge's seams were almost completely corroded, leaving the hull of

[2] Quadrozzi testified on behalf of Gowanus that only non-conductive rope was used to secure the ADA to the neighboring barge. Tr. 87. That testimony was at odds with Henry's account that he removed steel cables from the ADA. Based on my assessment of each witness's demeanor, I credit Henry's testimony in that regard and disbelieve Quadrozzi's.

the barge riddled with holes. Tr. 35-36. Indeed, it is possible that the only thing keeping the barge from sinking was the marine growth that had attached to the hull and blocked the holes. Tr. 35. The barge was incapable of traveling back to Philadelphia in this condition and had to be repaired in New York. Tr. 75-76. I reject as unsupportable the proposition that the barge was in such a state of disrepair before it came into Gowanus's control.

The cost to repair the ADA is established by an invoice from May Ship Repair Contracting Corporation on Staten Island. AHS Pre-Inquest Memo. Ex. 4. Sulzer testified that the items in this invoice attributable to corrosion damage are the welding, the installation of hull plates, and miscellaneous work including the removal of "skegs." Tr. 43-44. The additional expenses, including dry-docking the barge and sandblasting the hull, were part of routine maintenance and not related to any damage suffered by the ADA. Tr. 44. Sulzer estimated that approximately $15,000 or $16,000 of the invoice is attributable to the repair costs associated with corrosion. Tr. 44. The invoice supports that estimate. *See* AHS Pre-Inquest Memo. Ex. 4. I therefore respectfully recommend that the court award $15,000 to compensate AHS for the repair expenses necessitated by the damage to the ADA while it was in the care of Gowanus.

4. <u>Fourth Counterclaim</u>

In its Answer, AHS seeks damages for expenses incurred in the performance of a physical inspection of the hull of the barge. Answer ¶ 47. In its Pre-Inquest Memorandum, however, AHS appears to abandon this claim for damages, explaining that the fee paid to Ahlstrom for the inspection is being treated as a litigation cost and is therefore not an element of the counterclaim damages. AHS Pre-Inquest Memo. at 8. I therefore recommend that the court award no damages on the fourth counterclaim.

5. Total Compensatory Damages

As set forth above, I respectfully recommend that the court award AHS a total of $208,200 in compensatory damages. This amount includes $93,000 in lost rental income for the period from CDS's abandonment of the barge until AHS's demand for its return; $100,200 in lost rental income for the period from AHS's demand until its recovery of the barge (excluding the period when AHS mitigated its losses); and $15,000 in repair costs.

B. Punitive Damages

The purpose of punitive damages is not to compensate the victim, but rather to "punish the wrongdoer and deter him and others from duplicating his misconduct." *Williams v. City of New York*, 508 F.2d 356, 360 (2d Cir. 1974). Under maritime law, such damages may be available for "intentional or wanton and reckless conduct [that] amount[s] to a conscious disregard of the rights of others." *In re Horizon Cruises Litig.*, 101 F. Supp. 2d 204, 211 (S.D.N.Y. 2000) (quoting *CEH, Inc. v. F/V SEAFARER (ON 675048)*, 70 F.3d 694, 699 (1st Cir. 1995)); *see also Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. ----, 129 S. Ct. 2561, 2575 (2009).[3] Gowanus's conduct does not rise to this level. Although Gowanus was not justified in

---

[3] AHS removed this action on the basis of both maritime and diversity jurisdiction. Although the court's prior decision made explicit reference only to diversity jurisdiction, *see* M&O at 5, I conclude that the court also has maritime jurisdiction because AHS's counterclaims arose from activities that occurred on the navigable waters of the United States and bears "a significant relationship to traditional maritime activity." *E. River Steamship Corp. v. Transam. Delaval, Inc.*, 476 U.S. 858, 864 (1986). However, the precise source of the court's jurisdiction is of little significance to the question of punitive damages. If jurisdiction here were based exclusively on diversity, the substantive law of New York would apply. That law makes punitive damages available "where the wrongdoing is intentional or deliberate, has circumstances of aggravation or outrage, has a fraudulent or evil motive, or is in such conscious disregard of the rights of another that it is deemed willful and wanton." *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 321 (S.D.N.Y. 2008) (quoting *Swersky v. Dreyer & Traub*, 643 N.Y.S.2d 33, 38 (N.Y. App. Div. 1996)). Applying the latter standard would not alter my analysis.

withholding the barge, AHS has not demonstrated that Gowanus acted in a manner that evinces a conscious disregard for AHS's rights. Indeed, the court has already determined, in denying AHS's request for sanctions, that Gowanus earnestly believed that it was entitled to the expenses it attempted to recover from AHS. M&O at 14. Moreover, AHS acknowledges that a grant of its request for damages during the period covered by the first counterclaim vitiates, at least to some extent, its claim for punitive damages. AHS Br. at 12. I therefore respectfully recommend that the court decline to exercise its discretion to award punitive damages.

C. Costs And Attorneys' Fees

An award of fees and expenses in a maritime action is discretionary "upon a finding of bad faith." *Am. Nat'l Fire Ins. Co. v. Kenealy*, 72 F.3d 264, 270 (2d Cir. 1995) (citing *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 309 (2d Cir. 1987)). Such an award requires "clear evidence" that the losing party acted "for reasons of harassment or delay or for other improper purposes." *Puritan Ins. Co. v. Eagle S.S. Co.*, 779 F.2d 866, 873 (2d Cir. 1985) (citation omitted). The court has already concluded that Gowanus did not act in bad faith. M&O at 13-16 (denying AHS's request to impose sanctions on Gowanus under Federal Rule of Civil Procedure 11(b)(1) and 11(b)(2)). I therefore respectfully recommend that the court decline to award costs and attorneys' fees.

III. Recommendation

For the reasons set forth above, I respectfully recommend that the court enter judgment in favor of defendant Arthur H. Sulzer Associates, Incorporated and award it damages in the total amount of $208,200 (consisting of $93,000 in lost rental income on the first counterclaim; $100,200 in lost rental income on the second counterclaim; $15,000 in repair costs on the third

counterclaim; and nothing on the fourth counterclaim). I further respectfully recommend that the court deny the defendant's request for punitive damages, litigation costs, and attorneys' fees.

IV. Objections

Any objections to this Report and Recommendation must be filed no later than April 7, 2010. Failure to file objections within this period designating the particular issues to be reviewed waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, --- F.3d ----, 2010 WL 547526, at *7 (2d Cir. Feb. 18, 2010).

**SO ORDERED.**

Dated: Brooklyn, New York
March 24, 2010

/s/ James Orenstein
JAMES ORENSTEIN
U.S. Magistrate Judge

# EXHIBIT 5

MANDATE

10-2981-cv
Gowanus Indus. Park v. Arthur H. Sulzer Assocs.

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

## SUMMARY ORDER

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 19th day of August, two thousand eleven.

PRESENT: RALPH K. WINTER,
BARRINGTON D. PARKER,
DENNY CHIN,
Circuit Judges.

- - - - - - - - - - - - - - - - - - - -x

GOWANUS INDUSTRIAL PARK, INC.,
Plaintiff-Appellant,

-v.- 10-2981-cv

ARTHUR H. SULZER ASSOCIATES, INC.,
Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - -x

FOR PLAINTIFF-APPELLANT: JOSEPH N. PAYKIN, Hinman, Howard & Kattell, LLP, New York, New York.

FOR DEFENDANT-APPELLEE: JAMES M. MALONEY, Law Office of James M. Maloney, Port Washington, New York.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Matsumoto, J.).

MANDATE ISSUED ON 10/07/2011

Case 1:06-cv-00105-KAM-JO Document 74 Filed 10/07/11 Page 2 of 7 PageID #: 987

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **VACATED AND REMANDED.**

Plaintiff-appellant Gowanus Industrial Park, Inc. ("Gowanus") appeals from a judgment entered June 23, 2010 in the district court awarding defendant-appellee Arthur H. Sulzer Associates, Inc. ("AHS") $208,200 in damages on AHS's counterclaims. We assume the parties' familiarity with the facts, proceedings below, and issues presented on appeal.

On May 30, 2000, AHS leased a barge to CDS Marine Construction, LLC ("CDS") pursuant to a demise charter party.[1] In April 2003, CDS contracted with Gowanus to repair the latter's dock and bulkhead facilities, and brought the barge into Gowanus's waters. CDS failed to complete its repair services. In August 2003, CDS ceased operations and abandoned the barge at the work site, on Gowanus's property. In October 2003, CDS filed for bankruptcy, and was discharged in bankruptcy in July 2004.

On February 17, 2004, AHS contacted Gowanus by letter, informing Gowanus that it was the barge's actual owner and requesting the barge's return. Gowanus soon informed AHS that it would not relinquish it unless AHS reimbursed Gowanus for storage and maintenance of the barge. AHS refused. On October 27, 2005, AHS resorted to self-help and retrieved the barge from Gowanus's property.

---

[1] A "demise charter party" transfers "full possession and control" of the vessel to the charterer for the period of the contract, and the charterer is treated as the owner of the vessel for most purposes. See Thomas J. Schoenbaum, 2 Admiralty and Maritime Law § 11-1 (4th ed. 2004 & Supp. 2010).

Case 1:06-cv-00105-KAM-JO Document 74 Filed 10/07/11 Page 3 of 7 PageID #: 988

In November 2005, Gowanus sued AHS in the Supreme Court of the State of New York, Kings County, asserting a maritime lien and other claims arising from its maintenance of the abandoned barge. In January 2006, AHS removed the action to the district court below. AHS counterclaimed for damages, and moved for summary judgment to dismiss Gowanus's complaint and for partial summary judgment on Gowanus's liability for the counterclaims.

On April 1, 2008, the district court (Johnson, J.) granted AHS's motion for summary judgment and dismissed the complaint. It also granted AHS's motion for partial summary judgment with respect to Gowanus's liability on the counterclaims, and referred the matter for an inquest on damages. On March 24, 2010, Magistrate Judge Orenstein awarded AHS $208,200 in damages on its counterclaims. On June 23, 2010, the district court (Matsumoto, J.) adopted Judge Orenstein's report and recommendation in its entirety. Judgment was entered on June 28, 2010, but the judgment referred only to Judge Matsumoto's June 23, 2010 decision regarding the counterclaims. Gowanus filed a notice of appeal, referencing only Judge Matsumoto's decision. Neither the judgment nor the notice of appeal referenced the dismissal of the complaint or Judge Johnson's decision granting summary judgment dismissing the complaint.

Several procedural issues are presented. First, although Gowanus's notice of appeal cites Judge Matsumoto's June 23, 2010 order, and not the final judgment, we may treat that notice of appeal as an appeal from the final judgment, see Krause v. Bennett, 887 F.2d 362, 367 n.2 (2d Cir. 1989), and we do so.

Case 1:06-cv-00105-KAM-JO Document 74 Filed 10/07/11 Page 4 of 7 PageID #: 989

Second, although no separate final judgment, as required by Federal Rule of Civil Procedure 58(a), was ever entered dismissing Gowanus's complaint following Judge Johnson's grant of summary judgment, that failure does not defeat our jurisdiction, as it is plain that the entire action has been dismissed. Bouboulis v. Transp. Workers Union of Am., 442 F.3d 55, 60 (2d Cir. 2006) (citing Bankers Trust Co. v. Mallis, 435 U.S. 381, 385 (1978)). Third, although Gowanus makes a half-hearted attempt to challenge the dismissal of Gowanus's compensation claims for storing and maintaining the barge, devoting two sentences of its brief to this endeavor, it never filed a notice of appeal referencing the dismissal of its complaint or Judge Johnson's decision doing so. Hence, we do not have jurisdiction to review the dismissal of Gowanus's complaint. See Fed. R. App. P. 3(c)(1)(B) ("The notice of appeal must . . . designate the judgment, order or part thereof being appealed."); New Phone Co. v. City of New York, 498 F.3d 127, 130 (2d Cir. 2007) ("[O]ur jurisdiction is limited by the wording of the notice [of appeal]. . . . While we may construe the rules liberally, we do not have the authority to waive the jurisdictional requirements of this rule.").

Turning to the merits, Gowanus challenges, inter alia, the district court's finding of liability on AHS's counterclaims and its award of damages to AHS. We review a district court's findings of fact for clear error, and its conclusions of law de novo. Bessemer Trust Co., N.A. v. Branin, 618 F.3d 76, 85 (2d

Cir. 2010).  Upon our review of the record, we find it necessary
to vacate and remand.

First, the record is unclear as to the legal basis for
the determination that Gowanus was liable to AHS.  In its
counterclaims, AHS asserted only that it was "wrongfully deprived
of hire" (Answer with Countercls. ¶¶ 39, 44), and that Gowanus
"willful[ly] and unjustifiab[ly] refused" to return the barge
(id. ¶ 43).  The counterclaims did not specify the legal theory
of liability.  In its brief on appeal, AHS does little better,
writing only that its counterclaims "arise in tort as opposed to
contract."  (Appellee Br. 6).  AHS does not clearly articulate a
theory of liability, such as conversion or quasi-contract or
general maritime law.  See Harrison v. Flota Mercante
Grancolombiana, S.A., 577 F.2d 968, 977 (5th Cir. 1978) ("General
maritime law incorporates the general law of torts when not
inconsistent with the law of admiralty.").[2]  The district court
decisions likewise do not identify the legal basis for imposing
liability on Gowanus.  The district court granted AHS's motion
for partial summary judgment on liability on the counterclaims
merely because "[Gowanus] has presented no legal justification
for withholding [AHS's] property," without citation to any legal
authority.  It is difficult for us to review for error when we
are unsure of the legal basis for the imposition of liability.

---

[2]     AHS does not explain, for example, on what basis it
seeks to hold Gowanus liable for lost rental income when the
barge was in fact already rented out to CDS pursuant to a demise
charter, which, the relevant parties seem to assume, remained in
effect through the relevant time period -- another issue as to
which there is uncertainty.

Second, there is particular doubt with respect to the
district court's award to AHS of $93,000 in damages on its first
counterclaim for 311 days' lost rental income from April 23, 2003
until February 28, 2004.  This period covered the time from when
CDS brought the barge onto Gowanus's property until AHS appeared
and notified Gowanus that it, in fact, owned the barge.[3]  During
this period, Gowanus was dealing exclusively with CDS, and there
is nothing in the record to suggest that Gowanus knew that AHS
was in the picture.  The legal basis for holding Gowanus liable
to AHS for the period when Gowanus was dealing only with CDS and
was unaware of AHS's existence is not apparent to us, and neither
the district court nor AHS has provided any legal basis for the
imposition of such liability.  Nor has AHS cited any legal
authority to support the imposition of an affirmative duty upon a
party to research the ownership of a vessel when the vessel is
brought onto the party's property by another entity, when it had
no reason at the time to do so.  In other words, the district
court should have considered the legal basis for imposing
liability for the different periods of time separately.[4]

---

[3]    AHS's first counterclaim alleged that it was entitled
to damages for that 311-day period.  (Answer with Countercls.
¶¶ 36, 39).

[4]    Indeed, Judge Johnson's April 1, 2008 order granting
AHS's motion for partial summary judgment does not differentiate
among any of AHS's counterclaims before referring the case to
Judge Orenstein for a recommendation as to the extent of the
damages.  Gowanus Indus. Park v. Arthur H. Sulzer Assocs., No. 06
Civ. 105 (SJ), 2008 WL 877203, at *6 (E.D.N.Y. Apr. 1, 2008).

Case 1:06-cv-00105-KAM-JO Document 74 Filed 10/07/11 Page 7 of 7 PageID #: 992

Similarly, the district court awarded AHS $15,000 in damages for repairs to the barge on its third counterclaim, but this award apparently included damages for the full period of time in which the barge was "on Gowanus's property," Gowanus Indus. Park v. Arthur H. Sulzer Assocs., No. 06 Civ. 105 (JO), 2010 WL 2594626, at *4 (E.D.N.Y. Mar. 24, 2010), or "in its custody or care," Gowanus Indus. Park, No. 06 Civ. 105 (KAM), 2010 WL 2594311, at *4 (E.D.N.Y. June 23, 2010). It is unclear whether some of this repair work was for corrosion to the barge that developed during the 311-day period at issue in the first counterclaim, before Gowanus learned of AHS's involvement, or thereafter, and again the district court must analyze liability for the two time periods separately.

The judgment of the district court is hereby **VACATED** and the case is **REMANDED** for further proceedings not inconsistent with this order.

FOR THE COURT:

Catherine O'Hagan Wolfe, Clerk

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit